# U.S. SECURITIES AND EXCHANGE COMMISSION

Washington, D.C.  20549

# Form 10-K

**[√ ] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended.................................................December 31, 2010

OR

**[  ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from.........................to............................

Commission file number 000-25067

# PRIVATE MEDIA GROUP, INC.

(Name of Registrant as specified in its Charter)

| **Nevada** | **87-0365673** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**Calle de la Marina 16-18, Floor 18, Suite D, 08005 Barcelona, Spain**

(Address of European principal executive offices)

**34-93-620-8090**

(Issuer's telephone number, including country and area code)

**Securities registered pursuant to Section 12(b) of the Exchange Act:**

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $0.001 par value | The Nasdaq Stock Market LLC (Nasdaq Global Market) |

**Securities registered pursuant to Section 12(g) of the Exchange Act:   None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes____No √

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes____No √

Indicate by check mark whether the registrant (1)has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ___  No √

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes___ No___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [  ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated file, a non-accelerated filer, or a smaller reporting company (as defined in Rule 12b-2 of the Act).

Large Accelerated Filer____   Accelerated Filer _____   Non-accelerated filer ___   Smaller Reporting Company  √

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes  No √

At June 30, 2010, the aggregate market value of the voting stock and non-voting common equity held by non-affiliates of the registrant was $17,036,304. The aggregate market value has been computed by reference to the last sales price of the common stock on June 30, 2010.

On April 8, 2011 the registrant had 20,815,824 shares of Common Stock outstanding.

**ITEM 1.       BUSINESS**

*This Report includes forward-looking statements. Statements other than statements of historical fact included in this Report, including the statements under the headings "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business" and elsewhere in this Report regarding future events or prospects, are forward-looking statements. The words "may," "will," "expect," "anticipate," "believe," "estimate," "plan," "intend," "should" or variations of these words, as well as other statements regarding matters that are not historical fact, constitute forward-looking statements. We have based these forward-looking statements on our current view with respect to future events and financial performance. These views involve a number of risks and uncertainties which could cause actual results to differ materially from those we predict in our forward-looking statements and from our past performance. Although we believe that the estimates and projections reflected in our forward-looking statements are reasonable, they may prove incorrect, and our actual results may differ, as a result of the following uncertainties and assumptions:*

- *our business development, operating development and financial condition;*
- *our expectations of growth in demand for our products and services;*
- *the impact of competition on revenues and margins;*
- *our expansion and acquisition plans;*
- *the impact of expansion on our revenue potential, cost basis and margins;*
- *the effects of regulatory developments and legal proceedings on our business;*
- *the impact on the company and its investors from the outcome of legal proceedings discussed under Item 3 – Legal Proceedings;*
- *the impact of exchange rate fluctuations; and*
- *our ability to obtain additional financing.*

*We do not intend to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise except to the extent required by law. You should interpret all subsequent written or oral forward-looking statements attributable to us or persons acting on our behalf as being expressly qualified by the cautionary statements in this Report. As a result, you should not place undue reliance on these forward-looking statements.*

## THE COMPANY

**OVERVIEW**

Private Media Group, Inc., a US incorporated company, and its subsidiaries (together referred to hereinafter as "Private Media Group", "Private", "the Company" "we" or "us") is a leading international provider of high quality adult media content for a wide range of media platforms. Any references in this report to Milcap Media Group refers to Milcap Media Group S.L.U.(Spain), and Milcap Media Limited refers to Milcap Media Limited (Cyprus).

Private Media Group, Inc. is incorporated in the State of Nevada. In accordance with Nevada law we maintain a registered office at 3230 Flamingo Road, Suite 156, Las Vegas, Nevada. Our European headquarters are located at the offices of one of our principal operating subsidiaries, Milcap Media Group, S.L.U, whose address is Calle de la Marina 16-18, Floor 18, Suite D, 08005 Barcelona, Spain, telephone +34-93-620 80 90.

We acquire worldwide rights to still photography and motion pictures tailored to our specifications from independent producers/directors and process these images into products suitable for popular media formats such as print publications, DVDs and electronic media content for Internet, mobile and broadcasting distribution. We distribute our adult media content directly, and through a network of local affiliates and independent distributors, through multiple channels, including (1) newsstands, video rental stores, travel retail and adult bookstores, (2) mail order catalogues, (3) IPTV (Internet Protocol Television), cable, satellite and hotel television programming, (4) over the Internet via proprietary and third party websites and (5) wireless telephony. In addition to media content, we also market and distribute branded leisure and novelty products oriented to the adult entertainment lifestyle and generate

additional sales through the licensing of our *Private* trademark to third parties. In the fiscal year ended December 31, 2010, we had net sales of EUR 23.3 million and a net loss of EUR 4.3 million.

Our business was founded in 1965 and achieved initial success through our flagship publication, *Private*, the first full color, hard-core sex publication in the world. Today, we produce one X-rated periodical magazine: *Private*. As of December 31, 2010, we had compiled a digital archive of more than two million photographs and all of our 557 issues of print publications. Approximately 45,000 copies of our print publications are distributed together with DVDs each month at retail price of approximately Euro 14.50-19.50.

Since 1992, we have also acquired, processed and distributed adult motion picture entertainment. We acquire worldwide rights to motion pictures that meet our exacting standards for entertainment content and production value from independent producers/directors, either under exclusive contracts or on a freelance basis. We then process these motion pictures to ensure consistent image quality and prepare and customize them for distribution in several formats, including DVDs, broadcasting, which includes IPTV, cable, satellite and hotel television programming, and the Internet. Our proprietary motion pictures and those produced by joint ventures in which we participate have received more than 180 industry awards since 1994, evidencing our success in setting high quality standards for our industry. As of December 31, 2010, our movie library contained 1,443 titles. We expect to add more than 50 titles in 2011.

We license our content to cable & satellite television operators and IPTV platforms as well as to hotels. Through different partnerships, we have also launched two television channels, *The Private Channel* and *PrivateSpice*, which broadcast our content. Consumers pay for these products either on a video-on-demand, pay-per-view or subscription basis.

Since 1997, we have expanded our presence in emerging electronic markets such as the Internet, broadcasting and hand-held devices including both smartphones, iPods, iPads and similar devices. We believe that these technologies represent a substantial growth opportunity for us in the future.

We launched our first Internet website, *www.private.com*, in 1997. We now own a number of sites directed at specific customer bases, including www.gamelink.com and www.maleflixxx.tv. We also generate incremental sales by licensing our trademarks and proprietary adult media content for use on the websites of other companies.

On January 20, 2009 we expanded our Internet operations through the acquisition of Game Link LLC and its affiliates, companies engaged in digital distribution of adult content over the Internet and eCommerce development. GameLink is a leading US adult entertainment VOD and eCommerce platform through its GameLink.com website. The site's installed user base represents over one million domestic and international customers and it serves over100,000 users daily. Including 70,000 video titles, GameLink has the largest library of digital and physical adult media and novelties in the United States.

On October 29, 2009 we continued the ongoing expansion of our global digital media platform through the acquisition of Sureflix Digital Distribution and its affiliates, companies engaged in the business of digital distribution of premium gay adult content. Sureflix is a leading global supplier of adult programming. The company operates a vast network of more than 100 pay-per-view VOD websites and has a North American broadcast presence. It represents premium production studios in global television broadcast (cable, satellite), mobile, IPTV and Internet VOD markets. Sureflix has not only in-depth knowledge of adult programming, but also significant VOD technology and marketing expertise.

We operate in a highly regulated industry. This requires us to be socially aware and sensitive to government strictures, including laws and regulations designed to protect minors and to prohibit the distribution of obscene material. We take great care to comply with all applicable governmental laws and regulations in each jurisdiction where we conduct business. Moreover, we do not knowingly engage the services of any business or individual, including producers/directors, that does not adhere to the same standards. Since 1965, we have never been held to have violated any laws or regulations regarding obscenity or the protection of minors.

**History**

The parent company, Private Media Group, Inc., was originally incorporated in 1980 as a Utah corporation under the name Glacier Investment Company, Inc. for the purpose of acquiring or merging with an established company. In 1991, we changed our domicile to the State of Nevada. The parent company had no material business activity prior to its acquisition of Milcap Media Limited and Cine Craft Limited in June 1998.

On December 19, 1997 Private Media Group, Inc. entered into acquisition agreements with Milcap Media Limited and Cine Craft Limited to acquire all of their outstanding capital stock in exchange for 7,500,000 shares of Common Stock, 7,000,000 shares of the $4.00 Series A Preferred Stock, and 875,000 common stock purchase warrants. Private Media Group, Inc. completed these acquisitions on June 12, 1998. In connection with these acquisitions, in December 1997 the parent company changed its corporate name to Private Media Group, Inc. and declared a one for five reverse split of its Common Stock.

On January 20, 2009 we expanded our Internet operations through the acquisition of Game Link LLC and its affiliate, companies engaged in digital distribution of adult content over the Internet and eCommerce development.

On October 29, 2009 we continued the ongoing expansion of our global digital media platform through the acquisition of Sureflix Digital Distribution and its affiliates, companies engaged in the business of digital distribution of premium gay adult content.

**Our Strategy**

Our vision is to be the world's preferred content provider of adult entertainment to consumers anywhere, at any time and across all distribution platforms and devices. We have developed the strategies described below to increase sales and operating margins while maintaining the quality of our products and services and the integrity of our brand name.

*Develop strategic alliances and joint ventures with businesses outside of the adult entertainment industry to broaden our distribution channels.* We are entering into strategic alliances and joint ventures with leading media companies outside of the adult entertainment industry to distribute our adult media content for use on popular and newly developing media formats, including revenue sharing relationships with cable and satellite television operators, telecoms and Internet service providers with significant market positions. We expect these initiatives to widen the scope of our distribution network, enabling us to reach new customers while supplying our partners and licensees with content.

*To be at the forefront of the adult entertainment industry in adapting new technology and distribution channels such as wireless and IPTV[1] distribution of our content.* By actively seeking out and utilizing advanced technologies such as Internet, digital cable and satellite television, IPTV and wireless devices to distribute our content, we expect to increase revenues with minimal incremental cost.

*To be able to deliver our entire movie library, including metadata, via any new format in order to facilitate distribution and provide unparalleled service.* We have developed an extensive library of motion pictures and other pictorial content. Until recently, this library was archived on a master print, which would allow duplication in traditional media. New forms of electronic distribution provide us with an opportunity to use this content by distributing it through new forms of media, such as, Internet, IPTV broadcasting and wireless devices.

*Continue to increase and strengthen brand awareness.* We have developed strong brand awareness within each of our magazines and videos' targeted markets. We own the worldwide rights to all of our content. We seek to strengthen awareness of our brand name by consistently featuring the *Private* label prominently in our product packaging, cross-promoting our own products and distributing under the *Private* label complementary or ancillary non-media products that are consistent with an adult entertainment lifestyle.

---

[1] IPTV (Internet Protocol Television) describes a system where a digital television service is delivered to subscribing consumers using the Internet Protocol over a broadband connection.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 4 of 105

**Our Competitive Strengths**

We believe the following strengths, among others, will enable us to exploit the global market for adult entertainment:

*Recognized brand name*

We believe that our target customers associate the *Private* brand name with high quality adult entertainment products and services. This name recognition attracts leading producers of adult media content, as well as distributors and prospective joint venture partners interested in working with Private Media Group. We believe that the strength of our brand name leads to more favorable economic terms than we could otherwise obtain in our processing and distribution contracts, and enables us to negotiate favorable revenue sharing arrangements and joint ventures from which we derive significant licensing fees and royalty income. We have entered into joint venture and co-branding agreements with leading participants in our industry, including Playboy and Penthouse. We seek to strengthen awareness of our brand name by consistently featuring the *Private* label prominently in our product packaging, cross-promoting our own products and distributing under the *Private* label complementary or ancillary non-media products that are consistent with an adult entertainment lifestyle. We believe that these activities engender a loyal customer base which, in turn, enables us to grow even with relatively modest external advertising and marketing expenditures.

*Established market position and distribution network*

We have access to a well-established worldwide distribution network which has been built up over the past 40 years, including some + 100,000 points of sale in over 40 countries as of December 31, 2010. In many markets, we believe that our established presence hinders our competitors' ability to break into the market. In some cases, exclusive distribution agreements improve our market position further. This broad distribution network provides an effective channel to introduce new products and services and new formats for existing products and services. In electronic media categories, we have entered into strategic alliances with a number of leading international service providers. In addition, we have assembled an internal team of Internet specialists to maintain and improve our Internet infrastructure and electronic products and services. In January 2009, we expanded our Internet operations through the acquisition of Game Link LLC and its affiliate, companies engaged in digital distribution of adult content over the Internet and eCommerce development. On October 29, 2009 we continued the ongoing expansion of our global digital media platform through the acquisition of Sureflix Digital Distribution and its affiliates, companies engaged in the business of digital distribution of premium gay adult content. Sureflix is a leading global supplier of adult programming. We believe that our broad, multi-format distribution network affords our customers convenient access to high quality adult media content in the format of their choice.

*Extensive library of high quality adult media content*

We have an extensive library of high quality adult media content. As of December 31, 2009, our library included still photographs developed for more than 500 back-issues of magazines and 1,000 movie titles. We hold exclusive worldwide rights to this entire content archive. This has enabled us to enter into distribution arrangements with a wide range of media content platforms, including leading international telecoms and broadcasting companies. To facilitate electronic distribution of our products, we have converted our entire archive of print images into a digital format. Our video archive is now also stored in rich media digital format, which can be converted into any known file format and delivered digitally online or on hard drives. We believe that this electronic archive constitutes one of the largest libraries of high quality adult media content in the world.

*Flexible operating structure and access to capital*

We acquire adult media content from third-party producers/directors on a project basis. This approach gives us substantial flexibility in terms of production volume and delivery time, significantly reduces our fixed production overhead and largely eliminates the risk to us of cost overruns in production. Because of our multiple product and service formats and broad distribution network, we can afford to engage top directors in the industry, which we believe results in a higher quality product for our customers. Similarly, we reduce our fixed processing costs by outsourcing editing and duplication functions for most of our products, although we retain oversight of the overall

5

production process for cost and quality control purposes. As a public company with access to the capital markets we believe that we will have sufficient financial resources to increase our production and grow through acquisitions without sacrificing our high quality standards. However, we cannot guarantee that funds will be available from the capital markets when needed.

### Experienced professional management

Our management team has extensive experience in the acquisition and distribution of adult media content and in general business administration. Berth H. Milton, our Chairman of the Board and CEO, has extensive knowledge of our industry and has successfully founded and developed other profitable businesses. Other members of our management team have broad expertise in content acquisition, sales and marketing, technology and finance.

### Our Principal Products and Markets

### Internet Services

We launched our first Internet website, *private.com*, in 1997. We now own a number of sites directed at specific customer bases, including *gamelink.com* and *maleflixxx.com*. In January 2009 we expanded our Internet operations through the acquisition of Game Link LLC and its affiliate, companies engaged in digital distribution of adult content over the Internet and eCommerce development. On October 29, 2009 we continued the ongoing expansion of our global digital media platform through the acquisition of Sureflix Digital Distribution and its affiliates, companies engaged in the business of digital distribution of premium gay adult content. We also generate incremental sales by licensing our trademarks and proprietary adult media content for use on the websites of other companies.

### Video

Since 1992, we have acquired and distributed adult motion picture entertainment. These productions generally feature men and women in a variety of erotic and sexual situations, in hardcore and softcore versions. We maintain the ownership and copyrights of every movie we acquire. As of December 31, 2010, our movie library contained 1,443 movie titles. We expect to release more than 50 movie titles in 2011, with distribution through our worldwide network. These products are sold by both traditional and technologically advanced distributors, and wholesalers worldwide. Distributors include national video store and newsstand distribution networks, Internet, IPTV, cable, satellite, mobile telephone networks and hotel television operators.

### Wireless - Mobile Entertainment

We launched our mobile content program in 2003. We generate revenues from wireless deals both on- and off-portal and our current principal market is Europe. Our product offering consist of rich-media mobile downloads including; MMS, wallpapers, screensavers, video clips and video streaming.

### Magazine Publications

We are the publisher of *Private*, an international X-rated magazine. *Private* was founded in 1965, and was the first full color, hardcore sex publication in the world. We distribute the magazine through newsstands and other retail outlets.

**INTERNET SERVICES**

Private Media Group's Internet team has combined its extensive media library with the most advanced technology to take advantage of the growth of Internet access and new distribution methods. The Company's online offering centers around three core concepts: pay-site platforms, e-commerce platforms, and mobile platforms. Through a combination of acquisitions and custom software development efforts, during 2009 and 2010, the Company has been able to significantly improve and expand its online infrastructure.

**Pay-site platforms**

*Private.com (www.private.com)* is a membership site which offers access to high-quality adult content that includes full-length Private movies, video clips, photosets, a library of all Private magazines ever published in image and downloadable PDF format.

In May 2010 we launched our new membership platform, which manages and optimizes traffic across a large network of membership pay-sites. The first properties to leverage the new offering are the company's flagship membership site, www.private.com and affiliate program www.privatecash.com. The two sites have been completely overhauled following extensive feedback from the affiliate community to maximize conversion, retention and traffic. With the launch of the membership pay-site platform, the Company now offers the most comprehensive Internet marketing, sales and distribution solution in the adult market, fueled by a traffic network that the company has developed over the past year. Managed by the Company's team of experts and industry veterans, the membership platform offers daily updates of content and a content delivery system that is optimized for traffic conversion. In addition, the new platform has been built to be substantially less labor intensive to operate compared to the previous one. During the second half of 2010 the new membership pay-site attracted 73% more unique visitors compared to the previous one in the same period in 2009.

The Company has also opened the membership pay-site to all major adult studios who are looking for an externally managed solution to maximize their online sales. The platform can be branded to each studio's graphic requirements to ensure the end consumer has a true experience of the studio's brand positioning. The platforms flexibility ensures that websites can be created quickly, at low cost and are immediately integrated into the affiliate industry standard NATS system via Private's affiliate program. As more studios join Private's network of sites the platform will become a one-stop shop with a variety of high quality content, creating more opportunities to up-sell the content to affiliate driven traffic and ensuring greater conversion.

**e-Commerce platforms**

*GameLink.com.* On January 20, 2009 we expanded our Internet operations through the acquisition of the company Game Link LLC and its affiliates, companies engaged in digital distribution of adult content over the Internet and eCommerce development. GameLink is a leading US adult entertainment VOD and eCommerce platform through its GameLink.com website. The site's installed user base represents over one million domestic and international customers and it serves over 100,000 users daily. Including 70,000 video titles, GameLink has the largest library of digital and physical adult media and novelties in the United States. GameLink offers VOD in multiple media formats including streaming and downloads to computers and mobile phones. GameLink's infrastructure is the most robust in the industry and is highly flexible, customizable and scalable designed to support multiple retail strategies and products simultaneously. Additionally, through its related company, GameLink offers third-party and white-label ecommerce solutions and development.

*Maleflixxx.com.* On October 29, 2009 we continued the ongoing expansion of our global digital media platform through the acquisition of Sureflix Digital Distribution and its affiliates, companies engaged in the business of digital distribution of premium gay adult content. Sureflix is a leading global supplier of adult programming. The company operates a vast network of more than 100 pay-per-view VOD websites. It represents premium production studios. Sureflix has not only in-depth knowledge of adult programming, but also significant VOD technology and marketing expertise.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 7 of 105

*Private VOD (www.privatevod.com)* is an eCommerce site which offers a catalogue of proprietary and third party content in multiple media formats including streaming and downloads. The site is based on GameLink's outstanding technology for eCommerce sites.

### Online Mobile platforms

In April 2010, GameLink, launched a proprietary mobile solution enabling users to instantly stream over 15,000 movies. The mobile Internet platform is accessible via www.gamelink.com and it is an extension of GameLink's leading Video-on-Demand e-commerce platform, which allows consumers to purchase and consume content instantly. All content is available for future viewing in the customer's virtual media center, stored in the Company's "Cloud". The platform has initially been optimized to work with Apple devices including the iPhone, iPod, the iPad as well as Android devices. In addition to streaming, consumers can choose to download their movies or purchase DVDs and novelties from the globally accessible platform. A white label[2] version of the mobile platform is available and will be marketed to adult studios and affiliates worldwide.

In August 2010, Sureflix Digital Distribution launched a new mobile VOD platform for its Maleflixxx network of sites. The new mobile platform, Maleflixxx Mobile, allows consumers to view gay content on all mobile devices, including the iPad, iPod Touch, iPhone and Android handsets. The platform is accessible via www.maleflixxx.tv and from Maleflixxx's network of hundreds of white label websites, which includes Private's gay content brand Man-Size at www.man-size.tv. Sureflix's proprietary technology detects which devices are being used to access the site and delivers the interface for a particular device. Users can access their account from any device, experiencing the same functionality. The platform's easy-to-navigate interface allows users to instantly browse content by category, theme and studio. Broadcasting in video quality, equal to a high speed Internet connection, more than 44,000 scenes from over 200 studios are available. The platform is localized in seven languages: English, French, Spanish, German, Portuguese, Italian and Japanese. A white label version of the mobile platform is also available and will be marketed to studios and affiliates worldwide.

In contrast to Private's other mobile content business, which is based on an on-portal model going through content aggregators and carriers, the new online mobile platforms are off-portal and provides substantially improved margins as content is sold directly by the Company to the consumer.

## VIDEO

### Production

In 1992, we began releasing movies under the *Private* label. As a result of technology advances during recent years, we currently spend on average approximately $50,000 per acquired movie. This amount includes post-production, master production and language customization. Generally, we create and design all artwork for promotional items and packaging and contracts for printing services. With respect to DVDs they are duplicated by independent laboratories.

We do not produce movies ourselves, we acquire our content from independent producers that are carefully selected for being the best in their genre on each particular time and are subject to strict quality controls. All producers assume production costs, obligations and legal responsibilities, including among other things, the delivery of rights, model releases and all production and performers related paperwork. The free lance producers deliver the movies on digital masters to us. Digital masters are customized, dubbed, sub-titled, duplicated by third parties and sent to different distributors and duplication centers. All marketing material and artwork for video covers is created in-house.

As of December 31, 2010, our movie library contained 1,443 movie titles. During 2011, we expect the total to increase by more than 50 titles. Almost all titles are available on any available format. We presently market our content in over 40 countries.

---

[2] A white label product or service is a product or service produced by one company (the producer) that other companies (the marketers) rebrand to make it appear as if they made it.

**MOVIE LIBRARY**

| Title | As of December 31, 2010 N° of titles | 2009 N° of Titles |
|---|---|---|
| Amanda's Private Diary | 5 | 5 |
| Best - End of Year | 12 | 12 |
| Best of by Private | 137 | 114 |
| Bukkakke | 7 | 7 |
| Cum on my face | 7 | 7 |
| Phantom Seducer | 2 | 2 |
| Gaia | 6 | 6 |
| Horny Housewives | 9 | 9 |
| Ionie Luvecoxxx | 20 | 20 |
| Mansize | 14 | 13 |
| Peepshow Special | 12 | 12 |
| Pirate Fetish Machine | 32 | 32 |
| Pirate Video | 12 | 12 |
| Pirate Video de Luxe | 16 | 16 |
| Private Auditions | 10 | 10 |
| Private Black Label | 56 | 56 |
| Private Blockbuster | 5 | 4 |
| Private Bluebird | 18 | - |
| Private Castings | 53 | 53 |
| Private Fetish | 4 | 4 |
| Private Films | 28 | 28 |
| Private Gold | 111 | 106 |
| Private Independent | 2 | 1 |
| Private Interactive | 1 | 1 |
| Private Lesbian | 10 | 9 |
| Private Lust Treasures | 9 | 9 |
| Private Man | 14 | 14 |
| Private Man – Stars | 12 | 12 |
| Private Movies | 51 | 48 |
| Private Porn Vacation | 3 | 3 |
| Private Presents | 2 | - |
| Private Reality Video | 26 | 26 |
| Private Specials | 49 | 29 |
| Private Sports | 12 | 12 |
| Private Stories | 27 | 27 |
| Private Superf*ckers | 12 | 12 |
| Private Exotic | 4 | 4 |
| Private Tropical | 42 | 42 |
| Private Video Magazine | 26 | 26 |
| Private X-Treme | 45 | 44 |
| Private XXX | 39 | 39 |
| Private-Ninn | 4 | 4 |
| Private-Penthouse Movies | 12 | 12 |
| The Best of the Year | 14 | 13 |
| The Matador Series | 15 | 15 |
| The Private Adventures of Pierre Woodman | 10 | 10 |
| The Private Life of... | 77 | 66 |

| MOVIE LIBRARY | As of December 31, | |
| | **2010** | **2009** |
| **Title** | **N° of titles** | **N° of Titles** |
|---|---|---|
| The Private Story of… | 9 | 9 |
| Triple X Files | 12 | 12 |
| Triple X Video | 32 | 32 |
| Virtualia | 6 | 6 |
| When Pornstars Play | 6 | 6 |
| Erotica (soft titles) | 284 | 283 |
| **Total** | **1,443** | **1,354** |

### Distribution

We distribute our productions worldwide via digital files and digital masters. We license our movies to IPTV, cable and satellite television networks and adult pay-per-view television channels. These licenses generally grant the operator a specific right of transmission and we retain the intellectual property rights of every production. We edit many of our new feature movie releases into several versions depending on the media through which they are to be distributed. Versions edited for cable, satellite and hotel television programming may be less sexually explicit than the versions edited for home video distribution. DVDs are sold or rented in video stores, sex shops, newsstands and other retail outlets, and where permitted, through direct mail.

### Broadcasting

*TV-Channels*

Since launching our broadcasting business in 2000, we have rapidly expanded in Europe and Latin America. The broadcasting business was launched through an exclusive joint venture agreement with International Film Productions and Distributions, Ltd., ("IFPD"). IFPD was a European-based television broadcasting company associated with major content providers that specialized in the distribution of adult cable and satellite television channels. Under the joint venture agreement, IFPD was responsible for promoting and broadcasting two channels, namely Private Gold (hardcore) and Private Blue (soft core), globally. In 2003 the joint venture was dissolved and the Company acquired the channel names Private Gold and Private Blue, but continued licensing them to affiliated companies of IFPD under a two-year agreement with a minimum guarantee. The license was worldwide excluding North and Latin America and expired in 2005.

The Private Gold channel was originally launched in Europe under an exclusive joint venture agreement with IFPD. As mentioned above, the Company later acquired the channel name and continued licensing it to an affiliate company of IFPD for a fixed fee. By the end of 2005, Private Gold had become the leading Adult Pay-TV channel in Europe and was distributed via satellite and cable in 25 countries in the region. In November 2005 the agreement with IFPD expired and the Company and Playboy TV International signed a five-year agreement to merge their two adult pay-TV channels, Private Gold and Spice Platinum, and thereby consolidating their market leadership in Europe. The new channel was launched under the name of Private Spice and under the terms of the agreement, Playboy TV International is operating, distributing and marketing the new channel and Private provides content, brand and marketing support. Prior to the merging of the two channels, Spice Platinum had rapidly become one of Europe's most sought after and fastest growing premium adult networks reaching over 15 countries. In May 2006, the Private Spice Channel was launched in Europe and the new channel makes available unique and proprietary quality content, offering flexible language tailoring and market localization and platforms are able to offer their viewers a unique channel developed and serviced by the world's leading adult television brands, while ensuring professional reliability and continuity. In 2010, the Private Spice agreement with Playboy was renewed for another five years. The channel is receivable in all of Europe and it currently has distribution in 22 countries via 101 cable, satellite, DTT and IPTV platforms.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 10 of 105

The Private Gold channel was also launched in Latin America in 2001, via the joint venture agreement with IFPD and under a distribution agreement with Pramer S.C.A. The agreement was terminated in 2005 and in May the same year, the Company partnered with Playboy TV Latin America, by signing an exclusive agreement to operate and distribute the Private branded channel throughout Latin America. Under the terms of the agreement, Playboy TV Latin America is operating and distributing the channel via its Pay TV distribution network. In 2009, the channel was re-branded to the Private Channel. The channel is receivable in all of Latin America and it currently has distribution in 19 countries via 63 cable, satellite and IPTV platforms and reaches 38 million subscribers to these platforms.

*IPTV driven Video-on-Demand*

While European broadband users are signing up for IPTV services in the hundreds of thousands each month, making Europe the biggest and fastest growing IPTV region in the world, we have successfully implemented part of our new media strategy and contracted for supplying content for TVOD[3] services to a total of 26 major platform operators in 18 countries in the region. During 2010 the European IPTV market grew by 25% to 20.7 million IPTV subscribers and by the end of the year we had more than 75% market coverage. France remains the "world champion" IPTV country with 10.3 million subscribers and we cover 100% of this market.

*General Licensing*

In Europe we license our content to channel operators. Typically we contract for a certain time period for a) a set quantity of specific titles, or b) access to our entire library for a limited quantity of unspecified titles. The operators distribute via Digital Terrestrial Television (DTT) and Cable & Satellite and are spread across Europe and include companies such as: Sky Italy and Canal+.

*In-Room Entertainment*

The Company also licenses the right to use its content to In-Room Entertainment operators.

**DVDs**

We have entered into distribution agreements in Europe, North America and Australia. Under these distribution agreements we provide our back catalogue of titles and all our new titles each month during the term of the agreement, and a licensee normally serves as the exclusive distributor throughout its own country or language territory. In general, we believe that national distribution agreements enable us to have an ongoing branded presence in international markets and to generate higher and more consistent revenues, than we could achieve selling directly to retailers.

**WIRELESS – MOBILE CONTENT**

We generate revenues from wireless deals both on and off portal. Our ability to effectively use and re-use our content creates a high-margin business model for wireless since distribution costs are almost non-existent. The market currently consist of SMS, games and rich-media mobile downloads including; MMS, wallpapers, screensavers, video clips and video streaming. During 2010, the distribution of Private content continued to increase and by the end of the year it was available to 1.5 billion handsets via 114 mobile network operators in 37 countries. The markets of Asia and the Americas are still underexploited by us and therefore represent a significant growth potential. Furthermore, Mobile TV, increased penetration of Smart Phones and the implementation of age verification systems offer additional growth potential with both current and future operators in 2011 and beyond[4].

---

[3] True Video On Demand - (TVOD) - TVOD is the ideal VOD service where individual users get immediate responses when interacting with the VOD system. With TVOD, the user can not only get instant access to the program online and watch it on TV, but also be able to do any VCR or DVD-like commands on the VOD system with the same quick response time as it is when working a VCR or DVD.

[4] Juniper Research estimates in its 2010 study 'Mobile Adult Strategies: Downloads, Video Chat, Apps & Messaging 2010-2015.' that global revenues from all mobile adult services will rise from $1.7 billion in 2009 to $2.8 billion by 2015.

**MAGAZINE PUBLICATIONS**

Our publishing operations include the publication of the adult magazines identified in the table below. All of these magazines are distributed Europe, North America and Australia. Our magazines feature pictures of men and women engaged in erotic and sexually explicit situations. During 2010 we distributed approximately 45,000 copies of our print publications, packaged together with our DVDs, per month at an average retail price of approximately (Euro) 14.50-19.50. Our current publication is *Private*.

| MAGAZINE LIBRARY | As of December 31, | |
| --- | --- | --- |
| | **2010** | **2009** |
| **Title** | **Nº of Issues** | **Nº of Issues** |
| Private ........................................................................ | 222 | 216 |
| Pirate .......................................................................... | 111 | 111 |
| Triple-X ...................................................................... | 85 | 85 |
| Private Sex ................................................................. | 85 | 81 |
| Private Man ................................................................ | 4 | 4 |
| Mansize ...................................................................... | 4 | 4 |
| Special Editions ......................................................... | 30 | 30 |
| Best of Private (Book) ............................................... | 15 | 15 |
| Special Editions (Book) ............................................. | 1 | 1 |
| **Total** | **557** | **547** |

| | **Quantities of Magazines Produced (Printed, not sold)** | |
| --- | --- | --- |
| **Title** | **2010** | **2009** |
| Private ........................................................................ | 148,413 | 211,931 |
| Pirate .......................................................................... | - | 93,913 |
| Triple-X ...................................................................... | - | 72,948 |
| Private Sex ................................................................. | 61,254 | 114,467 |
| Special Editions ......................................................... | - | - |
| **Total** | **209,667** | **493,259** |

**Circulation**

Our magazines are distributed to newsstands and other public retail outlets through a network of national distributors, who maintain a local network of wholesale and retail distributors. Newsstand retail sales are permitted in most of Europe and we distribute our magazines to newsstands in: Norway, Sweden, Finland, Denmark, the Netherlands, Germany, Austria, Switzerland, Belgium, France, Italy, Portugal and Spain. Independent distributors who distribute our magazines do so under individual firm sales distribution agreements. Agreements with both national and independent distributors are normally subject to automatic yearly extensions unless either party terminates the arrangement.

**Production, Distribution and Fulfillment**

We print and ship all of our proprietary magazines from Barcelona, Spain. We determine the amount of printed publications bi-monthly with input from each of our national distributors. Most of our products are packaged and delivered directly by the printer or supplier.

## PROPRIETARY RIGHTS

### General

We believe that our branded video and magazine titles and logos are valuable assets and are vital to the success and future growth of our businesses. We have filed trademark registration applications with respect to most of our trade names and logos. We believe that the name recognition and image that we have developed in each of our markets significantly enhance customer response to our sales promotions. We intend to aggressively defend our trademarks throughout the world, and we constantly monitor the marketplace for counterfeit products. We initiate legal proceedings from time to time to prevent unauthorized use of our trademarks.

### Piracy Problems

Our content is constantly being pirated on the Internet. We have an internal program for challenging websites who publish our content without permission. The program includes subscribing to different legal programs and services concerned with Internet piracy.

Our legal counsel handles most piracy problems and attempts to resolve these matters or litigate them on a case-by-case basis.

## COMPETITION

### General Considerations

Our products compete with other products and services that utilize leisure time or disposable income of adult consumers. The adult internet industry is highly competitive and highly fragmented given the relatively low barriers to entry. We have few long-term or exclusive service agreements with our customers. Business generation is based primarily on customer satisfaction with key factors in a purchase decision, including reliability, timeliness, quality and price. We believe that our extensive and longstanding international operations, our brand name, image and reputation, as well as the quality of our content and our distributors, provide a significant competitive advantage over many of our competitors.

Our primary competitors in the movie industry are adult motion picture studios, with in-house production and post-production capabilities. These include U.S. producers such as Hustler, Vivid Film, Wicked Pictures and Evil Angel Productions. Some competitors are smaller, but locally or regionally they are capable of quickly identifying niche markets that could compete for our customers.

Although we believe our products are well-established in the adult entertainment industry, we compete with entities selling adult oriented products via any type of distribution network, including the Internet. Many of these products are similar to ours. Over the past few years, the adult entertainment industry has undergone significant change. Traditional producers of softcore content as well as mainstream providers of media content have shifted to producing hardcore content. As a result, we face greater competition to distribute hardcore content. This shift has also led to industry consolidation, creating fewer, more financially formidable competitors. Recently, the introduction of a large number of free content Internet sites that allow users to access large libraries of content has created an even more challenging environment where both sales volume and margins are decreasing substantially.

### Internet

The Internet market for adult oriented content has expanded dramatically over the past years. Because it costs as little as $5,000 to establish an Internet presence, there is significant competition among distributors of adult media content over the Internet. There are numerous adult media content websites competing with ours, some of which are operated by companies that possess global distribution, broadcasting and branding. Historically pay sites have contained most of the adult media content on the Internet, but recently "tube" sites, offering free content, have become a serious threat to both the Internet and DVD distribution of adult entertainment.

### Broadcasting

The distribution of adult movies on cable and satellite television systems and hotel pay-per-view systems is highly competitive. Competition in this area is increasing in line with increasing consumer demand for hardcore adult entertainment generally. Our strongest geographical market position for cable and television and distribution is in Europe and Latin America, with the channels, *Private Spice* and *The Private Channel*, and licensing arrangements with established European television networks, such as Canal+ and SKY Italy, and IPTV platforms operated by international telcos.

### DVDs

The distribution of adult entertainment DVDs is a highly competitive business. Revenue generation for motion picture entertainment products depends, in part, upon general economic conditions, but the competitive position of a producer or distributor is still greatly affected by the quality of, and public response to, the entertainment product it makes available to the marketplace. Competition arises from established adult video producers and from independent companies distributing low-quality material. The introduction of a large number of free content Internet sites that allow users to access large libraries of content has created an even more challenging environment where both sales volume and margins are decreasing substantially.

### Magazines

We meet with minimal direct competition from other publishers of hardcore adult magazines and paperback books. We believe that our print publications are dissimilar to other adult publications in style and format. The only similar business of which we are aware was represented by Rodox N.V., a Dutch/ Danish corporation, which has discontinued its publishing operation. We do not believe there is presently any significant competition in this segment of our business. Magazines such as Playboy and Penthouse and similar print publications do not compete directly with our publications, since we consider them to be softcore publications. There are several hardcore publications in each country where our magazines are sold. In general, these are printed in limited editions and are of lower quality than our publications.

## EMPLOYEES

As of December 31, 2008, 2009 and 2010 we employed 97, 168 and 112 people. The 2008, 2009 and 2010 numbers include 12, 12 and 3 part time employees, respectively. The 2009 and 2010 number of people includes the addition of 84 and 56 full time employees, respectively, as a result of the acquisitions of GameLink and Sureflix. Our employees in Spain are represented by two labor unions and we have never experienced a work stoppage. We believe that we have a good relationship with our employees.

## GOVERNMENT REGULATION

We operate in a highly regulated industry. This requires us to be socially aware and sensitive to government strictures, including laws and regulations designed to protect minors or which prohibit the distribution of obscene material. We take great care to comply with all applicable governmental laws and regulations in each jurisdiction where we conduct business. Moreover, we do not knowingly engage the services of any business or individual, including producers/directors, that does not adhere to the same standards. Since 1965, we have never been held to have violated any laws or regulations regarding obscenity or the protection of minors.

### Regulation of the Adult Entertainment Industry in the U.S.

The following is a description of some of the laws and regulations in the United States which impact the adult entertainment industry. It is not an exhaustive description of all such laws. Moreover, we conduct business in over 40 countries around the world, each of which has its own regulatory framework. This regulatory environment is constantly changing in the geographical areas in which we conduct business, and in some instances laws which are enacted are subsequently determined by the courts to be unconstitutional.

The Classification and Rating Administration of the Motion Picture Association of America, MPAA, a motion picture industry trade association, assigns ratings for age group suitability for theatrical and home video distribution of motion pictures. Submission of a motion picture to the MPAA for rating is voluntary, and we do not submit our motion pictures to the MPAA for review. However, with the exception of several titles which have been re-edited for cable television, most of the movies distributed by us, if so rated, would most likely fall into the NC-17 - No Children Under 17 Admitted rating category because of their depiction of nudity and sexually explicit content.

The right to distribute adult videocassettes, magazines and DVD products in the United States is protected by the First and Fourteenth Amendments to the United States Constitution, which prohibits Congress or the several States from passing any law abridging the freedom of speech.

The First and Fourteenth Amendments, however, do not protect the dissemination of obscene material, and several states and communities in which our products are distributed have enacted laws regulating the distribution of obscene material, with some offenses designated as misdemeanors and others as felonies, depending on numerous factors. The consequences for violating these state statutes are as varied as the number of states enacting them. Similarly, specific U.S. federal regulations prohibit the dissemination of obscene material. The potential penalties for individuals (including directors, officers and employees) violating the Federal obscenity laws include fines, community service, probation, forfeiture of assets and incarceration. The range of possible sentences requires calculations under the Federal Sentencing Guidelines, and the amount of the fine and the length of the period of the incarceration under those guidelines are calculated based upon the retail value of the unprotected materials. Also taken into account in determining the amount of the fine, length of incarceration or other possible penalty are whether the person accepts responsibility for his or her actions, whether the person was a minimal or minor participant in the criminal activity, whether the person was an organizer, leader, manager or supervisor, whether multiple counts were involved, whether the person provided substantial assistance to the government, and whether the person has a prior criminal history. In addition Federal law provides for the forfeiture of: (1) any obscene material produced, transported, mailed, shipped or received in violation of the obscenity laws; (2) any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and (3) any property, real or personal, used or intended to be used to commit or to promote the commission of such offense, if the court in its discretion so determines, taking into consideration the nature, scope and proportionality of the use of the property in the offense.

With respect to the realm of potential penalties facing an organization such as ours, the forfeiture provisions detailed above apply to corporate assets falling under the statute. In addition, a fine may be imposed, the amount of which is tied to the pecuniary gain to the organization from the offense or determined by a fine table tied to the severity of the offense. Also factored into determining the amount of the fine are the number of individuals in the organization and whether an individual with substantial authority participated in, condoned, or was willfully ignorant of the offense; whether the organization had an effective program to prevent and detect violations of the law; and whether the organization cooperated in the investigation and accepted responsibility for its criminal conduct. In addition, the organization may be subject to a term of probation of up to five years.

Federal and state obscenity laws define the legality or illegality of materials by reference to the U.S. Supreme Court's three-prong test set forth in *Miller v. California*, 413 U.S. 1593 (1973). This test is used to evaluate whether materials are obscene and therefore subject to regulation. *Miller* provides that the following must be considered: (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value. The Supreme Court has clarified the *Miller* test in recent years, advising that the prurient interest prong and patent offensiveness prong must be measured against the standards of an average person, applying contemporary community standards, while the value prong of the test is to be judged according to a reasonable person standard.

We are engaged in the wholesale distribution of our products to U.S. wholesalers and/or retailers. We have taken steps to ensure compliance with all Federal, State and local regulations regulating the content of motion pictures and print products, by staying abreast of all legal developments in the areas in which motion pictures and print products are distributed and by specifically avoiding distribution of motion pictures and print products in areas where the local standards clearly or potentially prohibit these products. In light of our efforts to review, regulate and restrict

the distribution of our materials, we believe that the distribution of our products does not violate any statutes or regulations.

Many of the communities in the areas in which we offer or intend to offer products or franchises, have enacted zoning ordinances restricting the retail sale of adult entertainment products. We supply products only in locations where the retail sale of adult entertainment products is permitted.

In February 1996, the U.S. Congress passed the Telecommunications Act. Some provisions of the Telecommunications Act are directed exclusively at cable programming in general and adult cable programming in particular. In some cable systems, audio or momentary bits of video of premium or pay-per-view channels may accidentally become available to non-subscribing cable customers. This is called bleeding. The practical effect of Section 505 of the Telecommunications Act is to require many existing cable systems to employ additional blocking technology in every household in every cable system that offers adult programming, whether or not customers request it or need it, to prevent any possibility of bleeding, or to restrict the period during which the programming is transmitted from 10:00 p.m. to 6:00 a.m. Penalties for violation of the Telecommunications Act are significant and include fines and imprisonment. Surveying of cable operators and initial results indicate that most will choose to comply with Section 505 by restricting the hours of transmission. We believe that our revenues will be marginally adversely affected as a result of enforcement of Section 505. However, as digital technology (which is unaffected by Section 505) becomes more available, we believe that ultimately the impact will be insignificant.

As discussed above, federal and state government officials have targeted sin industries, such as tobacco, alcohol, and adult entertainment for special tax treatment and legislation. In 1996, U.S. Congress passed the Communications Decency Act of 1996, or the CDA. Recently, the U.S. Supreme Court, in ACLU v. Reno, held certain substantive provisions of the CDA unconstitutional. Businesses in the adult entertainment and programming industries expended millions of dollars in legal and other fees in overturning the CDA. Investors should understand that the adult entertainment industry may continue to be a target for legislation. In the event we must defend ourselves and/or join with other companies in the adult programming business to protect our rights, we may incur significant expenses that could have a material adverse effect on our business and operating results.

*Child Pornography and Non-Mainstream Content*

We believe that roughly 90% of the adult material produced and distributed over the past 15 years contains mainstream sexual acts between consenting adults. The rest could be classified as specialty material which does not contain explicit sex, but which still involves consenting adults (i.e. fetish, bondage, etc.). Mainstream sex acts means intercourse, oral sex, anal sex, group sex, etc. Our adult movies do not contain any depictions, let alone actual performances of rape, sex with coercion, animals, urination, defecation, violence, incest or child pornography.

Since 1990, the Free Speech Coalition has worked with the U.S. government to create a workable regulatory system designated to prevent minors from working in the adult industry. Child Protection Restoration and Penalties Enhancement Act of 1990 (18 U.S.C. section 2257) requires, in essence, that no one can work without having copies of their passport or driver's license, and a declaration under perjury of their age and true name, on file with a designated Custodian of Records, and available for inspection by law enforcement.

As indicated above, all of our products are all in compliance with 18 U.S.C. Section 2257 and all models performing in our productions are 18 years of age or older. We specifically require compliance from the third-party producers/directors to which we acquire our contents.

**Internet Regulation**

Government regulation of the Internet is a rapidly developing area and, therefore, adds additional uncertainty to our business. New laws or regulations relating to the Internet, or more aggressive application of existing laws, could decrease the growth of our websites, prevent us from making our content available in various jurisdictions or otherwise have a material adverse effect on our business, financial condition and operating results. These new laws or regulations could relate to liability for information retrieved from or transmitted over the Internet, taxation, user privacy and other matters relating to our products and services. For example, the U.S. government has recently

enacted laws regarding website privacy, copyrights and taxation. Moreover, the application to the Internet of other existing laws governing issues such as intellectual property ownership and infringement, pornography, obscenity, libel, employment and personal privacy is uncertain and developing.

*Regulation of the Internet outside the United States*

We may also be subject to claims based upon the content that is available on our websites through links to other sites and in jurisdictions that we have not previously distributed content in. For example, a recent French ruling banning the sale of Nazi memorabilia in France suggests that website operators may be forced to undertake expensive security measures to block certain users or face significant fines. Implementing such security measures to reduce our exposure to this liability may require us to take steps that would substantially limit the attractiveness of our websites and/or their availability in various geographic areas, which could negatively impact their ability to generate revenue.

**SEASONALITY**

Our businesses are generally not seasonal in nature. However, June, July and August are typically impacted by smaller orders from some European and U.S. distributors, due to the holiday season.

**AVAILABLE INFORMATION**

As a public company, we are required to file annual, quarterly and special reports, proxy statements and other information with the SEC. You may read and copy any of our materials on file with the SEC at the SEC's Public Reference Room at 100 F Street N.E., Washington, DC 20549. Our filings are available to the public over the Internet at the SEC's website at http://www.sec.gov. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the Public Reference Room. We also make available copies of our Forms 8-K, 10-K, 10-Q, Proxy Statement and Annual Report at no charge to investors through our website, http://www.prvt.com, as soon as reasonably practicable after filing such material with the SEC. Information on our website is not part of this Report.

**ITEM 1A.          RISK FACTORS**

*You should carefully consider the risks described below, together with all of the other information contained in this Annual Report on Form 10-K in evaluating our business and us. If any of the following risks actually occur, our business, financial condition or results of operations could be materially and adversely affected. In that case, the trading price of our common stock could decline, and you may lose all or part of your investment.*

***As a result of operating losses our independent registered public accounting firm has substantial doubt about our ability to continue as a going concern.*** In each of the past three years we have experienced losses from operations.  At December 31, 2010, we had cash and cash equivalents of EUR 370,000 and a working capital deficit of EUR 1,102,000.  As a result, our independent registered public accounting firm has concluded that there is substantial doubt as to our ability to continue as a going concern, and has modified its report in the form of an explanatory paragraph describing the events that have given rise to this uncertainty.  Our ability to continue as a going concern is based on our ability to generate or obtain sufficient cash to meet our obligations on a timely basis and ultimately to attain profitable operations. We currently expect future growth and a return to profitability provided that we are successful with the following objectives:

* rolling out our Internet platforms, including: a) our newly built signature property and membership platform private.com, b) our cutting edge mobile platform for Smartphones and c) our multinational eCommerce VOD platform;
* the successful marketing of our affiliate programs for all our properties to compete aggressively for, and attract, affiliate traffic;
* continuing the rollout of our content on cable and IPTV video-on demand platforms;
* completing the integration of businesses acquired in 2009;
* consolidating and restructuring our operations into an efficient new media business;
* outsourcing of non-cost effective parts of our operations; and
* identifying and exploring new online business opportunities which are less dependent on content.

If we are not successful in implementing the above objectives, or if we otherwise do not successfully respond to changing conditions in the adult entertainment industry, we may continue to incur significant losses. There can be no assurance that we will be able to operate profitably in the future.

***Our future capital requirements and needs for additional financing are uncertain.*** Although we expect that our available cash resources and cash generated from operations will be sufficient to meet our presently anticipated working capital and capital expenditure requirements for at least the next 12 months based upon our present plan of operation, we may need to raise additional funds to support more rapid growth or respond to unanticipated requirements. In this regard, we are presently engaged in a dispute with a third party lender regarding our obligations under a promissory note with an outstanding principal balance of not less than $2.9 million.  Although we believe that we have valid claims and defenses against the holder of the promissory note and its affiliates which may ultimately reduce our obligations relating to the promissory note, we cannot assure you that we will be able to reach agreement with the holder of the promissory note or that we will ultimately prevail on our claims and defenses. An adverse outcome in this dispute would likely have a material impact upon our liquidity if we are unable to obtain additional debt or equity financing to satisfy any resulting liability.

***We currently have no additional availability under our existing credit facilities and we cannot assure you that additional financing will be available to us in the future.*** The existence of a going concern exception by our auditors may make it more difficult to obtain additional bank financing if and when required. If additional funds are raised through the issuance of equity securities, our shareholders' percentage ownership will be reduced, they may experience additional dilution, or these newly issued equity securities may have rights, preferences, or privileges senior to those of our current shareholders. Additional financing may not be available when needed on terms favorable to us, or at all. In this regard, in the past most of our bank financing has included the guaranty of affiliated companies of our Chairman and principal shareholder, Berth Milton, and a pledge of shares of common stock owned by him or his affiliated companies.  We cannot assure you that Mr. Milton or his affiliated companies will guaranty future debt financings or that such guaranties will be sufficient to obtain future debt financings. If adequate funds are not available or are not available on acceptable terms, we may be unable to develop or enhance our products and

services, take advantage of future opportunities, maintain the scope of our operations or respond to competitive pressures or unanticipated requirements, which could harm our business.

***Our business is highly competitive.*** We compete in all aspects of our business, including price, promptness of service and product quality. We compete with a number of other businesses, offering various adult-oriented leisure-time activities, including Playboy Enterprises, Inc., Vivid Entertainment, Larry Flynt Publications, Inc. (Hustler), and Beate Uhse AG. Some of our competitors have significantly greater market presence, name recognition and financial and technical resources than we do. In addition, these companies may develop products or services that are more effective than our products or services and/or they may be more successful than us in marketing their products or services. We believe that the adult entertainment market will continue to shift towards the use of explicit sexual content, our principal market, resulting in increased competition in this area of our business. In our Internet business, we compete with other adult media content websites as to the content of their programming and the subscription fees that are offered to members. In addition, the growing availability of free adult entertainment through free websites has resulted in additional pressure on our business, which has adversely affected revenues and margins.

***Our business involves the provision of sexually explicit content which can create negative publicity, lawsuits and boycotts.*** We are engaged in the business of providing adult-oriented, sexually explicit products worldwide. Many people regard our primary business as unwholesome. Various national and local governments, along with religious and children's advocacy groups, consistently propose and enact legislation to restrict the provision of, access to, and content of such entertainment. These groups also often file lawsuits against providers of adult entertainment, encourage boycotts against such providers and mount negative publicity campaigns. In this regard, our magazines, and some of our distribution outlets and advertisers, have from time to time been the target of groups who seek to limit the availability of our products because of their content. We expect to continue to be subject to these activities.

The adult-oriented content of our websites may also subject us to obscenity or other legal claims by third parties. We may also be subject to claims based upon the content that is available on our websites through links to other sites and in jurisdictions that we have not previously distributed content in. Implementing measures to reduce our exposure to this liability may require us to take steps that would substantially limit the attractiveness of our websites and/or their availability in various geographic areas, which could negatively impact their ability to generate revenue.

In addition, some investors, investment banks, market makers, lenders and others in the investment community may refuse to participate in the market for our common stock, financings or other activities due to the nature of our primary business. These refusals may negatively impact the value of our common stock and our opportunities to attract market support.

***We face online security risks in connection with our Internet business .*** Online security breaches could materially adversely affect our business. Any well-publicized compromise of security could deter use of the Internet in general or use of the Internet to conduct transactions that involve transmitting confidential information or downloading sensitive materials in particular. For example, events such as the November 2001 security breach of the Playboy.com website that allowed a computer hacker to steal customers' credit card numbers could deter current and future subscribers from using or subscribing to our website. In offering online payment services, we will increasingly rely on technology licensed from third parties to provide the security and authentication necessary to effect secure transmission of confidential information, such as consumer credit card numbers. Advances in computer capabilities, new discoveries in the field of data encryption or other developments could compromise or breach the methods and procedures that we use to protect our consumers' transaction data. In addition, experienced programmers may attempt to steal proprietary information or cause interruptions in our services. To prevent such developments we may need to expend significant capital and other resources to protect against these problems.

***Continued imposition of tighter processing restrictions by credit card associations and acquiring banks would make it more difficult to generate revenues from our websites.*** Our ability to accept credit cards as a form of payment for our online products and services is critical to us. There are ongoing efforts by credit card associations to restrict the processing of credit cards for online adult-related content. To protect against such restrictions, we must invest heavily in new technologies to protect against fraud. Unlike a merchant handling a sales transaction in a non-Internet environment, e-commerce merchants are fully responsible for all fraud perpetrated against them.

Our ability to accept credit cards as a form of payment for our online products and services could be restricted or denied for many reasons, including:

- Visa Tier 1 capital ratio requirements for financial institutions have significantly reduced the total dollar sales volume of Visa credit card activity that any bank can process in any given month;
- if we experience excessive chargeback's and/or credits;
- if we experience excessive fraud ratios;
- if there is a breach of our security resulting in a theft of credit card data;
- if there is a change in policy of the acquiring banks and/or credit card associations with respect to the processing of credit card charges for adult-related content;
- tightening of credit card association chargeback regulations in international commerce;
- banks might choose not to accept accounts with adult-related content, in a similar manner to one bank in Spain which we previously used.

American Express has instituted a policy of not processing credit card charges for online, adult-related content. If other credit card processing companies were to implement a similar policy, this could have a material adverse effect on our business, results of operations and financial condition.

*We outsource our production and distribution.* We acquire still photography and motion pictures from independent producers/directors and we rely on third-party distributors to deliver our products to end-users through multiple distribution channels, including newsstands, the Internet and broadcasting. Our relationship with such producers/directors and distributors is contractually based. We cannot guarantee that our contracts with directors will be fulfilled or that we will enter into new ones, in which case we may not have adequate content for our magazines and movies. Also, we cannot guarantee that our contracts with distributors will be renewed, in which case we may not be able to sell new products through some or all channels or into some countries. Failure to secure new production contracts, to secure the fulfillment of current contracts or to maintain our current distribution contracts could have a material adverse effect on our business, results of operations and financial condition.

*We are dependent upon key employees.* Our future success depends, to a significant degree, on the continued services of our executive officers and other key personnel, including Berth Milton and Johan Gillborg. We have not procured key-man life insurance and there is no guarantee that we will be able to obtain such insurance in the future should we so desire. Mr. Milton is the founder of our principal operating division, the Milcap Group, and has taken part in our management since the acquisition of the trademark Private in 1990. We cannot guarantee that we will be successful in retaining his services in the future. We do not presently have employment agreements with many of our executive officers or key personnel. The loss of the services of any of them or an inability to continue to attract, motivate and retain highly qualified and talented personnel, including software development technical personnel, could have a material adverse effect on our business and operating results.

*We are subject to rapidly changing technology.* We are engaged in businesses that have undergone rapid technological change over the past few years. Therefore, we face risks inherent in businesses that are subject to rapid technological advancement and changes in consumer demands. This includes the possibility that a technology that we have invested in may become obsolete, requiring us to invest in new technology. Our future success will depend, in part, on our ability to adapt to rapidly changing technologies, to enhance existing services and to develop and introduce a variety of new services to address changing demands of our consumers.

*New technological discoveries may render our equipment uneconomical or obsolete.* As technologies change, the equipment used in our markets may become obsolete. As a result, we subcontract and intend to continue to subcontract capital intensive or technically complex businesses such as editing, DVD replication and other similar businesses. However, we may not have access to these subcontractors when their services are required, and their services may not be available on favorable terms.

*Increased government regulation in the United States or abroad could limit our ability to deliver content and expand our business.* New laws or regulations relating to the Internet, or more aggressive application of existing laws, could decrease the growth of our websites, prevent us from making our content available in various jurisdictions or otherwise have a material adverse effect on our business, financial condition and operating results. These new laws or regulations could relate to liability for information retrieved from or transmitted over the Internet, taxation, user privacy and other matters relating to our products and services. For example, the U.S. government has recently

enacted laws regarding website privacy, copyrights and taxation. Moreover, the application to the Internet of other existing laws governing issues such as intellectual property ownership and infringement, pornography, obscenity, libel, employment and personal privacy is uncertain and developing.

Cable system operators could also become subject to new governmental regulations that could further restrict their ability to broadcast our programming. If new regulations make it more difficult for cable operators to broadcast our programming, our operating performance would be adversely affected.

***We face risks relating to our proprietary intellectual property rights.*** We rely on a combination of copyright and trademark laws, trade secrets, software security measures, license agreements and non-disclosure agreements to protect our proprietary products. Despite these precautions, it may be possible for unauthorized third parties to copy parts of, or otherwise obtain and use, our products without authorization, or to substantially use our concepts and market them, trading on our established customer base. Products sold over the Internet are particularly vulnerable to piracy, particularly in some developing countries. In addition, we cannot be certain that others will not develop substantially equivalent or superseding products, thereby reducing the value of our proprietary rights. Confidentiality agreements with our employees or license agreements with our customers may not provide meaningful protection for our proprietary information in the event of any unauthorized use or disclosure of that proprietary information.

We do not believe that our products infringe the proprietary rights of third parties, and we are not currently engaged in any intellectual property litigation or proceedings. Nonetheless, in the future we could become the subject of infringement claims or legal proceedings by third parties with respect to current or future products. In addition, we may initiate claims or litigation against third parties for infringement of our proprietary rights or to establish the validity of our proprietary rights. We cannot be sure that any lawsuits or other actions brought by us will be successful or that we will not be found to infringe the intellectual property rights of third parties. In addition, to the extent we may desire, or are required, to obtain licenses to patents or proprietary rights of others, there can be no guarantee that any such licenses will be made available on terms acceptable to us, if at all.

***Enforcement of civil liabilities against Private Media Group and its management may be difficult.*** Presently, most of our directors and officers reside outside the United States. As a result, it may not be possible for investors to effect service of process within the United States upon them or to enforce, in courts outside the United States, judgments against these persons obtained in U.S. courts based upon the civil liability provisions of the U.S. federal securities laws. In addition, since a substantial portion of our assets are located outside the United States, a judgment obtained in the United States against us may not be fully collectible within the United States.

***There are risks associated with our foreign operations.*** A large part our operations are conducted outside the United States. In addition, our growth strategy contemplates increased services to foreign customers and to domestic customers distributing programming to international markets. As a consequence of the global nature of our business, we will be exposed to market risks from changes in interest rates and foreign currency exchange rates that may adversely affect our results of operations and financial condition. By virtue of our significant operations outside the United States, we will be subject to the risks normally associated with cross-border business transactions and activities, including those relating to delayed payments from customers in some countries or difficulties in the collection of receivables generally.

In addition, we will be exposed to the risk of changes in social, political and economic conditions in the countries where we engage in business. Political and economic instability in these countries could adversely affect our business activities and operations. Unexpected changes in local regulatory requirements, tariffs and other trade barriers and price or exchange controls could limit operations and make the repatriation of profits difficult. In addition, the uncertainty of differing legal environments could limit our ability to effectively enforce our rights in some markets.

***We are subject to risks relating to performers.*** Our movie, video and photo productions are subject to U.S. and foreign regulations which govern the terms and conditions under which sexually explicit media productions may occur. We have adopted practices and procedures intended to ensure compliance with these regulations. Although these measures are intended to protect us from liability under applicable U.S. and foreign laws governing sexually explicit media productions, we cannot guarantee that we will not be subject to successful legal attacks in the future.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 21 of 105

***We do not expect to pay dividends on our common stock in the foreseeable future.*** Although our shareholders may receive dividends if, as and when declared by our board of directors, we do not intend to pay dividends on our common stock in the foreseeable future. Therefore, you should not purchase our common stock if you need immediate or future income by way of dividends from your investment.

***We may issue additional shares of our capital stock that could dilute the value of your shares of common stock.*** We are authorized to issue 110,000,000 shares of our capital stock, consisting of 100,000,000 shares of our common stock and 10,000,000 shares of our preferred stock. At April 8, 2011, 20,815,824 shares of our common stock and no shares of our preferred stock were issued and outstanding. In connection with our acquisition of Game Link, LLC and its affiliate on January 20, 2009, 2,844,770 shares of our common stock were issued and up to 1,531,799 shares of our common stock are issuable in the future. In connection with our acquisition of Sureflix Digital Distribution and its affiliates in October 2009 we issued securities convertible into 1,300,000 shares of our common stock and up to 700,000 shares of our common stock are issuable in the future. In addition, approximately 9,668 shares of our common stock were issuable upon the exercise of options or warrants.

Should we obtain additional financing, we may issue authorized and unissued shares of common stock at below current market prices or preferred stock that could dilute the earnings per share and book value of your shares of our common stock.

***There are risks relating to the issuance of additional shares of preferred stock, including deterring attempts by third parties to acquire us.*** Our board of directors has the authority to issue up to 10,000,000 shares of preferred stock, none of which are currently issued and outstanding, and to determine their price, and other rights, preferences, privileges and restrictions without any further vote or action by our stockholders. The rights of the holders of common stock are subject to, and may be adversely affected by, the rights of the holders of any preferred stock, including preferred stock that we may issue in the future. If preferred stock is issued, it may rank senior to our common stock in respect of the right to receive dividends and to participate in distributions or payments in the event of our liquidation, dissolution or winding up. The provisions in our articles of incorporation authorizing preferred stock could delay, defer or prevent a change of control and could adversely affect the voting and other rights of holders of our common stock, including the loss of voting control to others, which could make it more difficult for a third party to acquire control of us.

***Our Chairman of the Board owns a significant amount of our common stock, which may enable him to exercise significant influence or control over our business and affairs, and he may have interests which differ from the other holders of our stock.*** Berth Milton, our Chairman, President and principal shareholder, owns up to 43.5% of our issued and outstanding stock. Therefore, he may be able to effectively exercise significant influence or control over all matters requiring approval by our shareholders, including the election of directors and the approval of significant corporate transactions. His interests may differ from the interests of other shareholders and, therefore, result in corporate decisions that may be disadvantageous to other shareholders. This concentration of ownership may also have the effect of delaying or preventing a change in control, which could have a material adverse effect on our stock price.

***Future sales of common stock by our Chairman or third parties as a result of foreclosures could adversely affect the price our common stock and could in the future result in a change in control of the Company.*** Our Chairman, Berth Milton, claims direct or indirect beneficial ownership of 9,059,840 shares of our common stock, or approximately 43.5% of our outstanding common stock. All of these shares have been pledged by Mr. Milton or entities controlled by Mr. Milton or are subject to liens or claims by third parties. Depending on a number of factors, including the status of the various loan obligations for which the shares serve as collateral, and the outcome of legal disputes involving some of these shares, Mr. Milton or his affiliates may experience a foreclosure that could result in the sale of the pledged shares, in the open market or otherwise, or Mr. Milton may otherwise cease to have voting rights with respect to these shares under the terms of loan agreements or applicable law. Unlike Mr. Milton, sales by these persons or entities may not be subject to the volume limitations of Rule 144. Sale of these shares, or the perception of possible future sales, could have a materially adverse effect on the trading price of our common stock or make it more difficult for the Company to raise additional capital through sales of equity securities.

In particular, it is our understanding that two of the purported pledgees, claiming rights to 5,600,000 and 1,842,179, pledged shares, respectively, have made various attempts to foreclose on the collateral of the pledged shares, or to exercise voting rights in order to effect a change of control, and that Mr. Milton is currently involved in legal disputes regarding the voting rights for these shares and a possible foreclosure and sale of these shares. A sale of these shares, or the successful exercise of voting rights in a manner adverse to Mr. Milton, could result in a change of control of the Company, depending upon the number of shares and the ownership interests of other shareholders.

*There may be adverse consequences to our shareholders and our business if our common stock ceases to be quoted on the NASDAQ Stock Market or a principal stock exchange.* To continue to be listed on the NASDAQ Stock Market, we must maintain certain requirements. If we fail to satisfy one or more of the requirements, our common stock may be delisted. If our common stock is delisted, and does not become listed on another stock exchange, then it will be traded, if at all, in the over-the-counter market commonly referred to as the FINRA OTC Bulletin Board or the "pink sheets." If this occurs, it may be more difficult for you to sell our common stock.

*If we are delisted from the NASDAQ Stock Market, your ability to sell your shares of our common stock would also be limited by the penny stock restrictions, which could further limit the marketability of your shares.* If our common stock is delisted and trades below $5.00 per share, it would come within the definition of "penny stock" under SEC rules. The penny stock rules impose additional sales practice requirements on broker-dealers who sell securities to persons other than established customers and accredited investors. For transactions covered by the penny stock rules, the broker-dealer must make a special suitability determination for the purchaser and receive the purchaser's written agreement to the transaction prior to the sale. Consequently, if the penny stock rules were to become applicable, this would affect the ability or willingness of broker-dealers to sell our securities, and accordingly would affect the ability of shareholders to sell their shares in the public market. These additional procedures could also limit our ability to raise additional capital in the future

**ITEM 1B.        UNRESOLVED STAFF COMMENTS**

Not applicable

**ITEM 2.          PROPERTIES**

Private Media Group maintains an office in the United States at 3230 Flamingo Road, Suite 156, Las Vegas, Nevada 89121.

Since October 2007, Milcap Media Group leases office space in Torre MAPFRE, located at Calle de la Marina 16-18, 08005 Barcelona, Spain, for a term of five years. Average monthly base rental expense is approximately $30,000. The office space is currently used primarily by our departments providing Internet, marketing and administration services to the group. In addition, the office space serves as the European headquarters of Private Media Group, Inc. The lease also requires us to pay our proportionate share of the building's real estate taxes and operating expenses. In January 2008 Milcap Media Group partly renewed the lease for office space in the building located at Carretera de Rubi 22, 08173 Sant Cugat del Valles, Barcelona, Spain for a further term of five years. The lease can be cancelled prematurely against a penalty of one year's rent. Average monthly base rental expense is approximately $23,000. The building is currently used by our operating departments engaged in providing programming and logistic services for the group.

In connection with the acquisition of GameLink LLC by the Company, we entered into a lease of anapproximately 10,000 square feet building used by GameLink in San Francisco, California. The lease extends through December 31, 2011, has a base rent of $13,620 per month, and provides for GameLink to be responsible for property taxes and maintenance expenses during the term of the lease.

In connection with the acquisition of Sureflix by the Company, we entered into a lease of an approximately 5,250 square feet office space used by Sureflix in Toronto, Canada. The lease extends through February 28, 2013, has a base rent of $8,132 per month, and provides for Sureflix to be responsible for property taxes and maintenance expenses during the term of the lease.

We recognize rent expense on a straight-line basis over the term of the leases. The leases also require us to pay our proportionate share of the building's real estate taxes and operating expenses.

# ITEM 3.    LEGAL PROCEEDINGS

## *Termination of Ilan Bunimovitz as CEO and Subsequent Litigation*

On July 19, 2010, Ilan Bunimovitz was terminated as Chief Executive Officer of Private Media Group, Inc. Mr. Bunimovitz was employed as CEO since 2009 pursuant to a written employment agreement, which agreement was terminated by the Company under provisions allowing it to terminate the agreement for "cause" (as defined in such agreement). Conduct of Mr. Bunimovitz constituting "cause" included breach of fiduciary duty, conflict of interest, material acts of dishonesty and violations of the Company's Code of Ethics. Mr. Bunimovitz's termination for cause was unanimously approved by all three independent directors and a majority of the disinterested directors. Mr. Bunimovitz continues to serve as a director of the Company for the remainder of his term, which expires when his successor is duly elected by the shareholders.

Immediately following Bunimovitz's termination, he instituted two legal proceedings against the Company, both of which are believed by the Company to be without merit and are being contested vigorously by the Company. These legal proceedings are described below under "*Employment Arbitration and U.S. Department of Labor Claim*" and "*Nevada State Court Action.*"

### *Employment Arbitration and U.S. Department of Labor Claim*

On July 23, 2010, Mr. Bunimovitz filed a Demand for Arbitration and related Statement of Claim against the Company with JAMS (Case No. 1100063395), a private arbitration service, pursuant to the dispute resolution provisions of his Employment Agreement, contesting his termination as CEO. In the Statement of Claim, Mr. Bunimovitz alleged that (1) his termination on July 19, 2010, was without "cause" under his written Employment Agreement; (2) the termination was taken in retaliation for Mr. Bunimovitz demanding an independent investigation of Berth Milton's alleged "self-dealing transactions and was taken in an effort to silence him"; and (3) the termination of employment was not properly authorized by the Board of Directors, and is therefore invalid. Mr. Bunimovitz seeks unspecified compensatory and punitive damages. On August 6, 2010, the Company filed an Answer, denying Mr. Bunimovitz's allegations in all material respects. The Company and GameLink, a wholly owned subsidiary, have also filed a Cross-Claim against Mr. Bunimovitz for breach of contract and conversion, based upon his failure to return property belonging to Private which Bunimovitz had wrongfully refused to turn over to the Company at the time of his termination.

In March 2011 Bunimovitz amended his Statement of Claim to include two additional allegations: that the Company improperly failed to allow him to sell shares he received when his company was acquired; and that the Company has failed to deliver the shares to which he is entitled to receive under the earnout provisions of the acquisition agreement between the Company and GameLink. The Company has denied both of these additional claims.

Although Bunimovitz claims that he was terminated in retaliation for demanding an "independent investigation" of self-dealing transactions on June 8, 2010, in fact both Mr. Bunimovitz and his personal legal counsel were aware of the request made by the Chairman to the Board of Directors to terminate Bunimovitz for cause since at least May 5, 2010. The alleged "self-dealing transactions" of which Mr. Bunimovitz complains include "payment of rent for the Chairman's personal offices, the failure of the Chairman to repay a multi-million dollar loan from the Company and unauthorized cash payments that the Chairman be directed to himself," transactions which were under review by the independent directors since January 2010 and disclosed in the Company's SEC reports, to the extent required by SEC rules. In particular, Form 8-K filed with the SEC on March 11, 2010, addressed in detail payments made to Mr. Milton in 2009, and their approval by the Board of Directors. In addition, Item 13 in the Company's ANNUAL REPORT on Form 10-K filed with the SEC on May 25, 2010, addressed in detail the status of the loan transaction. Mr. Bunimovitz signed this ANNUAL REPORT on Form 10-K as CEO and director and personally certified the accuracy and completeness of this filing pursuant to the provisions of the Sarbanes-Oxley Act of 2002. As required by Nasdaq corporate governance rules, all related party transactions involving directors and officers continue to remain under the ongoing review of the Audit Committee, comprised solely of three independent directors, to ensure fairness of these transactions to the shareholders.

On September 24, 2010, the Company received notice of Claims filed by Bunimovitz with the U.S. Department of Labor against Private (Case No. 9-3290-10-057) alleging that Bunimovitz was terminated as CEO by Private in violation of Section 806 of the Sarbanes-Oxley Act in retaliation for Bunimovitz raising questions about self-dealing transactions involving the Chairman of the Company and the accuracy of the Company's public disclosures in light of these transactions, and seeking reinstatement and unspecified compensatory and punitive damages. The Company has filed an Answer denying these claims.

*Nevada State Court Action (the "Nevada Action")*

On August 11, 2010, Mr. Bunimovitz, together with Consipio Holding BV ("Consipio"), a creditor of the Company, and Tisbury Services Inc., filed a Complaint against Private Media Group, Inc. in Nevada County Court, Clark County, Nevada (Case No. A-10-622802-B) alleging mismanagement of the Company's business by the Company's three independent directors, Johan G. Carlberg, Peter Dixinger and Bo Rodebrandt, and Berth Milton, the Company's Chairman and CEO, and seeking to have Mr. Bunimovitz and another non-independent director, Eric Johnson, appointed as receivers to run the business and affairs of Private, to the exclusion of the other directors. The Complaint also sought an injunction which, if granted, would prevent Private from issuing any stock, borrowing any money or taking any other action outside the ordinary course of business. The Complaint as originally filed did not name any defendant other than the Company. The matter was set by the Court for a Preliminary Hearing on September 3, 2010, to determine whether the Plaintiffs were entitled to any of the requested relief. On August 25, 2010, the plaintiffs amended the Complaint by adding an additional cause of action as a shareholder derivative suit against Messrs. Carlberg, Dixinger, Rodebrandt, and Milton, as well as the Company's CFO, Johan Gillborg, and Phil Christmas, the Financial Director of Private's principal operating subsidiary, alleging gross mismanagement and breach of fiduciary duty, arising out of transactions between the Company and Milton or his affiliates, including the failure of an affiliate of Milton, Slingsby Enterprises Limited, to repay a related party receivable in excess of EUR 7 million, and compensation paid to Milton in 2009 without prior Board approval. On September 3, the Company filed Counterclaims against Bunimovitz and Consipio, alleging that Bunimovitz breached his fiduciary duty as a director and CEO of Private by improperly conspiring with Consipio, a creditor of the Company, to take over control of the Company, and seeking unspecified damages.

On August 13, 2010, the Plaintiffs also requested the Court to grant a temporary injunction, to remain in effect until the Preliminary Hearing on September 3, which, if granted, would have prohibited the Company from engaging in any transaction outside the ordinary course of business. The Court denied the Plaintiffs' requested temporary relief, but issued a temporary order, to remain in effect until the conclusion of a Preliminary Hearing, requiring Private to seek permission of the Court to hold any special Board meeting.

The Preliminary Hearing commenced on September 3, 2010 before Presiding Judge Elizabeth Gonzalez to determine whether the Plaintiffs were entitled to appointment of a receiver or other injunctive relief. On November 17, 2010, following the conclusion of the Preliminary Hearing, the Court denied the Plaintiff's request for appointment of a receiver, determining that the statutory requirements to appoint a receiver to address alleged mismanagement were not met. The Court also modified its temporary order issued on August 13, 2010. As modified, the preliminary injunction requires Private to seek permission of the Court to hold any special Board of Directors meeting. The preliminary injunction also requires that all transactions outside of the ordinary course of business be approved by a majority of disinterested directors without such directors being unduly influenced by current management or its current outside legal counsel. Further, although the Preliminary Injunction contains a specific finding by the Court that it has found no violation of any federal rule or listing requirement regarding the issuance of shares, self-dealing or misappropriation, allegations contained in the Complaint, the Court made a preliminary finding that the failure of Private to demand repayment of related party receivables from Slingsby Enterprises Limited (currently 7.4 million EUR at December 31, 2010), much of which has been outstanding since at least 2002, is a violation by the Company of the provisions of Section 402 of the Sarbanes-Oxley Act, and that the Company has an obligation to bring legal proceedings to enforce repayment of the outstanding amount. This finding appears to be based upon an interpretation by the Court of Section 402 which the Company believes is erroneous. The Court seems to have concluded that because Mr. Milton may have indirectly personally benefited from the extension of indebtedness to his controlled companies arising out of business transactions with the Company, the continued extension of this indebtedness constitutes a "personal loan to or for the benefit of any director or executive officer" within the meaning of Section 402 of SOX. The Company believes that this preliminary ruling misstates the scope and purpose of

Section 402, which was to prohibit personal loans to affiliates, but not to prohibit incurring indebtedness in connection with bona fide business transactions between the Company and an affiliate.

The Preliminary Injunction also contains preliminary findings that notwithstanding approval by all three independent directors and a majority of the disinterested directors of a retention bonus of EUR139,000 awarded to Mr. Milton in March 2010, the retention bonus was improper and the bonus should be returned. Specifically, the Court made preliminary findings that this decision was improperly influenced by statements made by Mr. Milton in a Board of Directors meeting that he would resign and sell his position in the Company if he was not adequately compensated, and the advice of the Company's outside legal counsel that the directors should consider the advisability of granting a retention bonus, a subject that had not been considered by the directors prior to counsel's advice.

In January and March 2011 the Court granted motions filed by defendants Bo Rodebrandt, Peter Dixinger, Johan Carlberg, Johan Gillborg and Philip Christmas dismissing all of the plaintiffs' claims against each of them, due to lack of jurisdiction over them. Accordingly, there is only one remaining named defendant, Berth Milton, who also filed a motion dismissing him from the action on the grounds that the Nevada court has no jurisdiction of Mr. Milton. This motion was denied by the court on June 2, 2011, but without prejudice of Mr. Milton to raise this objection at a later time during the proceeding.

The Company believes that this litigation is an improper attempt to circumvent valid and lawful actions of the disinterested majority of the Board of Directors, including all of the independent directors, and to instead place control of the Company in the hands of a disgruntled former employee (Bunimovitz), his former subordinate employee (Eric Johnson) and a creditor (Consipio Holding BV) with whom the Company has been in a protracted and heavily litigated dispute reported in SEC filings since 2003. Consipio, in addition to being a creditor, is also an affiliate of a competitor of Private, Beate Uhse, AG, an adult entertainment company listed on the Frankfurt Stock Exchange. For further information regarding the other litigation with Consipio see "*Consipio Holding BV vs. Private Media Group, Inc. and Slingsby Enterprises Limited, New York State Supreme Court, County of New York, Case No. 650462/10,* which appears in this Item 3 below.

The Company also believes that the actions of Mr. Bunimovitz as a director since he was terminated as CEO, including pursuing a lawsuit with a creditor with whom the Company is in protracted litigation, are a clear and serious breach of his fiduciary duties, and have been taken in bad faith to advance the personal interests of Mr. Bunimovitz. Accordingly, the Company has filed counterclaims against Bunimovitz in this proceeding, discussed above, seeking monetary damages and other appropriate relief.

The Company believes that the allegations in the Complaint against the Company and the single remaining individual defendant, and the findings of the Court in the Preliminary Injunction are without merit, and that the Company and the individual defendant will prevail upon the conclusion of this proceeding.

***Consipio Holding BV vs. Private Media Group, Inc. and Slingsby Enterprises Limited, New York State Supreme Court, County of New York, Case No. 650462/10 (the "New York Action")***

On May 1, 2009, Consipio Holding BV filed a lawsuit against the Company in U.S. federal court asserting a claim for unspecified damages under a Note dated December 21, 2001 in the original principal amount of $4,000,000, which was guaranteed by Slingsby Enterprises Limited ("Slingsby"), an affiliate of the Company's Chairman and principal shareholder. The guarantee was secured by a pledge of 1,650,000 shares of the Company's common stock, and Slingsby's agreement to pledge an additional 3,950,000 shares upon the occurrence of an event of default. The Company filed its Answer and asserted several affirmative defenses. The lawsuit also included a claim against Slingsby to enforce its guaranty of the Note. On March 26, 2010, the Court dismissed the lawsuit, finding that U.S. federal courts did not have jurisdiction over the subject matter of the lawsuit.

On July 9, 2010, the Company received a notice from Consipio stating that the Company continued to be in default under the Note and requesting Slingsby to deliver an additional 3,950,000 shares of common stock as collateral to Consipio under the terms of the pledge agreement. In addition, pursuant to such notice Consipio purported to exercise the right as pledgee to vote all of the 5,600,000 collateral shares, including the 1,650,000 shares of common stock previously pledged as collateral, so long as an event of default has occurred and is continuing under

the Note.

On August 12, 2010, the Company received notice that Consipio had re-filed the lawsuit against the Company and Slingsby in New York State Court in May 2010 to enforce the Note and the related guaranty agreement. As amended, the Complaint against the Company alleged that the Company had orally agreed with Consipio in 2003 to change the stated interest rate on the Note from 7% to 9.9 %, and to denominate the principal amount under the Note in euro instead of U.S. dollars, a position which the Company believes is totally without merit. On October 12, 2010, Slingsby filed a Motion to Dismiss the claims against it under the guaranty agreement based upon the position that Consipio's claims against Slingsby were time barred under the statute of limitations. In November 2010 the Company filed an Answer, and included affirmative defenses, including claims of substantial offsets to the amounts due under the Note. On December 13, 2010, following a hearing on November 8, 2010, the Court granted Slingsby's Motion to Dismiss the Complaint against it, and granted Consipio leave to amend the Complaint to plead additional allegations against Slingsby which, if proven by Consipio, would extend the statute of limitations. On December 21, 2010 Consipio filed an amended Complaint which contained substantially similar allegations as against the Company and Slingsby. The amended Complaint also named Berth Milton as a defendant and included additional allegations against Slingsby and Mr. Milton. Mr. Milton has not yet been served with the amended Complaint. In February 2011, Slingsby filed a motion to dismiss the amended Complaint against it, principally on the grounds that even if the allegations in the amended Complaint were true, enforcement of the guaranty was time barred under the applicable statute of limitations. The court denied the motion to dismiss, and discovery is now underway in this case. Both the Company and Slingsby intend to continue to vigorously contest the allegations of Consipio, including defenses by the Company of substantial offsets against the Note and defenses by Slingsby based upon the defense that the statute of limitations bars enforcement of the guaranty agreement and related pledge agreement from Slingsby which purports to grant a pledge in favor of Consipio as holder of the Note against 5,600,000 shares of Private Common Stock originally registered in the name of Slingsby.

On April 1, 2011, Consipio filed an application with the court seeking a pre-judgment writ of attachment against the Company in the amount of $6.7 million. On April 12, 2011, the Company filed an opposition to the application, which has been set for a hearing on June 16, 2011. Consipio had previously filed a similar application for attachment in September 2010, which was summarily denied by the court.

For additional information relating to this litigation see Note 10 to the consolidated financial statements under "Other Debt" for additional information regarding the Note obligation. The Company, Slingsby and Berth Milton intend to vigorously defend against these claims.

***Litigation Regarding Election Results for 2010 Annual Meeting of Shareholders***

As noted above, on July 9, 2010, the Company received a notice from Consipio stating that the Company continued to be in default under the Note and requesting Slingsby to deliver an additional 3,950,000 shares of common stock as collateral to Consipio under the terms of the pledge agreement from Slingsby to Consipio. In addition, pursuant to such notice Consipio purported to exercise the right as pledgee to vote all of the 5,600,000 collateral shares pledged under the pledge agreement, including the 1,650,000 shares of common stock previously pledged as collateral, so long as an event of default has occurred and is continuing under the Note. On September 16, 2010, the Company was notified by Consipio that it intended to nominate six directors at the 2010 Annual Meeting, five of whom had not been nominated by the Company's Board of Directors. On September 22, 2010, Slingsby advised Consipio and the Company that under New York law all of Consipio's rights under the pledge agreement and related guarantee agreement in respect of the 5,600,000 collateral shares had terminated, including any rights of Consipio to vote these shares, and instructed the Company not to allow Consipio to vote any of the collateral shares.

On October 21, 2010, Consipio, Ilan Bunimovitz and the other plaintiffs in the Nevada Action obtained an Order from Judge Gonzalez requiring that the Company recognize the right of Consipio to vote the 5,600,000 collateral shares under the pledge agreement at the 2010 Annual Meeting of Shareholders. As discussed below, this Order has been appealed by the Company and is therefore under the review of the Nevada Supreme Court.

The Company held its 2010 Annual Meeting of Shareholders on November 18, 2010, in Barcelona, Spain. Two proposals were presented at the Meeting for approval: (1) to elect six directors; and (2) to ratify the appointment

of BDO Auditores, S.L. as the Company's independent registered public accountants for the fiscal year ended December 31, 2010. Following the closing of the polls, the Annual Meeting was continued in order to allow the independent Inspector of Elections to tabulate the votes and issue his final report certifying the results.

On December 16, 2010, the Company received the independent Inspector of Election's Final Report. The results of the voting at the 2010 Annual Meeting, as set forth in the Inspector of Elections Final Report, are as follows:

**Proposal No. 1 – Election of Six Nominees for Director:**

| Nominee for Director | Number of Shares Voted for | Number of Shares Withheld |
|---|---|---|
| Eric Johnson | 15,893,296 | 7,507 |
| Jan Jensen | 8,095,390 | 6,256 |
| Bernt Akander | 8,094,351 | 7,295 |
| Peter Dixinger | 8,073,491 | 28,155 |
| Bo Rodebrant | 8,072,525 | 29,121 |
| Berth Milton | 8,071,301 | 30,345 |
| IlanBunimovitz | 7,799,157 | - |
| David Dohrmann | 7,799,157 | - |
| Alexander V. Matveev | 7,509,016 | 290,141 |
| Charles William Prast | 7,509,016 | 290,141 |
| John S. Wirt | 7,509,016 | 290,141 |

**Proposal No. 2 – Ratify BDO Auditores, S.L. as Independent Registered Accounting Firm for the Fiscal Year ending December 31, 2010:**

| Number of Shares Voted for | Number of Shares Against | Number of Shares Abstained |
|---|---|---|
| 16,033,432 | 998 | 5,740 |

Under Nevada law, the six nominees who are finally determined to have received the highest number of votes are elected to the Board of Directors and serve as directors until the 2011Annual Meeting and until their successor is elected and qualified. However, following the delivery of the Inspector of Election's Final Report on December 16, 2010, Consipio contended that 3,950,000 of the collateral shares pledged by Slingsby to Consipio were not voted in favor of five of the six Consipio director nominees (Messrs. Bunimovitz, Dohrmann, Matveev, Prast and Wirt), as required by the Nevada Court's October 21, 2010 Order. Accordingly, in December 2010 the Nevada Court entered an Order at the request of Consipio, Ilan Bunimovitz and the other plaintiffs in the Nevada Action, to the effect that the Inspector's Final Report was subject to review by the Court, and could not be deemed final and effective by the Company until approved by the Court.

The Inspector's Final Report was reviewed by the Court at a hearing on January 4, 2011, to determine whether the Inspector of Election's Final Report would be approved by the Court. Following the conclusion of the hearing on January 4, 2011, the Court entered a further Order refusing to either modify or confirm the Inspector's Report. Accordingly, the then current directors (Messrs. Milton, Rodebrandt, Dixinger, Jensen, Johnson and Bunimovitz) continue to remain in office pending further order of the Court approving or modifying the Inspector of Election's Final Report, or until the Company convenes the 2011 Annual Meeting of Shareholders. On January 28, 2011, the Court ordered that an evidentiary hearing be held in June 2011 to determine whether there is sufficient evidence to confirm or modify the Final Report of the Independent Inspector of Elections. As noted above, Consipio contends that the 3,950,000 collateral shares were not voted as directed by Consipio, which Consipio contends is inconsistent with the Court's Order of October 21, 2010. As discussed below under *"Appeal to Nevada Supreme Court,"* this Order is currently being challenged by the Company in the Nevada Supreme Court. In order to comply with Nasdaq listing requirements requiring that a majority of the directors in office be independent, on January 28,

2011, the Court further ordered that the Company's six member board create a vacancy for a seventh director and to fill the newly created vacancy with an independent director, to serve until the earlier of the 2011 Annual Meeting or until the Court is able to confirm the final election results for the November 2010 election.

On February 3, 2011, the Board of Directors voted to create a seat for a seventh director and to fill this vacancy by appointing Bernt Akander. His nomination was unanimously approved by all three independent directors and a majority of the six directors in office. Mr. Akander, who was a Company nominee for the Board of Directors at the 2010 Annual Meeting, has accepted the February 3 appointment. Accordingly, as of February 3, 2011, the Company's Board of Directors was comprised of seven directors, four of whom were determined to be independent directors in accordance with the applicable Nasdaq listing rules. As previously reported, Mr. Akander resigned in May 2011; thus the vacancy created by the Court's January 28, 2011 court order remains unfilled until a nominee who is an independent director is selected and approved by the Board of Directors.

On April 14, 2011, pursuant to a stipulation entered into by the Company and the plaintiffs in the Nevada Court proceeding and approved by the Court, the vote regarding the Company's proposal to ratify the appointment of BDO Auditores, S.L. as the Company's independent registered public accountants for the fiscal year ended December 31, 2010, was approved as final.

If the Nevada Court at any time in the future confirms either of the two director nominee slates presented at the November 2010 Annual Meeting, then at that time the Board of Directors is expected to be comprised of six directors, four of whom will be independent directors.

*Appeal by the Company to the Nevada Supreme Court*

As discussed above, on October 21, 2010, Consipio, Ilan Bunimovitz and the other plaintiffs in the Nevada Action obtained an Order from Judge Gonzalez requiring that the Company recognize the right of Consipio to vote the 5,600,000 collateral shares under the pledge agreement in favor of Consipio at the 2010 Annual Meeting. On December 3, 2010, the Company filed a Petition for Writ with the Nevada Supreme Court seeking an Order directing Judge Gonzalez to vacate her Order of October 21, 2010, on the basis that she did not have jurisdiction over this issue, and seeking a stay of the Order until the issue can be decided in the New York Action. The October 2010 Order required the Company to recognize the right of Consipio to vote the 5,600,000 collateral shares under the pledge agreement at the 2010 Annual Meeting of Shareholders.

In particular, the Company believes that Judge Gonzalez exceeded her authority by entering the Order, on the basis that (i) Slingsby Enterprises Ltd., the entity which pledged the collateral shares to Consipio, is not a party to the Nevada Action, and (ii) the Order is beyond the scope of the Complaint filed in the Nevada Action. On January 7, 2011, the Nevada Supreme Court agreed to hear the appeal and directed that the interested parties, including Consipio, file opposing papers. In February 2011 Consipio filed its opposition to the Company's request for a Writ. The parties are awaiting the ruling of the Nevada Supreme Court.

*Swedish Tax Authority Proceedings*

In December 1999 the Company received final notification from the Swedish Tax Authority assessing its subsidiary in Cyprus for the tax years 1995-1998 for a total amount of SEK 42,000,000 (approx. EUR 4.5 million) plus fines amounting to SEK 16,800,000 (approx. EUR 1.8 million) plus interest. The Swedish Tax Authority has taken the position that the subsidiary carried on business in Sweden from a permanent establishment during the period in question and should therefore be taxed on the income attributable to the permanent establishment. The Company is of the view that no permanent establishment is at hand in Sweden. However, the Administrative Court of Appeal has finally decided that a permanent establishment is at hand. In February 2009, the County Administrative Court reduced the assessment for the tax years 1995-1998 to a total amount of SEK 12,600,000 (approx. EUR 1.1 million) plus fines amounting to SEK 5,040,000 (approx. EUR 0.5 million) plus interest. In November 2010, the Administrative Court of Appeal decided that the County Administrative Court's decision should prevail. However, as a matter of fact, the tax claim on the Company has been extinguished according to Administrative Law. Due to the fact there is no longer any claim at stake, no amounts have been provided in the Company's financial statements for this dispute.

We are from time to time a defendant in suits for defamation and violation of rights of privacy, many of which allege substantial or unspecified damages, which we vigorously defend.

We are presently engaged in litigation, most of which is generally incidental to the normal conduct of our business and is immaterial in amount. We believe that our reserves are adequate and that no such action will have a material adverse impact on our financial condition. However, there can be no assurance that our ultimate liability will not exceed our reserves.

Except as disclosed above, neither Private Media Group, Inc. nor its subsidiaries is involved in any other litigation or arbitration proceedings which could have a material influence on our financial condition or results of operations.

**ITEM 4.**      **Not applicable**

**PART II**

**ITEM 5.**      **MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market for Private Media Group, Inc. Common Stock**

The common stock of Private Media Group, Inc. has traded on the NASDAQ National and Global Markets since February 1, 1999 under the symbol "PRVT". Previously, our common stock traded on the FINRA (formerly NASD, Inc.) OTC Bulletin Board since March 29, 1996. The following table sets forth the range of representative high and low sales prices for the common stock for the periods indicated, as reported by the NASDAQ Stock Market. Quotations represent inter-dealer prices, do not include retail markups, markdowns or commissions and may not represent actual transactions.

|  | **High** | **Low** |
|---|---|---|
| *Fiscal 2010:* | | |
| First Quarter…………………………… | $2.85 | $1.55 |
| Second Quarter…………………………… | $3.05 | $1.69 |
| Third Quarter …………………………… | $2.19 | $1.33 |
| Fourth Quarter…………………………… | $1.91 | $1.00 |
| | | |
| *Fiscal 2009:* | | |
| First Quarter…………………………… | $3.87 | $2.70 |
| Second Quarter…………………………… | $4.14 | $1.68 |
| Third Quarter …………………………… | $2.76 | $1.80 |
| Fourth Quarter…………………………… | $3.60 | $1.75 |

On April 8, 2011, the last sales price reported on the NASDAQ Stock Market was $0.65. On September 23, 2010, there were approximately 1,668 beneficial owners of our common stock.

**Dividend Policy**

We did not pay any cash dividends during our last two fiscal years and we do not contemplate doing so in the near future. We currently intend to retain all earnings to finance the development and expansion of our operations, and do not anticipate paying cash dividends on our shares of common stock in the foreseeable future. Our future dividend policy will be determined by our Board of Directors on the basis of various factors, including results of operations, financial condition, business opportunities and capital requirements. The payment of dividends will also be subject to the requirements of Nevada Law, as well as restrictive financial covenants which may be required in credit agreements.

**Transfer Agent**

The transfer agent and registrar for our common stock is InterWest Transfer Co., Inc., 1981 East 4800 South, Suite 100, Salt Lake City, Utah 84117.

**ITEM 6.**      **Not applicable**

# ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

You should read this section together with the consolidated financial statements and the notes and the other financial data in this Report. The matters that we discuss in this section, with the exception of historical information, are forward-looking statements within the meaning of the Private Securities Reform Act of 1995. Such forward-looking statements are subject to risks, uncertainties and other factors which could cause our actual results to differ materially from those expressed or implied by such forward-looking statements. Potential risks and uncertainties relate to factors such as: (1) the timing of the introduction of new products and services and the extent of their acceptance in the market; (2) our expectations of growth in demand for our products and services; (3) our ability to successfully implement expansion and acquisition plans; (4) the impact of expansion on our revenue, cost basis and margins; (5) our ability to respond to changing technology and market conditions; (6) the effects of regulatory developments and legal proceedings with respect to our business; (7) the impact on the Company and its investors from the outcome of legal proceedings discussed under Item 3 – Legal Proceedings; (8) the impact of exchange rate fluctuations; and (9) our ability to obtain additional financing. The foregoing list of factors is not exhaustive. For a more complete list of factors that may cause results to differ materially from projections, please refer to the Risk Factors section of this Form 10-K.

**Overview**

We are an international provider and distributor of adult media content. We acquire or license content from independent studios, producers and directors and process these images into products suitable for popular media formats such as digital media content for Broadcasting, Mobile and Internet distribution, and print publications and DVDs. In addition to media content, we also generate additional sales through the licensing of our Private trademark to third parties.

On January 20, 2009 we expanded our Internet operations through the acquisition of Game Link LLC and its affiliates, companies engaged in digital distribution of adult content over the Internet and eCommerce development. GameLink is a leading US adult entertainment VOD and eCommerce platform through its GameLink.com website. The site's installed user base represents over one million domestic and international customers and it serves over 100,000 users daily. Including 70,000 video titles, GameLink has one of the largest libraries of digital and physical adult media and novelties in the United States.

On October 29, 2009 we continued the ongoing expansion of our global digital media platform through the acquisition of Sureflix Digital Distribution and its affiliates, companies engaged in the business of digital distribution of premium gay adult content. Sureflix is a leading global supplier of adult programming. The company operates a vast network of more than 100 pay-per-view VOD websites and has a North American broadcast presence. It represents premium production studios in global television broadcast (cable, satellite), mobile, IPTV and Internet VOD markets. Sureflix has not only in-depth knowledge of adult programming, but also significant VOD technology and marketing expertise.

We operate in a highly competitive, service-oriented market and are subject to changes in business, economic and competitive conditions. Nearly all of our products compete with other products and services that utilize adult leisure time and disposable income. Although we believe our products are well-established in the adult entertainment industry, we compete with entities selling adult oriented products via any type of distribution network, including the Internet. Many of these products are similar to ours. Over the past few years, the adult entertainment industry has undergone significant change. Traditional producers of softcore content as well as mainstream providers of media content have shifted to producing hardcore content. As a result, we face greater competition to distribute hardcore content. This shift has also led to industry consolidation, creating fewer, more financially formidable competitors. Recently, the introduction of a large number of free content Internet sites that allow users to access large libraries of content has created an even more challenging environment where both sales volume and margins are decreasing substantially. In addition, the recent recession has shown that the adult industry is not immune to economic cycles.

Despite serious challenges in the market for online content, we expect growth going forward. There are many

reasons to be optimistic about our opportunities and our Internet group has been working hard to position itself to take advantage of these opportunities.

The primary source of growth is expected to come from a significant increase in traffic to our online properties coupled with improved conversion and retention rates and a much more sophisticated approach to traffic management. We have rebuilt our signature property, private.com, and restructured our affiliate programs in all properties to compete aggressively for affiliate traffic. In addition to our technical systems, we have restructured our departments with resources highly skilled in affiliate traffic development and shifted our emphasis from account management towards sales. We have also developed solutions for critical new markets: gay, international, and mobile. Finally, we have increased our efforts to defend against piracy of our content and the propagation of pirated content. The combination of the breadth of our premium assets and the scope of our market reach give us a unique and very defensible position.

During 2010, the DVD market has continued to shrink, with sales for our physical products declining by 18%. However, the DVD business is by no means dead even in this competitive landscape. The content providers that manage to survive the current "clean out" will control the DVD market going forward.

With respect to broadcasting, Private is a leading adult content provider in Europe and Latin America. Private content is currently continuously broadcasted via 194 platforms in 42 countries. In addition to this we are providing content to leading Pay-TV operators. Our strategic partnerships prove to be solid and strong revenue generators and will continue to perform well.

Private's mobile "on portal" revenues declined again in 2010. We are still the most distributed adult brand in the world and will monetize existing distribution as best as we can by going live with the few outstanding carriers and replacing non-performing content aggregators with new ones. During 2010 we have enabled smart phone users to browse, purchase and consume our library of content on all of our web properties and expect to generate substantial growth from this initiative going forward.

Through the acquisition of Gamelink and Sureflix, Private acquired a team of the most innovative and experienced developers in the adult industry who will lead a product development effort focused on a clear goal: increase qualified traffic to our web properties. There are three key strategies: opening our services to third parties to develop products on top of our platform; developing applications like Smart Phone & TV apps that give our content hooks into emerging markets and devices; and developing widgets that will merge the unique data analytics we have with our vast product offering and enable sites to easily leverage our catalog and transactional capabilities to their customers.

One Movie All Screens: the VOD landscape is an endless field of format proliferation. Consumers are forced to purchase the same movie in a variety of different formats at various price points in order to view it on different devices. Our goal is to provide our customers with the ability to watch any movie in our catalog on any screen available to them.

In addition to our online R&D efforts for traffic generation and improving conversion and retention rates, we will continue to explore the most effective way to enable customers to view our movies on all screens. The primary focus of our online R&D efforts will be on delivering content to the TV and enabling purchase and consumption on Smart Phones.

We generate revenues primarily through:

- Internet e-commerce, subscriptions and licensing;
- the broadcasting of movies through IPTV (Internet Protocol Television), cable, satellite and hotel television programming;
- sales of DVDs and magazines;
- sales of adult mobile content, B2B "on-portal" and B2C "off-portal" (wireless); and
- content, brand name and trademark licensing.

The following table illustrates our net sales by product group for the periods indicated.

| | Years ended December 31, | | |
|---|---|---|---|
| | **2008** | **2009** | **2010** |
| | **EUR** | **EUR** | **EUR** |
| *Net sales by product group* | (in thousands) | | |
| Internet ............................................................ | 4,218 | 13,129 | 14,766 |
| Broadcasting ..................................................... | 5,805 | 4,491 | 3,859 |
| DVDs & Magazines ........................................... | 7,687 | 3,843 | 3,151 |
| Wireless ........................................................... | 1,957 | 1,597 | 1,494 |
| Total ................................................................. | 19,667 | 23,061 | 23,270 |

Over time, we expect net sales from DVDs & magazines to continue to decline as a percentage of net sales in relation to total net sales from Internet, broadcasting and wireless. We expect net sales from Internet and wireless broadcasting to grow during the coming years.

We recognize net sales on delivery (for further information, see Critical Accounting Estimates).

Even though we recognize net sales upon delivery, we generally provide extended payment terms to our distributors of between 90 and 180 days. Although our extended payment terms increase our exposure to accounts receivable write-offs, we believe our risk is minimized by our generally long-term relationships with our distributors. In addition, we view our extended payment terms as an investment in our distribution channels which are important to the growth of our business.

Our primary expenses include:

- web page development costs;
- acquisition and licensing of content for our library of photographs and videos;
- printing, processing and duplication costs; and
- selling, general and administrative expenses.

We released 71, 72 and 87 proprietary video titles during 2010, 2009 and 2008, respectively. The releases include both new and archival material. We plan to release more than 50 proprietary video titles in 2011.

Over the years, our cost of sales has been fluctuating relative to net sales due to our use of new mediums for our products, such as the Internet, broadcasting and wireless. We also incur significant intangible expenses in connection with the amortization of our library of photographs and movies and capitalized development costs, which include the Internet. We amortize these tangible and intangible assets on a straight-line basis for periods of between three and five years.

*Restructuring*

During 2009 and 2010 we have faced several organizational challenges as a result of the acquisitions and integration of the online businesses GameLink and Sureflix into the group. Parallel with the integration, we have rebuilt our signature property, private.com, and restructured our affiliate programs in all properties to compete aggressively for affiliate traffic. In addition, we have restructured our departments with resources highly skilled in affiliate traffic development and shifted our emphasis from account management towards sales. We have also developed solutions for critical new markets: gay, international and mobile. Furthermore, as a response to decreased margins in the adult entertainment industry, we have reviewed, analyzed and continued to restructure the operations of the non-online part of the business in order to become more cost effective. All the aforementioned processes have had impact both in terms of lost sales and additional selling, general and administrative expenses. However, as part of these processes, during 2010 we have reduced our workforce by 34% from 168 to 112 employees and we expect to continue this process as we become more efficient and enjoy economies of scale from the aforementioned

acquisitions. During 2011, we expect to benefit from the continued restructuring and reduce costs and increase sales as we implement and launch new initiatives, such as fully combining our Internet assets, outsourcing major parts of our non-online operations and aggressively marketing our new Internet platforms.

**Critical Accounting Estimates**

*General*

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amount of assets and liabilities revenues and expenses. On an ongoing basis, we evaluate our estimates, including those related to impairment of the library of photographs and videos and other long lived assets, allowances for bad debt, income taxes and contingencies and litigation. Accounts receivable and sales related to certain products are, in accordance with industry practice, subject to distributors right of return to unsold items. We base our estimates on historical experience and on various assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily available from other sources. Management periodically reviews such estimates. Actual results may differ from these estimates as a result of unexpected changes in trends.

We believe the following critical accounting policies are significantly affected by judgments and estimates used in the preparation of our consolidated financial statements.

*Recognition of Revenue*

The Company's primary sources of revenue are the sale of content delivered via Internet, broadcasting, DVD & magazines and mobile phones.

Internet video on-demand offerings are sold directly via the Company's online retail websites and are paid for almost exclusively by credit card. The Company recognizes revenue from video-on-demand when the service is rendered and collectability is reasonably assured, specifically, when the customer's credit card is charged, which is, in most cases, simultaneous with delivery of the on-demand video. Credit card payments accelerate cash flow and reduce the Company's collection risk, subject to the merchant bank's right to hold back cash pending settlement of the transactions. The Company also offers a prepaid video-on-demand service in which a customer purchases a number of minutes of on-demand video at a set rate per minute based on the number of minutes purchased. The rate per minute decreases as the number of prepaid minutes increases. The Company records revenue from pre-pay customers as deferred revenue prior to commencement of services and recognizes revenue as the services are rendered. Prepaid minutes purchased under this program do not expire.

The Company also offers a customer loyalty program under which each member's purchase of video on-demand, DVDs, movie downloads, books, novelties or other items earns the member one point for each dollar spent. After accumulating 150 points, a customer may redeem the points for a $5 purchase. Points increase in value as they are accumulated and redeemed, with a maximum accumulation of 2,000 points, which may be redeemed for a $200 purchase. All of a customer's points expire after 180 days of no purchase activity. Because the value of the award points is not significant in relation to the value of the services or products purchased by the customer, the Company records a liability for the estimated cost of the discounted services or products to be provided in the future.

Revenues from the sale of subscriptions to the Company's Internet website are deferred and recognized ratably over the subscription period.

IPTV (Internet Protocol Television), satellite & cable broadcasting revenues are recognized upon delivery when the following conditions have been met (i) license period of the arrangement has begun and the customer can begin its exploitation, exhibition, or sale (ii) the arrangement fee is fixed or determinable and (iii) collection of the arrangement fee is reasonably assured. Such revenues may be generated by either a fixed license fee or as an agreed

percentage of sales, based on sales reported each month by the Company's IPTV, cable and satellite affiliates. The affiliates do not report actual monthly sales for each of their systems to the Company until approximately 60 - 90 days after the month of service ends. This practice requires management to make monthly revenue estimates based on historical experience for each affiliated system. Revenue is subsequently adjusted to reflect the actual amount earned upon receipt. Adjustments made to adjust revenue from estimated to actual have historically been immaterial.

DVDs & Magazines (physical products) are sold both to wholesalers, on firm sale basis, and via national newsstand distributors, with the right to return. Our physical products are generally multi-lingual and the principal market is in Europe. Revenues from the sale of physical products where distributors are not granted rights-of-return are recognized upon transfer of title, which generally occurs upon delivery. Revenues from the sale of physical products under consignment agreements with distributors are recognized based upon reported sales by the Company's distributors. Revenues from the sale of physical products under agreements that grant distributors rights-of-return are recognized upon transfer of title, which generally occurs on delivery, net of an allowance for returned product. Distributors with the right to return are primarily national newsstand distributors. Most of our products are bi-monthly (six issues per year) and remain on sale at a newsstand for a period of two months. Normally, all unsolds are reported to us within a period of four to six months from delivery. There are normally two to four national newsstand distributors for all newspapers and periodicals operating in each country. A majority of our national newsstand distributors are members of Distripress, the international organization for publishers and distributors, and carry out the distribution of the largest national and international newspapers and periodicals, including: Financial Times, Herald Tribune, Time, Newsweek, Vogue, etc. The Company uses specific return percentages per title and distributor based on estimates and historical data. The percentages vary from 50-80%. Percentages are reviewed on an on-going basis. Magazines have an approximate retail price of EUR 11.50 (USD 15.95) per copy and are printed on glossy high-quality paper at a cost of EUR 1.25 (USD 1.75). They are often shrink-wrapped in order to comply with local regulation or guidance for the sale of adult publications. In view of the high retail price, the margin and the physical quality of the magazines and the fact that the content has a very long "shelf-life" since it is not particularly linked to time, trends, fashion or current events, the Company has always collected the returns from newsstands in order to make them available for sale again. The Company operates scheduled re-distribution of returned magazines, via national newsstand distributors, together with DVDs as Magazine/DVD packs as a way of increasing DVD distribution. Since the national newsstand distributors have the right to return, the DVD packs are returned in order to be sold via an additional scheduled re-distribution. The retail price for products sold via re-distribution vary between EUR 14.95-19.95 (USD 20.75-27.70). Magazine returns not re-distributed as per above are sold on a firm sale basis to wholesalers as back numbers at a lower price than new issues. The Company has historically sold all returned copies at an average price higher than, or equal, to cost.

Revenues from mobile content (wireless) sales are recognized based on sales reported each month by mobile operators via aggregators. The aggregators do not report actual monthly sales for each of their operators to the Company until approximately 60 - 90 days after the month of service ends. This practice requires management to make monthly revenue estimates based on historical experience for each affiliated system. Revenue is subsequently adjusted to reflect the actual amount earned upon receipt. Adjustments made to adjust revenue from estimated to actual have historically been immaterial.

*Accounts receivable*

We are required to estimate the collectability of our trade receivables and notes receivable. A considerable amount of judgment is required in assessing the ultimate realization of these receivables including the current credit-worthiness of each customer. Significant changes in required reserves have been recorded in the past and may occur in the future due to the current market environment.

Management reviews the allowance for doubtful accounts on at least a quarterly basis and adjusts the balance based on their estimate of the collectability of specific accounts as well as a reserve for a portion of other accounts which have been outstanding for more than 180 days. This estimate is based on historical losses and information about specific customers. After collection attempts have failed, the Company writes off the specific account.

*Goodwill and Other Intangible Assets*

Goodwill represents the excess of the purchase price paid over the fair value of the net assets of businesses acquired.

Other Intangible Assets represents the value attributable to: a) Customer base, which was acquired from two of the Company's former distributors in the U.S. and in Canada in 2001 and 2003, respectively, (see Note 8). The amortization expense is calculated on a straight-line basis over 10 years for each acquisition, b) Broadcasting asset, which was acquired from International Film Production and Distribution Limited in 2003 (see Note 8). At the time of acquisition, the asset was deemed to have an indefinite life and is not subject to amortization, and c) Trade and Domain names, which were acquired from GameLink and Sureflix (see Note 8). At the time of acquisition, the assets were deemed to have an indefinite life and are not subject to amortization.

Goodwill and indefinite lived intangible assets are reviewed annually for impairment (or more frequently if indicators of impairment arise), see Note 8. Further separable intangible assets that are not deemed to have an indefinite life are amortized over their expected useful lives.

During 2008, 2009 and 2010, the we had impairment charges of EUR 293 thousand, EUR 884 thousand and EUR 1,562 thousand, respectively, and going forward additional impairment charges may occur, see Note 8.

*Impairment of Long-Lived Assets*

The Company evaluates the carrying value of its long-lived assets when events or circumstances indicate the carrying value may not be recoverable through the estimated undiscounted cash flows from the use of the asset. An impairment loss is then measured as the amount by which the carrying value of the asset exceeds its estimated fair value. In 2010, the Company had an impairment charge of EUR 548 thousand relating developed website technology, see Note 6. Going forward additional impairment charges may occur.

*Inventories*

Inventories are valued at the lower of cost or market, with cost principally determined on an average basis. Inventories principally consist of DVD's and magazines held for sale or resale. The inventory is written down to the estimated market value based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected by management, write-downs may be required.

**Results of Operations**

*2010 compared to 2009*

*Net sales.* For the twelve months ended December 31, 2010, we had net sales of EUR 23.3 million compared to net sales of EUR 23.1 million for the twelve months ended December 31, 2009, an increase of EUR 0.2 million, or 1%. The increase was the result of increased Internet sales offset by decreases in sales of DVD & Magazines, broadcasting and wireless. Internet sales increased EUR 1.6 million to EUR 14.8 million, which represents an increase of 12% compared to the same period last year. The increase in Internet sales was the result of our acquisitions last year. Discounting EUR 3.4 million in impact from acquisitions, Internet Sales decreased EUR 1.8 million as a result of the rebuilding of our website private.com. Broadcasting sales decreased EUR 0.6 million, or 14%, to EUR 3.9 million. Wireless sales in the period decreased EUR 0.1 million, or 6%, to EUR 1.5 million as a result of a reduced share in the consumer spend provided to aggregators and content providers by telecom operators in general in this business. DVD & Magazine sales decreased EUR 0.7 million, or 18%, to EUR 3.2 million. The reduction in DVD & Magazine sales was primarily attributable to an industry wide decrease in DVD sales (see discussion under *Outlook* below).

Net sales in general were affected by changes in exchange rates. The annual average U.S. dollar exchange rate for the fiscal year 2010 compared to 2009 increased 4.2% which increased all our sales, cost and expenses denominated in U.S. dollars by the same percentage. Fluctuations in exchange rates between the euro and the dollar

can affect the comparability of our results from year to year. We translate our consolidated subsidiaries whose functional currency is not the euro into the euro for reporting purposes. Income statement amounts are translated into euro using the average exchange rate for the fiscal year. The balance sheet is translated at the year-end exchange rate.

Overall, net sales and margins were affected by the impact of free adult content on the Internet. Going forward, we expect Internet, wireless and Broadcasting sales to increase (see discussion under *Outlook* below).

*Cost of Sales.* Our cost of sales was EUR 16.8 million for the twelve months ended December 31, 2010 compared to EUR 16.9 million for the twelve months ended December 31, 2009, a decrease of EUR 0.1 million. Included in cost of sales is Internet, broadcasting and wireless. printing, processing and duplication and amortization of library. Internet cost was EUR 9.6 million for the twelve months ended December 31, 2010 compared to EUR 7.3 million for the twelve months ended December 31, 2009. Internet cost as a percentage of related sales in the period was 65% compared to 55% in the same period last year. The increase of EUR 2.4 million was primarily the result of the acquisition of our acquisitions last year which contributed EUR 2.6 million. In addition, we rebuilt our private.com membership site and as a result of this we incurred accelerated amortization of EUR 0.4 million of the old site which was decommissioned in May 2010. Finally, developed website technology was charged with impairment of EUR 0.5 million. Discounting the effects of acquisitions, accelerated amortization and impairment, Internet cost would have decreased by EUR 1.1 million. Broadcasting and wireless cost was EUR 0.3 million for the twelve months ended December 31, 2010 compared to EUR 0.6 million for the twelve months ended December 31, 2009. Broadcasting and wireless cost as a percentage of related sales in the period was 6% compared to 10% in the same period last year. Printing, processing and duplication cost was EUR 1.8 million for the twelve months ended December 31, 2010 compared to EUR 3.1 million for the twelve months ended December 31, 2009, a decrease of EUR 1.3 million, or 43%. The decrease was a reflection of the decrease in sales and the absence of write-down of magazine inventory which took place in 2009. Printing, processing and duplication cost as a percentage of DVD & Magazine sales was 57% for the twelve months ended December 31, 2010 compared to 81% in the same period last year. Amortization of library was EUR 5.1 million for the twelve months ended December 31, 2010 compared to EUR 5.8 million for the twelve months ended December 31, 2009, which represents a decrease of EUR 0.7 million. Amortization of library does not vary with sales since it reflects the amortization of our investments in content which has been available for sale for a period of three to five years.

*Gross Profit.* In the twelve months ended December 31, 2010, we realized a gross profit of EUR 6.4 million, or 28% of net sales compared to EUR 6.2 million, or 27% of net sales for the twelve months ended December 31, 2009.

*Selling, general and administrative expenses.* Our selling, general and administrative expenses were EUR 13.1 million for the twelve months ended December 31, 2010 compared to EUR 23.9 million for the twelve months ended December 31, 2009, a decrease of EUR 10.8 million, or 45%. Adjusting the difference for indemnification expense of EUR 0.5 million, impact from last year's acquisitions of EUR 1.8 million offset by the absence of EUR 9.5 million of non-recurring expenses in 2009 made up of: provision against related party receivable of EUR 7.3 million, investment write-off of EUR 1.0 million, expense related to closing down subsidiary of EUR 0.6 million and acquisition related expenses of EUR 0.6 million, we reduced selling, general and administrative expenses by EUR 3.6 million as a result of our restructuring program, see *Restructuring* above for additional discussion.

Considering indications during the three month period ending December 31, 2010, we expect to continue to reduce our selling, general and administrative expenses in 2011, significantly.

*Impairment of goodwill and other intangible assets.* During the twelve month period ended December 31, 2010, we recorded impairment charges of EUR 1.6 million compared to EUR 0.9 million for the twelve months ended December 31, 2009. Impairment charges in 2010 consisted of EUR 1.5 million and EUR 0.1 million related to our newly acquired eCommerce business in USA and our video distribution company in the Benelux countries, respectively. Impairment charge in 2009 related to our video distribution company in the Benelux countries,

*Change in fair value of contingent consideration payable.* During the twelve month period ended December 31, 2010, we recorded a EUR 4.2 million gain from change in fair value of contingent consideration payable as a result of the performance of GameLink and Sureflix. The two recently acquired companies have not reached the

earnout targets set for 2009 and 2010 and the fair value was adjusted accordingly.

*Operating loss.* We reported an operating loss of EUR 4.1 million for the twelve months ended December 31, 2010 compared to an operating loss of EUR 18.6 million for the twelve months ended December 31, 2009. The decrease of EUR 14.5 million in operating loss was the result of the increase in gross profit, the reduction in selling, general and administrative expenses and gain from change in fair value of contingent consideration payable offset by impairment charges.

*Interest expense.* We reported interest expense of EUR 0.3 million for the twelve months ended December 31, 2010, compared to EUR 0.4 million for the twelve months ended December 31, 2009.

*Income tax expense/benefit.* We reported an income tax expense of EUR 0.1 million for the twelve months ended December 31, 2010, compared to an income tax expense of EUR 1.7 million for the twelve months ended December 31, 2009. The income tax expense/benefit recorded for both 2010 and 2009 were deferred.

*Net loss.* We reported a loss of EUR 4.3 million for the twelve months ended December 31, 2010, compared to EUR 20.5 million for the twelve months ended December 31, 2009. The decrease of EUR 16.2 million was primarily the result of decreased operating loss and deferred tax.

*2009 compared to 2008*

*Net sales.* For the twelve months ended December 31, 2009, we had net sales of EUR 23.1 million compared to net sales of EUR 19.7 million for the twelve months ended December 31, 2008, an increase of EUR 3.4 million, or 17%. The increase was the result of increased Internet sales offset by decreases in sales of DVD & Magazines, broadcasting and wireless. Internet sales increased EUR 8.9 million to EUR 13.1 million, which represents an increase of 211% compared to the same period last year. The increase in Internet sales was the result of the acquisition of GameLink and Sureflix which contributed EUR 10.2 million and was offset by a decrease of EUR 1.3 million in our prior Internet business. The decrease in the prior Internet business was the result of a complete reorganization of this business as a result of the rebuilding of the Private websites. Broadcasting sales decreased EUR 1.3 million, or 23%, to EUR 4.5 million primarily as a result of a decrease in cabin royalties and title sales, offset by increases in TV-channel and video on demand sales via IPTV and cable. Wireless sales in the period decreased EUR 0.4 million, or 18%, to EUR 1.6 million as a result of a reduced share in the consumer spend provided to aggregators and content providers by the telcos in general in this business. DVD & Magazine sales decreased EUR 3.8 million, or 50%, to EUR 3.8 million. The reduction in DVD & Magazine sales was primarily attributable to an industry wide decrease in DVD sales (see discussion under *Outlook* below).

Net sales in general were affected by changes in exchange rates. The annual average dollar exchange rate for the fiscal year 2009 compared to 2008 increased 6% which increased all our sales, cost and expenses in dollar by the same percentage. Fluctuations in exchange rates between the euro and the dollar can affect the comparability of our results from year to year. We translate our consolidated subsidiaries whose functional currency is not the euro into the euro for reporting purposes. Income statement amounts are translated into euro using the average exchange rate for the fiscal year. The balance sheet is translated at the year-end exchange rate.

Overall, net sales and margins were affected by the current state of world economy and the impact of free adult content on the Internet. Going forward, we expect Internet, wireless and Broadcasting sales to increase (see discussion under *Outlook* below).

*Cost of Sales.* Our cost of sales was EUR 16.9 million for the twelve months ended December 31, 2009 compared to EUR 13.5 million for the twelve months ended December 31, 2008, an increase of EUR 3.4 million, or 25%.Included in cost of sales is Internet, broadcasting and wireless. printing, processing and duplication and amortization of library. Internet cost was EUR 7.3 million for the twelve months ended December 31, 2009 compared to EUR 1.2 million for the twelve months ended December 31, 2008. Internet cost as a percentage of related sales in the period was 55% compared to 28% in the same period last year. The increase of EUR 6.1 million was primarily the result of the acquisition of GameLink and Sureflix which contributed EUR 5.4 million. In addition, we are rebuilding

our private.com membership site and as a result of this we have incurred increased costs, including accelerated amortization of EUR 0.2 million of the old site which is being decommissioned in May 2010. Broadcasting and wireless cost was EUR 0.6 million for the twelve months ended December 31, 2009 compared to EUR 0.6 million for the twelve months ended December 31, 2008. Broadcasting and wireless cost as a percentage of related sales in the period was 10% compared to 8% in the same period last year. Printing, processing and duplication cost was EUR 3.1 million for the twelve months ended December 31, 2009 compared to EUR 5.4 million for the twelve months ended December 31, 2008, a decrease of EUR 2.3 million, or 42%. The decrease was primarily a reflection of the decrease in sales offset by the write-down of our magazine inventory by 50%. Printing, processing and duplication cost as a percentage of DVD & Magazine sales was 81% for the twelve months ended December 31, 2009 compared to 70% in the same period last year. Amortization of library was EUR 5.8 million for the twelve months ended December 31, 2009 compared to EUR 6.3 million for the twelve months ended December 31, 2008, which represents a decrease of EUR 0.5 million. Amortization of library does not vary with sales since it reflects the amortization of our investments in content which has been available for sale for a period of three to five years.

*Gross Profit.* In the twelve months ended December 31, 2009, we realized a gross profit of EUR 6.2 million, or 27% of net sales compared to EUR 6.2 million, or 31% of net sales for the twelve months ended December 31, 2008. GameLink and Sureflix contributed EUR 4.8 million which was offset by EUR 4.8 million in reduced gross profit from our other lines of business.

*Selling, general and administrative expenses.* Our selling, general and administrative expenses were EUR 24.8 million for the twelve months ended December 31, 2009 compared to EUR 13.1 million for the twelve months ended December 31, 2008, an increase of EUR 11.8 million, or 90%. The increase was primarily the result of the non-recurring expense of EUR 7.3 million associated with the full provision against related party receivable, see Note 13 to the consolidated financial statements, and the acquisition of GameLink and Sureflix which added EUR 5.2 million. The total of  EUR 12.5 million was offset by EUR 0.7 million net in reduced selling, general and administrative expenses in all other areas. The net EUR 0.7 million consisted of a reduction in payroll and general expenses of EUR 1.1 million and EUR 2.0 million, respectively, offset by an increase of EUR 0.3 million in bad debt provision, EUR 0.2 million in depreciation and other non-recurring expenses of EUR 1.9 million, including investment write-off, expense related to closing down subsidiary and acquisition expenses.

Discounting the effect of newly acquired companies and non-recurring expenses, the company reduced selling, general and administrative expenses by EUR 2.6 million.

Overall, selling, general and administrative expenses included EUR 9.5 million of non-recurring expenses made up of: provision against related party receivable of EUR 7.3 million, investment write-off of EUR 1.0 million, expense related to closing down subsidiary of EUR 0.6 million and acquisition related expenses of EUR 0.6 million.

*Operating loss.* We reported an operating loss of EUR 18.6 million for the twelve months ended December 31, 2009 compared to an operating loss of EUR 6.9 million for the twelve months ended December 31, 2008. The increase of EUR 11.7 million in operating loss was the result of the increase in selling, general and administrative expenses.

*Interest expense.* We reported interest expense of EUR 0.4 million for the twelve months ended December 31, 2009, compared to EUR 0.3 million for the twelve months ended December 31, 2008.

*Income tax expense/benefit.* We reported an income tax expense of EUR 1.7 million for the twelve months ended December 31, 2009, compared to an income tax benefit of EUR 1.8 million for the twelve months ended December 31, 2008. The income tax expense/benefit recorded for both 2009 and 2008 were deferred.

*Net loss.* We reported a loss of EUR 20.5 million for the twelve months ended December 31, 2009, compared to EUR 5.2 million for the twelve months ended December 31, 2008. The increase of EUR 15.3 million was primarily the result of increased selling, general and administrative expenses, including EUR 9.5 million of non-recurring expenses and a difference in deferred tax of EUR 3.5 million.

**Liquidity and Capital Resources**

We generate cash from our operating activities and borrowings from third parties. Our principal uses of cash include website development and building our library of photographs and movies.

We reported a working capital deficit of EUR 1.1 million at December 31, 2010, a decrease of EUR 2.4 million compared to the year ended December 31, 2009. The reduction in working capital is attributable to a decrease in current assets and an increase in current liabilities.

*Operating Activities*

Net cash provided by our operating activities was EUR 4.7 million for 2010 compared to EUR 3.3 million for 2009, and was primarily the result of net loss, as adjusted for non-cash transactions. We adjusted our net loss of EUR 4.3 million to reconcile it to net cash flows from operating activities. Adjustments included (1) deferred income taxes EUR 0.3 million, (2) depreciation of EUR 0.7 million, (3) gain from change in fair value of contingent consideration payable of EUR 4.2 million, (4) bad debt provision of EUR 0.7 million, (5) impairment of goodwill and other intangible assets of EUR 1.6 million, (6) amortization of other intangible assets of EUR 0.1 million, (7) amortization of web pages of EUR 3.4 million and (8) amortization of photographs and videos of EUR 5.1 million, providing a total of EUR 11.6 million which was offset by deferred income taxes EUR 0.3 million and gain from change in fair value of contingent consideration payable of EUR 4.2 million, which resulted in an adjusted income of EUR 2.8 million. Changes in operating assets and liabilities added EUR 1.9 million net through trade accounts receivable, inventories, prepaid expenses and other current assets, income taxes payable and accrued other liabilities totaling EUR 2.0 million, offset by EUR 0.1 million from accounts payable trade. The increase in cash provided by operating activities for 2010 compared to 2009 is primarily the result of net loss, as adjusted for non-cash transactions.

Net cash provided by our operating activities was EUR 3.3 million for 2009 compared to EUR 5.2 million for 2008, and was primarily the result of net loss, as adjusted for non-cash transactions. We adjusted our net loss of EUR 20.5 million to reconcile it to net cash flows from operating activities. Adjustments included (1) deferred income taxes EUR 1.7 million, (2) depreciation of EUR 1.0 million, (3) bad debt provision of EUR 7.8 million, (4) write-down of magazine inventory of EUR 0.8 million, (5) amortization of other intangible assets of EUR 0.1 million, (6) impairment of goodwill of EUR 0.9 million, (7) write-off of investment of EUR 1.0 million, (8) amortization of web pages of EUR 2.1 million and (9) amortization of photographs and videos of EUR 5.8 million, which resulted in an adjusted income of EUR 0.8 million. Changes in operating assets and liabilities added EUR 2.6 million net through trade accounts receivable, inventories, prepaid expenses and other current assets and accounts payable trade totaling EUR 3.2 million, offset by EUR 0.7 million from, income taxes payable, related party receivable, and accrued other liabilities. The decrease in cash provided by operating activities for 2009 compared to 2008 is primarily the result of net loss, as adjusted for non-cash transactions, offset by changes in operating assets and liabilities.

Net cash provided by our operating activities was EUR 5.2 million for 2008 compared to EUR 7.6 million for 2007, and was primarily the result of net loss, as adjusted for non-cash transactions and uses of cash related to changes in operating assets and liabilities. We adjusted our net loss of EUR 5.2 million to reconcile it to net cash flows from operating activities. Adjustments included (1) depreciation of EUR 1.0 million, (2) bad debt provision of EUR 0.3 million, (3) amortization of other intangible assets of EUR 0.4 million and (4) amortization of photographs and videos of EUR 6.3 million which was offset by EUR 1.9 million from deferred income taxes, which resulted in an adjusted income of EUR 1.1 million. Changes in operating assets and liabilities added EUR 4.1 million net through trade accounts receivable, inventories, prepaid expenses and other current assets and income taxes payable totaling EUR 5.7 million, offset by EUR 1.6 million from, related party receivable, accounts payable trade and accrued other liabilities. The decrease in cash provided by operating activities for 2008 compared to 2007 is primarily the result of net loss, as adjusted for non-cash transactions, offset by changes in operating assets and liabilities.

*Investing Activities*

Net cash used in investing activities for the fiscal year ended December 31, 2010 was EUR 3.5 million. The investing activities were investment in library of photographs and videos of EUR 1.8 million, which were carried out

in order to maintain the 2010 and 2011 release schedules for videos and capital expenditure of EUR 1.8 million. Capital expenditures is primarily related to investment in our websites. The decrease of EUR 0.4 million over the comparable twelve-month 2009 period is principally due to decreased investment in library of photographs and videos, offset by increased investment in our websites.

Net cash used in investing activities for the fiscal year ended December 31, 2009 was EUR 3.9 million. The investing activities were investment in library of photographs and videos of EUR 2.3 million, which were carried out in order to maintain the 2009 and 2010 release schedules for videos and capital expenditure of EUR 1.6 million. Capital expenditures is primarily related to investment in our websites. The decrease over the comparable twelve-month 2008 period is principally due to decreased investment in library. The decrease in investment in library is the result of our restructuring plans, see above under *Restructuring*.

Net cash used in investing activities for the fiscal year ended December 31, 2008 was EUR 5.4 million. The investing activities were investment in library of photographs and videos of EUR 4.3 million, which were carried out in order to maintain the 2008 and 2009 release schedules for magazines, DVDs. In addition to investment in library of photographs and videos, EUR 1.1 million was invested in capital expenditures. The decrease over the comparable twelve-month 2007 period is principally due to decreased investment in both library and capital expenditures. The decrease in investment in library is the result of our restructuring plans, see above under *Restructuring*.

*Financing Activities*

Net cash used in financing activities for the fiscal year ended December 31, 2010 was EUR 0.2 million, represented primarily by net reductions in borrowings, see *Note 10. Borrowings, in the consolidated financial statements for further information.*

Net cash provided by financing activities for the fiscal year ended December 31, 2009 was EUR 0.1 million, represented primarily by net additions to long-term borrowings of EUR 1.6 million offset by EUR 1.5 million in net reduction of short-term borrowings, see *Note 10. Borrowings, in the consolidated financial statements for further information.*

Net cash provided by financing activities for the fiscal year ended December 31, 2008 was EUR 0.1 million, represented primarily by additions to short-term borrowings of EUR 0.4 million offset by EUR 0.3 million in repayments on short and long-term borrowings.

*Liquidity*

In each of the past three years we have experienced losses from operations. At December 31, 2010, we had cash and cash equivalents of EUR 370,000 and a working capital deficit of EUR 1,102,000. As a result, our independent registered public accounting firm has concluded that there is substantial doubt as to our ability to continue as a going concern, and has modified its report in the form of an explanatory paragraph describing the events that have given rise to this uncertainty. Our ability to continue as a going concern is based on our ability to generate or obtain sufficient cash to meet our obligations on a timely basis and ultimately to attain profitable operations. We currently expect future growth and to return to profitability provided we are successful with the following objectives:

- the continued rollout and successful marketing of our Internet platforms, including: a) our newly built signature property and membership platform private.com, b) our cutting edge mobile platforms for Smart Phones and c) our multinational eCommerce VOD platform;
- the successful marketing of our affiliate programs for all our properties to compete aggressively for, and attract, affiliate traffic;
- continuing the rollout of our content on cable and IPTV video-on demand platforms;
- completing the integration of businesses acquired in 2009;
- consolidating and restructuring our operations into an efficient new media business;
- outsourcing of non-cost effective parts of our operations; and
- identifying and exploring new online business opportunities which are less dependent on content.

If we are not successful in implementing the above objectives, or if we otherwise do not successfully respond to changing conditions in the adult entertainment industry, we may continue to incur significant losses. There can be no assurance that we will be able to operate profitably in the future.

Although we expect that our available cash resources and cash generated from operations will be sufficient to meet our presently anticipated working capital and capital expenditure requirements for at least the next 12 months, we may need to raise additional funds to support more rapid growth or respond to unanticipated requirements. In this regard, we are presently engaged in litigation in New York state court with a third party lender regarding our obligations under a promissory note. An adverse outcome in this dispute would likely have a material impact upon our liquidity if we are unable to obtain additional debt or equity financing to satisfy any resulting liability. In addition, this lender has recently filed an application with the New York court seeking an order attaching assets of the Company as security for the promissory note, which if granted may make it more difficult to obtain bank financing. For additional information regarding this litigation, see Item 3 – "Legal Proceedings." Also see Note 10 to the consolidated financial statements under "Other Debt" for additional information regarding this obligation.

We currently have no additional availability under our existing credit facilities. The existence of a going concern exception by our auditors may make it more difficult to obtain additional bank financing if and when required. If additional funds are raised through the issuance of equity securities, our shareholders' percentage ownership will be reduced, they may experience additional dilution, or these newly issued equity securities may have rights, preferences, or privileges senior to those of our current shareholders. Additional financing may not be available when needed on terms favorable to us, or at all. In this regard, in the past most of our bank financing has included the guaranty of affiliated companies of our Chairman and principal shareholder, Berth Milton, and a pledge of shares of common stock owned by him or his affiliated companies. We cannot assure you that Mr. Milton or his affiliated companies will guaranty future debt financings or that such guaranties will be sufficient to obtain future debt financings. If adequate funds are not available or are not available on acceptable terms, we may be unable to develop or enhance our products and services, take advantage of future opportunities, maintain the scope of our operations or respond to competitive pressures or unanticipated requirements, which could harm our business.

**Outlook**

During 2009 and 2010, We have developed Internet solutions for critical new markets: gay, international and mobile. Furthermore, as a response to decreased margins in the adult entertainment industry, we have reviewed, analyzed and continued to restructure the operations of the non-online part of the business in order to become more cost effective. Last year's acquisitions of GameLink and Sureflix have also presented a challenge in terms of integration. All the aforementioned processes have had impact both in terms of lost sales and additional selling, general and administrative expenses. However, as part of these processes, during 2010 we have reduced our workforce by 34% from 168 to 112 employees and we expect to continue this process as we become more efficient and enjoy economies of scale from the aforementioned acquisitions. During 2011, we will start benefiting from the restructuring and reduce costs while increasing sales as we implement, launch and market new initiatives.

As part of our digital strategy, we have established that the combination of Private with major online retailers and accomplished platform developers is the approach to achieving our goals in the rapidly changing business landscape. The combined content assets of Private and core competencies of GameLink and Sureflix offer a compelling new business model. We will be expanding our joint Internet strategies globally with additional formats and applications to be launched in 2011. Currently we are reformatting and migrating all content on the GameLink VOD platform to a Content Delivery Network (CDN) and we expect this to enhance the user experience substantially and therefore improve both conversion and retention rates in general, but particularly in eastern North America and in Europe. This is a paramount initiative which is expected to increase sales significantly and also make it possible to expand our cooperation with affiliates worldwide. In addition, this initiative is crucial for the development and distribution of apps which will enable consumer access from the growing market of SMART TVs. The completion of the CDN initiative is expected to take place in the second half of 2011. In addition, during 2011 we will continue to aggressively market our recently launched cutting-edge Internet assets discussed below.

In May 2010, we launched our new private.com membership platform which we have been building since

mid 2009. The new platform features a number of proprietary sites and it is also available as a white label[5] version, which we expect will attract adult content providers and affiliates worldwide. In addition, the new platform has been built to be substantially less labor intensive to operate compared to the previous one. The new platform has already proved to have improved conversion rates and during the second half of 2010 the new membership pay-site attracted 73% more unique visitors compared to the previous one in the same period in 2009.

In April 2010, GameLink, launched a proprietary mobile solution enabling users to instantly stream over 15,000 movies. The platform is available to Smart Phones at the url: www.gamelink.com. The mobile Internet platform allows consumers to purchase and consume content instantly. All content is available for future viewing in the customer's virtual media center, stored in the company's "cloud". The platform has been optimized to work with Apple devices including the iPhone, iPod, the iPad as well as Android devices. Furthermore, in 2010, Apple's OS upgrade to iOS4.3 for iPhones, iPads and iPod touches made it possible to watch GameLink's mobile library on Apple TV by allowing users to redirect content streaming from those devices to their Apple TV. In addition to streaming, consumers can choose to download their movies or purchase DVDs and novelties from the globally accessible platform. A white label version of the mobile platform is available and is being marketed to adult studios and affiliates worldwide. Our objective is to become the main provider of an off-portal mobile platform solution to all major content providers in our industry. In contrast to Private's existing mobile content business, which is based on an on-portal model going through content aggregators and carriers, this new business is off-portal and provides substantially improved margins as content is sold directly by ourselves to the consumer. Our weekly sales for the GameLink VOD mobile solution has been steadily increasing since its launch and current weekly sales represents a USD 1.0 million twelve-month run rate. In August 2010, Sureflix introduced mobile VOD on its existing platform for its Maleflixxx network of hundreds of sites. The new mobile platform, Maleflixxx Mobile, allows consumers to view gay content on all mobile devices, including the iPad, iPod Touch, iPhone and Android handsets. Furthermore, in Q4, 2010, we released a number of Smart Phone apps with an end to increase traffic to our mobile assets. With the Smart Phone market growing rapidly[6], we expect to generate substantial growth from our mobile VOD initiatives going forward.

With respect to broadcasting, Private content is currently broadcasted via 194 platforms in 42 countries. We are continuing to implement our media growth strategy across all delivery systems, including: DTT, satellite, cable and IPTV. While European broadband users are signing up for IPTV services in the hundreds of thousands each month, making Europe the biggest and fastest growing IPTV region in the world, we have successfully implemented part of our new media strategy and contracted for supplying content for TVOD[7] services to a total of 26 major platform operators in 18 countries in the region. During 2010 the European IPTV market grew by 25% to 20.7 million IPTV subscribers[8] and by the end of the year we had more than 75% market coverage. France remains the "world champion" IPTV country with 10.3 million subscribers and we cover 100% of this market. In relation to Private branded TV channels carrying our content in Europe and Latin America, our partners Playboy TV International and Playboy TV Latin America continue to improve distribution. In 2010, the Private Spice agreement with Playboy TV International was renewed for another five years. The channel is receivable in all of Europe and it currently has distribution in 22 countries via 101 cable, satellite, DTT and IPTV platforms. During the past twelve months, Playboy TV Latin America continued to increase the distribution of the Private Channel. The channel is receivable in all of Latin America and it currently has distribution in 19 countries via 63 cable, satellite and IPTV platforms and reaches 38 million platform subscribers.

Private's mobile "on portal" revenues declined again in 2010. We are still the most distributed adult brand in the world and will monetize existing distribution as best as we can by going live with the few outstanding carriers and replacing non-performing content aggregators with new ones. During 2010, the distribution of Private content continued to increase and by the end of the year it was available to 1.5 billion handsets via 114 mobile network

---

[5] A white label product or service is a product or service produced by one company (the producer) that other companies (the marketers) rebrand to make it appear as if they made it.

[6] According to Parks Associates report of March, 2010, "Smart Phone: King of Convergence": the number of Smart Phone users is expected to quadruple, exceeding 1 billion worldwide by 2014.

[7] True Video On Demand - (TVOD) - TVOD is the ideal VOD service where individual users get immediate responses when interacting with the VOD system. With TVOD, the user can not only get instant access to the program online and watch it on TV, but also be able to do any VCR or DVD-like commands on the VOD system with the same quick response time as it is when working a VCR or DVD.

[8] According to Point Topic's report of March, 2011, "IPTV Q4 2010 Short Report".

operators in 37 countries. The markets of Asia and the Americas are still underexploited by us and therefore represent a significant growth potential. Furthermore, Mobile TV, increased penetration of Smart Phones and the implementation of age verification systems offer additional growth potential with both current and future operators in 2011 and beyond[9].

During 2010, the DVD market has continued to shrink, with sales for our physical products declining by 18%. However, the DVD business is by no means dead even in this competitive landscape. The content providers that manage to survive the current "clean out" will control the DVD market going forward.

**ITEM 7A.**     **QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

    Not applicable.

**ITEM 8.**     **FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

    Our audited consolidated financial statements and related notes appear at the end of this Report.

**ITEM 9.**     **CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

    Not applicable.

**ITEM 9A.**     **CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

    The Company maintains disclosure controls and procedures designed to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the specified time periods. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to its management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. As of the end of the period covered by this report, the Company's management evaluated, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures. Based on the evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2010.

**Changes in Internal Control Over Financial Reporting**

    There were no changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended December 31, 2010 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Inherent Limitations on Effectiveness of Controls**

    The Company does not expect that its disclosure controls and procedures or its internal control over financial reporting will prevent all error and all fraud. A control procedure, no matter how well conceived and operated, can provide only reasonable not absolute, assurance that the objectives of the control procedure are met. Because of the inherent limitations in all control procedures, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or

---

[9] Juniper Research estimates in its 2010 study 'Mobile Adult Strategies: Downloads, Video Chat, Apps & Messaging 2010-2015.' that global revenues from all mobile adult services will rise from $1.7 billion in 2009 to $2.8 billion by 2015.

mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the control. The design of any control procedure also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control procedure, misstatements due to error or fraud may occur and not be detected.

**Management's Annual Report on Internal Control Over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) of the Securities Exchange Act of 1934. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with United States generally accepted accounting principles. Internal control over financial reporting includes policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with United States generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisitions, use or disposition of the Company's assets that could have a material effect on the financial statements.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2010. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control-Integrated Framework* . Based on this assessment, and on those criteria, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2010.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm.

**ITEM 9B.      OTHER INFORMATION**

## ITEM 10.  DIRECTORS AND EXECUTIVE OFFICERS

**Identification of Directors, Executive Officers and Key Employees**

The following table sets forth all of the current directors, executive officers and key employees of Private Media Group, Inc., their age and the office they hold with Private Media Group or a subsidiary. Executive officers and employees serve at the discretion of the Board of Directors. All directors hold office until the earlier of (1) the confirmation of the Final Report of the Inspector of Elections for the 2010 Annual Meeting of Shareholders, or (2) 2011Annual Meeting of Shareholders.  For information regarding the status of the Final Report of the Inspector of Elections for the 2010 Annual Meeting of Shareholders, see "*Litigation Regarding Election Results for 2010 Annual Meeting of Shareholders*" appearing in Item 3 of this report.

| Name | Age | Position With the Company or Subsidiary |
|---|---|---|
| **Directors** | | |
| Berth H. Milton | 55 | Chairman of the Board, Chief Executive Officer, and President |
| Bo Rodebrant | 58 | Director |
| Peter Dixinger | 43 | Director |
| Jan Jensen | 57 | Director |
| Ilan Bunimovitz | 55 | Director |
| Eric Johnson | 50 | Director; President and CEO of Entruphema, Inc. |
| **Other Executive Officers and Key Employees** | | |
| Johan Gillborg | 49 | Secretary and Chief Financial Officer, Private Media Group, Inc.; Administrator, Milcap Media Group |

The following sets forth certain information with respect to the persons who are members of the Board of Directors, executive officers or key employees of Private Media Group, Inc.:

**Berth H. Milton** was appointed to the Board of Directors of the Company in February 1998 and was the Corporate Secretary from June 1998 until February 1999. In February 1999 Mr. Milton was appointed Chairman of the Board and Chief Executive Officer of Private, and served as Chief Executive Officer until May 2002. In November 2003 Mr. Milton was reappointed President and Chief Executive Officer of the Company and remained as Chief Executive Officer until April 2009. Mr. Milton was reappointed as Chief Executive Officer in July 2010. Mr. Milton was Administrator of Milcap Media Group from its inception until June 2000 and has been acting as an advisor to the Milcap Group since 1991. Mr. Milton is also active in several international industry and real estate projects and developments. Mr. Milton brings to the Board the highest level of business knowledge and experience in the adult entertainment industry in general, and the Company's operations in particular.  This extensive knowledge and experience makes Mr. Milton an extremely valuable experience, both as a visionary in the adult entertainment market generally, and in pursuing commercial ventures which are complementary to the Company's core businesses.

**Bo Rodebrant** was appointed as a Director of Private Media Group, Inc. in August 1998. Mr. Rodebrant has operated his own accountancy and management consulting services, R&S Ekonomiservice, since 1986. Prior to that time he co-founded an ice cream business, Hemglass, which was the largest of its kind in Stockholm, Sweden. The business was sold by Mr. Rodebrant in 1986. Mr. Rodebrant holds a degree in construction engineering which he received in 1974. Mr. Rodebrandt brings to the Board a strong background and experience in both accounting and management consulting.  This background and experience has made him a valuable resource in evaluating business opportunities and addressing accounting issues.  Also, his many years of experience on the Board as an outside director provide a unique perspective to the Board.

**Peter Dixinger** was appointed to the Board of Directors in June 2010. Mr. Dixinger operated his own company, Finanshuset, in Sweden from 2002 to 2010 until its sale to a third party. Mr. Dixinger has continued as an employee of Finanshuset following its sale. The company acts as a licensed independent financial advisor to companies, trusts and high net-worth individuals. Prior to 2002, Mr. Dixinger was a CEO and Board member in the same field of business. Mr. Dixinger holds a Bachelor's Degree in Finance from the University of Stockholm. Mr. Dixinger has extensive background and experience in the areas of investment advice and asset management. These attributes allow Mr. Dixinger to contribute to the Board of Directors a solid understanding in business and financial strategy.

**Jan Jensen** was appointed as a Director of Private in November 2010. Mr. Jensen has operated his own construction and real estate consultancy business, Jenbo AB, in Sweden, since 2008. Prior to this time, Mr. Jensen operated his own agency and retail business, Respira AB, in the fashion industry in Scandinavia for more than 20 years. His business represented several well-known brands such as: Geox, Benetton and Sisley, Jean Franco Ferré, Jean Paul Gaultier Junior and Katherine Hamnett. As the exclusive representative for Benetton and Sisley in Sweden and Finland, Mr. Jensen launched 90 Benetton shops during the period 1985 to 1989. Mr. Jensen was also an active board member and shareholder in Hard Rock Café, Sweden, between 1985 and 1995, and has been a shareholder and board member in several other companies, industry associations and societies. Mr. Jensen's strong understanding of retail and marketing allows him to offer valuable insight to our Board on operational matters and strategic planning. His experience as a director of other companies also contributes to the Board's ability to address corporate governance matters.

**Ilan Bunimovitz** was appointed to the Board of Directors in March 2009 pursuant to his Employment Agreement with Private entered into in January 2009 in connection with the acquisition of Game Link LLC and its affiliate, companies engaged in the business of digital distribution of adult content over the Internet and online eCommerce development. Mr. Bunimovitz was appointed as Executive Vice President of the Company's Online Media Division in January 2009. In April 2009, he was also appointed as Chief Executive Officer of the Company. In July 2010 Mr. Bunimovitz was terminated as CEO of Private. Mr. Bunimovitz was the founder, chief executive officer and co-owner of Game Link LLC prior to its acquisition by the Company, which he operated since its founding in 1993. Since 2011 Mr. Bunimovitz has been an Investment Banker with Ackrell Capital, Inc., a member of FINRA. Mr. Bunimovitz holds a Bachelor's Degree in Psychology from Bar-Ilan University, Israel.

**Eric Johnson** was appointed to the Board of Directors in December 2009 pursuant to his Employment Agreement with Private entered into in October 2009 in connection with the acquisition of Sureflix Digital Distribution Inc. and Sureflix Digital Logistics Inc., companies engaged in the business of digital distribution of premium gay adult content. Mr. Johnson serves as the President and CEO of Entruphema, Inc., a subsidiary of Private which operates the business of the Sureflix companies. Mr. Johnson has served as President, CEO and CFO for the Sureflix group of companies since 2003. Mr. Johnson holds the designations of Chartered Accountant in Canada and C.P.A. in the United States and is a graduate of the University of Toronto where he earned his Bachelor of Commerce Degree. Mr. Johnson's extensive experience in planning and managing on-line adult content is a valuable asset to the Board in matters involving strategic planning. His accounting experience also allows him to contribute to addressing accounting issues.

**Johan Gillborg** was appointed as Chief Financial Officer of Private Media Group, Inc. in August 1998 and has been the Chairman and Managing Director of Milcap Publishing Group AB from 1994 until January 2000.Mr. Gillborg joined the group in 1992 as Marketing Consultant. From 1991 to 1992 he operated his own business which acted as sub-contracting sales force for Securitas Direct of Sweden. From 1988 to 1990, Mr. Gillborg served as a general manager in the hotel business in the United Kingdom and Portugal. Mr. Gillborg holds a Bachelor's Degree in Business Administration from Schiller International University in London.

## Certain Relationships

Effective March 1, 2009, the Company appointed Ilan Bunimovitz as a director to fill the newly created vacancy on the Board. Mr. Bunimovitz was appointed as a director pursuant to his Employment Agreement with the Company and Game Link LLC, a subsidiary of the Company, entered into on January 20, 2009.Under the terms of the Employment Agreement the Company agreed to appoint Mr. Bunimovitz to its Board by March 1, 2009, and to nominate him to continue to serve as a director in 2009, 2010 and 2011 until such time as he ceases to be employed by

the Company. The Employment Agreement was entered into in connection with the acquisition of Game Link LLC and its affiliate by the Company on January 20, 2009, companies engaged in the business of digital distribution of adult content over the Internet and online eCommerce development. Under a separate agreement entered into in connection with the acquisition of Game Link, Berth Milton agreed to vote Private shares beneficially owned by him in favor of Mr. Bunimovitz's election to the Board of Directors in 2009, 2010 and 2011, so long as he continues to be employed by the Company. Effective July 2010 Mr. Bunimovitz ceased to be employed by the Company. Accordingly, Mr. Bunimovitz was not nominated by the Company to serve as a director in connection with the 2010 Annual Meeting of Shareholders held on November 18, 2010.

Effective December 17, 2009, the Company appointed Eric Johnson as a director pursuant to his Employment Agreement with the Company and Entruphema Inc., a subsidiary of the Company, entered into on October 29, 2009. The Employment Agreement was entered into in connection with the acquisition of Entruphema and its affiliate, Sureflix Digital Distribution Inc. on October 29, 2009. Under a separate agreement entered into in connection with the acquisition of Game Link, Berth Milton has agreed to vote Private shares beneficially owned by him in favor of Mr. Johnson's election to the Board of Directors in 2010, 2011 and 2012, so long as he continues to be employed by the Company.

No other director or executive officer serves pursuant to any arrangement or understanding between him or her and any other person. There are no family relationships between any of our directors or executive officers.

**Audit Committee**

We maintain an Audit Committee in accordance with applicable SEC and Nasdaq rules. The Audit Committee is currently comprised of Peter Dixinger, Bo Rodebrandt and Jan Jensen. All of the members of the Audit Committee are "independent" as defined in applicable Nasdaq listing requirements and SEC regulations, and each of them is able to read and understand fundamental financial statements. The Board has determined that Peter Dixinger is an "audit committee financial expert" as defined under applicable SEC regulations. The Audit Committee reviews and recommends to the Board, as it deems necessary, the internal accounting and financial controls for the Company and the accounting principles and auditing practices and procedures to be employed in preparation and review of financial statements of the Company. The Audit Committee makes recommendations to the Board concerning the engagement of independent public accountants and the scope of the audit to be undertaken by such accountants. The Audit Committee has adopted a written Audit Committee Charter.

**Code of Ethics**

We have adopted a code of ethics that applies to our principal executive officer, principal financial officer, principal accounting officer and persons performing similar functions. Our code of ethics is filed as Exhibit 14.1 to this Annual Report on Form 10-K. We intend to satisfy the disclosure requirements under Item 10 of Form 8-K, regarding an amendment to or waiver from our code of ethics, by posting the required information on our corporate Internet website at www.prvt.com or as otherwise permitted under applicable law.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Based solely upon a review of Forms 3, 4 and 5 furnished to Private covering its 2010 fiscal year filed under Section 16(a) of the Securities Exchange Act of 1934, each of Private's officers and directors complied with the reporting requirements under Section 16(a) for the 2010 fiscal year, except as follows: Jan Jensen and Peter Dixinger failed to file a single Form 3 upon being appointed a director of Private in 2010; Eric Johnson failed to file two Form 4's reporting the acquisition of an aggregate of 120,000 shares of common stock.

## ITEM 11.    EXECUTIVE COMPENSATION

The following table summarizes all compensation paid to (i) our two Chief Executive Officers serving during in such capacity during any part of 2010, and (ii) the other most highly compensated executive officer who was serving as an executive officer at the end of 2010 who earned compensation in excess of $100,000 in 2010, in each case for services rendered in all capacities to Private Media Group for the two fiscal years ended December 31, 2009, and December 31, 2010. No other executive officer earned compensation in excess of $100,000 in 2010.

### 2010 Summary Compensation Table

| Name and Principal Position During Fiscal 2010 | Fiscal Year | Salary ($)(1) | All Other Compensation ($)(1) | Total ($)(1) |
|---|---|---|---|---|
| Berth H. Milton, President, CEO,(2)(3) .......................... Director and Chairman of the Board | 2010 | 415,000 | 26,000(4) | 441,000 |
| | 2009 | 625,000 | 58,000(4) | 683,000 |
| Ilan Bunimovitz, CEO, Director, (5) .................................. | 2010 | 196,000 | 22,000(6) | 218,000 |
| Executive Vice President Online Media Division, Private Media Group, Inc.; President, GameLink LLC; President, eLine LLC | 2009 | 279,000 | 30,000(6) | 309,000 |
| Johan Gillborg (7) ............................................... Chief Financial Officer and Secretary, Private Media Group, Inc.; | 2010 | 197,000 | - | 197,000 |
| | 2009 | 206,000 | - | 206,000 |

(1) Salary amounts received in non-US currency have been converted into dollars using the average exchange rate for the applicable year.

(2) Mr. Milton served as CEO until April 2009, at which time he was appointed as President. Mr. Milton was reappointed as CEO in July 2010. The Table includes compensation received by Mr. Milton in all capacities in 2009 and 2010.

(3) Salary received in non-US currency, 311,000 euro in 2010 and 450,000 euro in 2009. As the salary paid to Mr. Milton for 2009 was not approved by the other directors in 2009, in January 2010 the Board of Directors directed that three independent directors, acting as the Compensation Committee, determine and recommend to the Board of Directors an appropriate level of compensation for Mr. Milton for 2009 and 2010.In March 2010 the Board of Directors reduced Mr. Milton's 2009 salary to $432,000 (311,000 euro).The Board determined that the remaining $193,000 (139,000 euro) received by Mr. Milton as salary in 2009 would be retained by Mr. Milton as a retention bonus provided he remains with the Company through December 31, 2011. For additional information, see "Compensatory Arrangements for Berth H. Milton" below.

(4) Comprises amounts paid by the Company for security, local transportation and legal expenses relating to a tax proceeding in Sweden, which may be deemed to be "Other Compensation" under applicable SEC rules. The Company furnished security and local transportation for Mr. Milton and his immediate family in 2010 and 2009, in the amounts of $8,000 and $25,000, respectively. The amounts in the Table for security and local transportation represent the non-business portion of such benefits, valued at the incremental cost to the Company. The Company also paid approximately $18,000 and $33,000 in legal fees for Mr. Milton's account in 2010 and 2009, respectively.

(5) Mr. Bunimovitz was appointed as Executive Vice President of the Company's Online Media Division on January 20, 2009. In April 2009 he was also appointed as Chief Executive Officer of the Company. Mr. Bunimovitz was terminated as an officer in July 2010. Table includes compensation received by Mr. Bunimovitz in all capacities in 2009 and 2010.

(6) Under Mr. Bunimovitz's employment agreement he received a $1,500 per month non-accountable car allowance during the time he served as an officer. He also received health insurance coverage at an amount of $16,000 in 2009 and $12,000 in 2010 under an executive plan which is available generally to Company employees. The Company also provided 401(k) matching at an amount of $2,400 and $4,000 in 2010 and 2009. The amount in the table represents the non-business portion of the car allowance and the dollar amount of premiums paid by the Company for Mr. Bunimovitz's health insurance.

(7) Salary received in non-US currency, 148,000 euro in 2010 and 148,000 euro in 2009.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 51 of 105

No bonuses or stock awards were granted to any of the named executive officers in 2009 or 2010 other than the retention bonus for Mr. Milton described in Note 3 above and in the section below entitled "Compensatory Arrangements for Berth H. Milton."

**Compensatory Arrangements for Berth H. Milton**

During the fiscal year ended December 31, 2009, Berth H. Milton received cash compensation totaling EUR 450,000 for services rendered to the Company during 2009 as Chairman, President and Chief Executive Officer (In 2009 Mr. Milton served as CEO of the Company until April 2009). As the amounts paid to Mr. Milton as compensation for 2009 were not approved by the other directors in 2009, in January 2010 the Board of Directors directed that three independent directors, acting as the Compensation Committee, determine and recommend to the Board of Directors an appropriate level of compensation for Mr. Milton for 2009 and 2010.

In March 2010, based in part upon information provided by Mercer Consulting S.L., a large independent international compensation consultancy firm retained by the Compensation Committee, the Compensation Committee recommended a compensation proposal for Berth Milton for 2009 and 2010, which was approved by the Board of Directors on March 5, 2010. Following is a description of the compensation proposal for Mr. Milton for 2009 and 2010, approved by the Board of Directors.

2009 Compensation – Mr. Milton was entitled to a salary of EUR 311,000 for 2009. The remaining EUR 139,000 received by Mr. Milton in 2009 would be retained by Mr. Milton as a retention bonus ("Retention Bonus"). Mr. Milton is required to return the EUR 139,000 Retention Bonus to the Company if he does not remain with the Company through December 31, 2011.

2010 Compensation – Mr. Milton was entitled to receive a salary of EUR 311,000, and was entitled to a performance bonus of up to 50% of his 2010 base salary (EUR 155,500) as follows:

- Mr. Milton was eligible to receive a bonus of up to 32.5% of his 2010 base salary, if the share price of the Company's Common Stock at the end of 2010 was greater than $3.00, *pro rata* based upon the amount increase of the share price over $3.00, with the maximum amount (32.5%) earned if the share price equals or exceeds $6.00.
- Mr. Milton was eligible to receive a bonus of up to 17.5% of his 2010 base salary based upon certain corporate projects completed by Mr. Milton in 2010.

No portion of the performance bonus was earned for 2010.

**Compensation Committee Interlocks and Insider Participation**

During the last fiscal year Bo Rodebrandt, Daniel Sánchez and Johan Carlberg, none of whom are officers, former officers or employees of the Company, acted as the Compensation Committee. During the last fiscal year, none of our executive officers served on our Board of Directors or Compensation Committee of any other entity whose officers served either on our Board of Directors or Compensation Committee.

**Grants of Plan-Based Awards in the Last Fiscal Year**

There were no plan-based awards granted to the individuals named in the Summary Compensation Table above for the year ended December 31, 2010.

**Outstanding Equity Awards at 2010 Fiscal Year-End**

No stock options, stock awards or equity incentive plan awards were issued in 2010 or were outstanding at the end of 2010 for the individuals named in the Summary Compensation Table.

**Option Exercises and Stock Vesting During 2010**

No stock options were exercised during 2010 by the individuals named in the Summary Compensation Table. No stock awards were issued or outstanding during fiscal 2010.

**Employment Contracts, Termination of Employment Contracts and Change in Control Arrangements**

We generally do not enter into long-term employment agreements with our executive officers. We generally do not enter into severance agreements or similar agreements providing for payments upon termination of employment or change-in-control. Such agreements, when entered into, are negotiated on a case-by-case basis. We have not entered into any employment agreements or severance agreements with the named executive officers other than Ilan Bunimovitz.

Ilan Bunimovitz was appointed as a director in March 2009 pursuant to his Employment Agreement with the Company and Game Link LLC, a subsidiary of the Company, entered into on January 20, 2009. The Employment Agreement was entered into in connection with the acquisition of Game Link LLC and eLine LLC by the Company on January 20, 2009, companies engaged in the business of digital distribution of adult content over the Internet and online eCommerce development. Mr. Bunimovitz was the founder and chief operating officer of Game Link LLC and an indirect co-owner of Game Link LLC and eLine, LLC. The Employment Agreement provided for Mr. Bunimovitz to serve as Executive Vice President of the consolidated Internet and Internet-related business conducted by the Company and its subsidiaries for a period of three years, subject to earlier termination by either party under specified circumstances. Under the terms of the Employment Agreement the Company agreed to appoint Mr. Bunimovitz to its Board by March 1, 2009, and to nominate him to continue to serve as a director in 2009, 2010 and 2011 until such time as he ceased to be employed by the Company. The Employment Agreement provided for Mr. Bunimovitz to receive an annual base salary of $281,828, $271,070 and $302,648 in the first, second and third years of the employment term. He was also entitled to receive stock options on the same terms as stock options granted to Berth Milton, the Company's Chairman, President and principal shareholder, during the term of the Employment Agreement, in an amount proportionate to the relative stock ownership as between Mr. Bunimovitz and Mr. Milton. If the Company terminated Mr. Bunimovitz's employment during the term of the Employment Agreement other than for "cause," or if Mr. Bunimovitz terminated his employment with the Company for "good reason," then Mr. Bunimovitz would be entitled to continue to receive his monthly base salary for the remaining period of the three year term. In April 2009 Mr. Bunimovitz was also appointed as the Company's Chief Executive Officer, and his Employment Agreement was modified to provide for an annual base salary in each of the three years of his employment term of $295,000 per year. Mr. Bunimovitz's Employment Agreement also provided for a non-accountable monthly car allowance of $1,500 per month and health insurance benefits equivalent to benefits afforded to other executive officers of the Company. On July 19, 2010, Ilan Bunimovitz was terminated as Chief Executive Officer for "cause" (as defined in the Employment Agreement). Mr. Bunimovitz is contesting his termination for "cause" in a private arbitration proceeding pursuant to the terms of his Employment Agreement.

## Director Compensation During 2010

The following table summarizes all compensation paid to our non-employee directors during 2010.

### 2010 DIRECTOR COMPENSATION TABLE

| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($) | Option Awards ($) (2) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($)(1) |
|---|---|---|---|---|---|---|
| Bo Rodebrant | 29,333 | - | - | - | - | 29,333 |
| Lluis Torralba | - | - | - | - | - | - |
| Johan G. Carlberg (3) | 17,333 | - | - | - | - | 17,333 |
| Daniel Sánchez (4) | 29,333 | - | - | - | - | 29,333 |
| Peter Dixinger (5) | 5,333 | - | - | - | - | 5,333 |
| Jan Jensen | - | - | - | - | - | - |

(1) Fee earned in non-US currency have been converted into dollars using the average exchange rate for the applicable year.
(2) Reflects the fair market value amount at the date of grant using the assumptions set forth in Note 18 to the financial statements included elsewhere in this Annual Report.
(3) The director earned 13,000 euro in non-US currency and, as of December 31, 2010, the director had 3,000 options outstanding.
(4) The director earned 22,000 euro in non-US currency and, as of December 31, 2010, the director had 6,668 options outstanding.
(5) The director earned 4,000 euro in non-US currency [and, as of December 31, 2010, the director had no options outstanding.

Our Board of Directors may, at its discretion, compensate directors for attending board and committee meetings and reimburse the directors for out-of-pocket expenses incurred in connection with attending such meetings.

We have agreed to pay our independent directors a fee of EUR 1,000, for each board and committee meeting attended. With respect to Bo Rodebrant, we have agreed to pay a fee of EUR 1,000, for each committee meeting attended.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 54 of 105

# ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table presents certain information as of April 8, 2011, regarding the beneficial ownership of our common stock by:

- each of our directors and executive officers individually,
- all persons known by us to be beneficial owners of five percent or more of our common stock, and
- all of our directors and executive officers as a group.

Unless otherwise indicated in the footnotes below, based upon information known to the Company, the persons and entities named in the table have sole voting and investment power as to all shares beneficially owned.

| Name and Address | Number of Shares Beneficially Owned (1) | Percent Beneficially Owned (1) |
|---|---|---|
| Berth H. Milton (2) …………………….…… | 9,059,840 (3) | 43.5% |
| Consipio Holding BV ………………………… | 5,600,000 (4) | 26.9% |
| RS Platou Markets AS ………………………… | 2,929,672 (5) | 14.1% |
| Tisbury Services Inc. ………………………… | 2,781,029 (6) | 13.4% |
| Abacus (Nominees) Limited …………………… | 2,781,029 (6) | 13.4% |
| Ilan Bunimovitz (7) ………………………… | 1,875,951 | 9.0% |
| Eric Johnson (2)…………………………… | 130,000 | * |
| Johan Gillborg (2) ………………………… | 35,000 | * |
| Bo Rodebrant (2) ………………………… | - | - |
| Peter Dixinger (2) ………………………… | - | - |
| Jan Jensen (2) ……………………………… | 21,281 | * |
| All Executive Officers and Directors as a group (7 people) ……………….............… | 11,102,072 | 53.3% |

---

\*      Denotes less than 1%

(1)   Beneficial ownership is determined in accordance with rules of the U.S. Securities and Exchange Commission. The calculation of the percentage of beneficial ownership is based upon 20,815,824 shares of common stock outstanding on April 8, 2011. In computing the number of shares beneficially owned by any shareholder and the percentage ownership of such shareholder, shares of common stock which may be acquired by such shareholder upon exercise or conversion of warrants or options which are currently exercisable or exercisable within 60 days of April 8, 2011, are deemed to be exercised and outstanding. Such shares, however, are not deemed outstanding for computing the beneficial ownership percentage of any other person. Except as indicated by footnote, to our knowledge, the persons named in the table above have the sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them.

(2)   His mailing address is c/o Milcap Media Group SLU, Calle de la Marina 16-18 Floor 18 Suite D, 08005 Barcelona, Spain.

(3)   All of these shares have been pledged by Mr. Milton or entities controlled by Mr. Milton or are subject to liens or claims by third parties. Accordingly, Mr. Milton may be deemed to share voting and investment power with respect to these shares. Includes 1,842,179 shares held in Mr. Milton's margin brokerage account with RS Platou Markets. As disclosed in Note 5, RS Platou also claims beneficial ownership and sole voting and investment power of these 1,842,179 shares under the terms of pledge agreements entered into between RS Platou and Mr. Milton. As disclosed in Note 4, Consipio Holding BV also claims sole voting and investment power over the 5,600,000 shares beneficially owned by Mr. Milton based upon a pledge agreement with Slingsby Enterprises Limited.

(4)  Based upon information reported by Consipio Holding BV on Schedule 13D filed with the SEC on August 11, 2010. The 5,600,000 shares of Common Stock as to which beneficial ownership is claimed by Consipio are the subject of a pledge agreement executed in favor of Consipio (as successor in interest to Commerzbank AG) by Slingsby Enterprises Limited to secure certain indebtedness of the Company to Consipio. Slingsby is controlled by Berth H. Milton. In July 2010 Consipio delivered a written demand for payment and notice of default to the Company, Slingsby, Mr. Milton and each member of the board of directors of the Company. The demand for payment included a demand for delivery of the pledged shares and formal notice to Slingsby, the Company and Mr. Milton that Consipio claims voting power over the 5,600,00 shares under the pledge agreement. Berth Milton also claims beneficial ownership and sole voting and investment power of these 5,600,000 shares. The business address of Consipio is Walsoordensestraat 70, NL-4588 KD, Walsoorden, The Netherlands.

(5)  Based upon information reported by RS Platou Markets AS on Schedule 13G filed with the SEC on February 16, 2010. Includes 1,842,179 shares held in Mr. Milton's margin brokerage account with, RS Platou Markets. Berth Milton also claims beneficial ownership and sole voting and investment power of these 1,842,179 shares. Its mailing address is Post Office Box 1474 Vika, Oslo, Norway N-0116.

(6)  Based upon information reported by Abacus (Nominees) Limited ("Abacus") and Tisbury Services Inc. ("Tisbury") on Schedule 13D jointly filed by them with the SEC on August 12, 2010, relating to 2,781,029 shares directly owned by Tisbury. Tisbury is wholly owned by Golden Lake Trust, a discretionary and revocable trust organized under the laws of Cyprus ("Golden Lake"). Abacus is the sole trustee of Golden Lake and, as such, directs the voting and investment of Golden Lake's portfolio securities. These investment and voting decisions are made by the 16 member board of directors of Abacus. Tisbury and Golden Lake are private investment and financing vehicles. Abacus is in the business of providing business services, including trustee services, to international clients. The mailing address of these filers is c/o Abacus (Nominees) Limited, Elenion Building, 2nd Floor, 5 Themistocles Dervis Street, CY-1066, Nicosia, Cyprus. Abacus (Nominees) Limited disclaims beneficial ownership of these shares.

(7)  Based upon information reported by Ilan Bunimovitz on Schedule 13D/A filed with the SEC on September 2, 2010. His mailing address is 515 Arkansas Street, San Francisco CA 94107, USA.

**Changes in Control**

As described under Item 3 – Legal Proceedings and Item 13 - Certain Relationships and Related Transactions and Director Independence, appearing elsewhere in this Report, on July 9, 2010, the Company received a notice from Consipio Holding BV advising it that the Company continues to be in default under the Note held by Consipio and requesting Slingsby Enterprises Limited to deliver 3,950,000 shares of common stock as collateral to Consipio under the terms of the Pledge Agreement, in addition to the 1,650,000 shares previously pledged by Slingsby under the Pledge Agreement. In addition, pursuant to such notice Consipio purported to exercise the right as pledgee to vote all of the collateral shares, including the 1,650,000 shares of common stock previously pledged as collateral, so long as an event of default has occurred and is continuing under the Note. On September 16, 2010, the Company was notified by Consipio that it intended to nominate six directors at the 2010 Annual Meeting, five of whom had not been nominated by the Company's Board of Directors. In October 2010 Consipio obtained an order from a Nevada state court requiring the Company to recognize the right of Consipio to vote the 5,600,000 shares it claims as collateral at the 2010 Annual Meeting of Shareholders held on November 18, 2010. The Company has appealed this ruling to the Nevada Supreme Court. If the October 2010 Order is ultimately determined to be valid, this could result in a change in control of the Company at some time in the future. There are no assurances as to the outcome of the appeal or any other proceedings to determine the rights of Consipio to vote these shares. For additional information regarding this litigation and the status of the voting results for the 2010 Annual Meeting, see "*Litigation Regarding Election Results for 2010 Annual Meeting of Shareholders*" appearing in Item 3 of this report.

**Equity Compensation Plan Information**

We have an expired Employee Stock Option Plan ("the 1999 Plan") and a new Equity Incentive Plan (the "2009 EIP") available. The 1999 Plan, was in effect until its expiration on March 1, 2009. The 1999 Plan authorized us to grant stock options exercisable for up to an aggregate of 2,400,000 shares of common stock. No stock options may be granted under the 1999 Plan, following its expiration. At December 31, 2010, options for 8,668 shares were

outstanding under the 1999 Plan. The 2009 EIP was shareholder approved and came into effect on December 16, 2009. It allows the Company to grant incentive stock options, non-statutory stock options, restricted stock, unrestricted stock and other equity-based awards, such as stock appreciation rights, phantom stock awards, and restricted stock units, which we refer to collectively as Awards. The Company may issue up to 2,066,667 shares of its common stock pursuant to Awards granted. Shares pursuant to Awards that have expired or are forfeited will be returned to the 2009 EIP.

Full details of the plans are included in Note 18 to the financial statements and are summarized below as of December 31, 2010:

| | | |
|---|---|---:|
| ( a ) | Number of securities to be issued upon exercise of outstanding options, warrants and rights | 9,668 |
| ( b ) | Weighted-average exercise price of outstanding options, warrants and rights | $6.42 |
| ( c ) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in row (a) above) | 2,065,667 |

We do not maintain any other equity compensation plans.

**ITEM 13.     CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

**Related Transactions**

*Guaranty of Commerzbank Note by Affiliate of Berth Milton*

In December 2001 the group's holding company, Private Media Group, Inc., borrowed $ 4.0 million from Commerzbank AG pursuant to a Note originally due on December 20, 2002. The Note bore interest at an annual rate of 7%, payable quarterly, with the entire principal amount and accrued interest originally due on December 20, 2002. The Note was guaranteed by Slingsby Enterprises Limited, an affiliate of Berth Milton, Private's Chairman, President and principal shareholder, and the guaranty was secured by 1,650,000 shares of Private Media Group, Inc. common stock. In December 2002 Commerzbank AG agreed to extend the maturity date of the Note to March 20, 2003. In April 2003 the Note was acquired by Consipio Holding b.v. from Commerzbank AG, and Consipio and Private reached an agreement-in-principle with Consipio to extend the maturity of the Note until April 2008. However, Consipio and Private were unable to reach final agreement on other terms and conditions relating to the restructured Note. Accordingly, in December 2003 Consipio notified Private and Slingsby Enterprises that Private was in default under the Note, and demanded $3.4 million as payment in full of all outstanding principal and interest under the Note. The Company continued to make regular payments on the Note, including principal and accrued interest, through February 2008. In April 2008 Consipio requested Private to pay the remaining balance of the Note, without indicating the amount due. Private in turn requested that Consipio provide a statement of the amount due and the basis for its calculation. In response, Consipio demanded payment of $3,194,000 as settlement in full of the Note, to be received by May 9, 2008. This calculation was made using an interest rate of 9.9%, as opposed to the 7% rate provided under the original terms of the Note. Consipio also advised that if payment was not received on such date it would institute litigation, in which event Consipio would claim that the amount due under the Note should be denominated in Euro, rather than U.S. dollars. In August 2008 Consipio notified Private that the Note was in default and that it intended to exercise its rights under the Note and the pledge of shares by Slingsby of Private common stock. Private believes that the amount due under the Note at May 9, 2008, including accrued interest, was no more than $2.4 million ($2.9 million at December 31, 2010), utilizing an interest rate of 7%.

For additional information regarding this litigation, see Item 3 – "Legal Proceedings," and Item12 - "Security Ownership of Certain Beneficial Owners and Management – Changes in Control" elsewhere in this Report.

*Guaranty of EUR One Million Loan by Affiliate of Berth Milton*

In December 2007 an affiliate of Mr. Milton agreed to guarantee a bank line of credit agreement of Euro 1.0 million entered into by one of the Company's European subsidiaries, which was originally due on December 31, 2008, and was subsequently extended until it expired in December 31, 2009. On December 11, 2009, the credit line of Euro 1.0 million was refinanced with a six year term loan by an institutional lender at an interest rate of EURIBOR + 1.2%. Interest is payable annually starting December 11, 2010 and the loan is repayable in equal annual installments over a five year period starting December 11, 2011 (the "December 2009 Refinancing"). The December 2009 Refinancing was arranged and guaranteed by an affiliate of Berth Milton and the guaranty is secured by 666,667 shares of Private common stock beneficially owned by Mr. Milton.

*Unsecured Loans to Slingsby Enterprises Limited*

We have unsecured loans to Slingsby Enterprises Limited ("Slingsby"), an entity controlled by Mr. Milton (the "Slingsby Loans"). The Slingsby Loans bear interest at the rate of EURIBOR+1% per annum and have no maturity date. During 2010 the highest amount outstanding was EUR 7.1 million. As of December 31, 2010, and March 31, 2011, EUR 7.1 million and EUR 7.1 million, respectively, remained outstanding on these loans, including interest. No payments of principal or interest have been made in respect of the Slingsby Loans. As of December 31, 2010, there are no amounts recorded in the Company's financial statements with respect to the loans, see below for further information.

In connection with the acquisition of Game Link LLC by the Company on January 20, 2009, in order to induce the sellers to consummate the acquisition, Slingsby Enterprises Limited entered into an agreement (the "GameLink Letter Agreement") with the Company and the sellers with regard to the partial repayment of the Slingsby Loans. Under the GameLink Letter Agreement, in each of the fiscal years ended December 31, 2009, 2010, and 2011, Slingsby is required to repay not less than EUR one million, either in cash or in Private common stock valued at its fair market value as determined by the disinterested directors of Private, to be applied first to accrued interest and then to principal of the loan. At December 31, 2010, Slingsby had not made the EUR one million payments due on December 31, 2009 and December 31, 2010.

In January 2010 Mr. Milton advised the Company's Board of Directors that Slingsby did not make the EUR one million payment due under the GameLink Letter Agreement on December 31, 2009, as he had arranged for the EUR one million December 2009 Refinancing on terms favorable to the Company and arranged for the pledge of 666,667 shares of common stock beneficially owned by Mr. Milton to secure the December 2009 Refinancing. In February 2010 the Company's independent directors determined that it was not in the best interest of the Company to enforce the December 31, 2009 EUR one million payment obligation under the GameLink Letter Agreement, in view of its determination that the arrangement by Mr. Milton of December 2009 Refinancing was done in good faith and was in the best interests of the Company and that Mr. Milton's involvement in the refinancing was an important factor in completing this financing, but that the payments due in 2010 and 2011 would remain in place.

The independent directors further determined in April 2010 that the terms of the Slingsby Loan should be renegotiated with Mr. Milton to reflect reasonable market terms in view of a number of factors, including the size of the loan, the failure of Slingsby Enterprises Limited to make the scheduled payment due on December 31, 2009, the absence of any security for the loan and the absence of a fixed maturity date or agreed payment schedule sufficient to repay the full amount of the Slingsby Loan. In April 2010 Mr. Milton proposed to restructure the payment terms of the Slingsby Loan to provide for a personal guaranty of the Slingsby Loan by Mr. Milton, a fixed maturity date of five years, and payments of EUR 1 million, in cash or Private common stock, in 2011 and 2012. However, the Company and Mr. Milton were unable to reach agreement on the material terms of the restructuring of the Slingsby Loan. Based upon the payment history of the loan and the absence of any security for the Slingsby Loan, in May 2010 the Company determined to fully provide against the Loan in its financial statements until such time as the terms of the Slingsby Loan are modified to provide adequate assurances of the collectability of the Slingsby Loan. As of the date of this Report no agreement has been reached regarding the restructuring of the Slingsby Loan.

The terms of the GameLink Letter Agreement provide that it may not be amended without the consent of the GameLink sellers, which includes Ilan Bunimovitz. These terms require payments of the Slingsby Loan of EUR1 million, in cash or Private common stock, on or before December 31, 2009, 2010 and 2011. Therefore, any restructuring of the Slingsby Loan which requires a modification of the payment terms in the GameLink Letter Agreement will be subject to obtaining the consent of the GameLink sellers. As of the date of this report the GameLink sellers have not agreed to waive or defer any required payments, including the payment required to be made by Slingsby to Private on December 31, 2009, and December 31, 2010.

For additional information regarding the Slingsby Loans, see Item 3 – "Legal Proceedings – Nevada State Court Action," and the Company's Consolidated Financial Statements, "Note 2 - Summary of significant accounting policies – Reclassifications and Immaterial Error," appearing elsewhere in this report.

*Game Link Agreements*

In January 2009 the Company completed the acquisition of Game Link LLC and eLine LLC, companies engaged in the business of digital distribution of adult content over the Internet and online eCommerce development. Mr. Bunimovitz was the founder and chief operating officer of Game Link LLC and an indirect co-owner of Game Link LLC and eLine, LLC. In consideration of the acquisition of Ilan Bunimovitz's interests in Game Link LLC and eLine LLC, he received 2,066,725 shares of the Company's common stock and he is entitled to receive up to an additional 1,112,852 shares of common stock if the combined EBITDA of the digital media operations of the Company and Game Link meet specified targets in 2009, 2010 and 2011. The total value of the shares received and to be received by Mr. Bunimovitz in connection with the acquisition, assuming the EBITDA targets are met in 2009,

2010 and 2011, is EUR 7,418,271 (USD 9,634,118), based on the closing price of the Company's common stock on January 20, 2009. The Company and the sellers have not yet reached agreement as to what extent the EBITDA target has been met for 2009 or 2010.

In connection with the acquisition by the Company of Game Link LLC and its affiliate, Game Link LLC entered into a lease agreement with 537 Stevenson Street L.L.C., a limited liability company which is 50% owned by Mr. Bunimovitz, providing for the lease by Game Link LLC of the land and building used by Game Link in San Francisco, California. The lease extends through December 31, 2011, has a base rent of $13,620 per month, and provides for Game Link to be responsible for property taxes and maintenance expenses during the term of the lease.

*Sureflix Transactions*

Effective December 17, 2009, the Company appointed Eric Johnson as a director pursuant to his Employment Agreement with the Company and Entruphema Inc., a subsidiary of the Company ("<u>Entruphema</u>"), entered into on October 29, 2009. The Employment Agreement was entered into in connection with the acquisition of Entruphema and its affiliate, Sureflix Digital Distribution Inc. on October 29, 2009, companies engaged in the business of digital distribution of premium gay adult content. Mr. Johnson was the chief executive officer and a minority owner of Entruphema prior to its acquisition by Private on October 29, 2009.

The Employment Agreement provides for Mr. Johnson to serve as Chief Executive Officer of Entruphema for a period of three years, subject to earlier termination by either party under specified circumstances. Under the terms of the Employment Agreement the Company agreed to appoint Mr. Johnson to its Board by December 31, 2009, and to nominate him to continue to serve as a director in 2010 and 2011 until such time as he ceases to be employed by Entruphema. The Employment Agreement provides for Mr. Johnson to receive an annual base salary of CAD 235,000 during each year of the three year employment term. If Entruphema terminates Mr. Johnson's employment during the term of the Employment Agreement other than for "cause," or if Mr. Johnson terminates his employment with the Entruphema for "good reason," then Mr. Johnson is entitled to continue to receive his monthly base salary for the remaining period of the three year term.

In consideration of the acquisition of Mr. Johnson's interest in Entruphema, he received non-voting Class A Preference Shares of Entruphema convertible into 130,000 shares of the Company's common stock, and he is entitled to receive additional Class A Preference Shares convertible into up to 70,000 shares of the Company's common stock if the combined EBITDA of the digital media operations of the Company and Entruphema meet specified targets in the three months ended December 31, 2009, the two 12-month periods ending December 31, 2010 and 2011, and the nine month period ending September 30, 2012. The Company and the sellers have not yet reached agreement as to what extent the EBITDA target has been met for the three months ended December 31, 2009, and the 12 months ended December 31, 2010.

The total value of the shares received and to be received by Mr. Johnson in connection with the acquisition, assuming the EBITDA targets are met, is $474,000, based on the closing price of the Company's common stock on October 29, 2009. The total value of the acquisition of Entruphema by the Company, based upon shares received and to be received by all of the sellers of Entruphema common stock in the transaction, including Mr. Johnson, assuming the EBITDA targets are met, is $4,740,000, based on the closing price of the Company's common stock on October 29, 2009.

**Review and Approval of Related Party Transactions**

Our Audit Committee is responsible for the review and approval of all related party transactions required to be disclosed to the public under SEC rules. This procedure, which is contained in the written charter of our Audit Committee, has been established by our Board of Directors in order to both meet the requirements of applicable Nasdaq rules requiring review and approval of related party transactions, and to serve the interests of our shareholders. In addition, we maintain a written Code of Ethics which requires all employees, including our officers, to disclose to the Audit Committee any material relationship or transaction that could reasonably be expected to give rise to a personal conflict of interest. Related party transactions are reviewed and approved by the Audit Committee on a case-by-case basis. Under existing, unwritten policy no related party transaction can be approved by the Audit

Committee unless it is first determined that the terms of such transaction is on terms no less favorable to us than could be obtained from an unaffiliated third party on an arms-length basis and is otherwise in our best interest.

**Director Independence**

All of the members of our Board of Directors are "independent" as defined in Nasdaq Stock Market Rule 5605(a)(2) other than Berth Milton, who is our Chairman and CEO, Ilan Bunimovitz, a director and former CEO, and Eric Johnson, who is President of Entruphema, Inc., a subsidiary of Private.

Our Board of Directors has an Audit Committee and a Compensation Committee. Our Board of Directors does not have a formal nominating committee. Therefore, all decisions regarding director nominations are addressed by the entire Board of Directors, subject to the approval of a majority of the independent directors. All of the members of the Audit Committee are independent under applicable SEC and Nasdaq listing rules.

Mr. Rodebrandt was appointed to the Audit Committee on January 14, 2010, on an interim basis, to replace Lluis Torralba. Prior to his appointment to the Audit Committee, a company owned and operated by Mr. Rodebrandt provided services to a subsidiary of Private, for which it was paid fees of less than $120,000 in 2007, 2008, 2009 and 2010.

## ITEM 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES

**Fees Paid to BDO Auditores, S.L.**

Following is information regarding fees billed by BDO Auditores, S.L. for services rendered to the Company in 2009 and 2010.

*Audit Fees.* The aggregate fees billed to the Company by the Company's principal accountant, BDO Auditores, S.L., for the audit of the Company's annual financial statements and for the review of the financial statements included in the Company's quarterly reports on Form 10-Q totaled $275,000 and $139,000 in 2009 and 2010, respectively. Audit fees consist of fees for the audit and review of the Company's financial statements, statutory audits, consents and assistance with and review of documents filed with the SEC.

*Audit-Related Fees.* BDO Auditores, S.L. did not provide any assurance or related services which are not included under "Audit Fees" in 2009 and 2010, respectively.

*Tax Fees.* BDO Auditores, S.L. did not provide any tax compliance, tax advice, or tax planning services in 2009 and 2010, respectively.

**Policy on Audit Committee Pre-Approval of Audit and Permissible Non-Audit Services of Independent Auditors**

The Audit Committee pre-approves all audit and permissible non-audit services provided by the Company's independent auditors. These services may include audit services, audit-related services, tax and other services. Pre-approval is generally provided for up to one year, and any pre-approval is detailed as to the particular service or category of services and is generally subject to a specific budget. The independent auditors and management are required to periodically report to the Audit Committee regarding the extent of services provided by the independent auditors in accordance with this pre-approval, and the fees for the services performed to date. The Audit Committee may also pre-approve particular services on a case-by-case basis. During 2009 and 2010, all services provided by BDO Auditores, S.L. were pre-approved by the Audit Committee in accordance with this policy.

**PART IV**

**ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K**

   (a)    **Documents filed as part of this Form 10-K:**

     1.    **Financial Statements.**

See Consolidated Financial Statements**.**

     2.    **Financial Statement Schedules.**

     See Schedule II.

     3.    **Exhibits.**

     See Exhibit Index**.**

## INDEX TO EXHIBITS

Exhibit
No.             **Description of Document**

(4) 2.1        Agreement and Plan of Reorganization dated as of January 20, 2009, by and among Private Media Group, Inc., PRVT Acquisition Corp. I, PRVT Acquisition Corp. II, Game Link LLC, eLine, LLC, Mama's LLC, ThinkForward, Inc. GreenCine, Inc., Ilan Bunimovitz, Andrew Sullivan, Dennis Woo and Peter Marinac.

(5) 2.2        Acquisition Agreement dated as of October 9, 2009, by and among Private Media Group, Inc., 2220445 Ontario Inc., Entruphema Inc., 2062249 Ontario Inc., Eric Johnson, Erik Schannen and Michel Lozier, and Eric Johnson in his capacity as Sellers Representative.

(9) 3.1        Restated Articles of Incorporation

(9) 3.2        Articles of Amendment to the Articles of Incorporation

(9) 3.3        Certificate of Amendment to Articles of Incorporation

(1)3.4        Amended and Restated Bylaws

*4.1        Specimen Common Stock Certificate.

(8)4.2        Exchange and Support Agreement dated October 29, 2009, by and among Private Media Group, Inc., 2220445 Ontario Inc., Entruphema Inc., 2062249 Ontario Inc., Eric Johnson, Erik Schannen and Michel Lozier, and Eric Johnson in his capacity as Sellers Representative, including Schedule A thereto (Exchangeable Share Provisions).

*10.1        Milcap Acquisition Agreement dated December 19, 1997

*10.2        Cinecraft Acquisition Agreement dated December 19, 1997

**10.3        7% Note Due 2002 from the Registrant to Commerzbank AK.

++10.4        Amendment No.1 to the 7% Note Due 2002

+10.5        Share Purchase Agreement dated as of December 9, 2002, by and among Fraserside Holdings Limited, Luthares Investments N.V. and Stichting de Oude Waag.

(1)10.6        Consulting Agreement dated September 29, 2006, by and between the Company and Peter Cohen, as amended by letter dated September 29, 2006.

(3)10.7        Employment Agreement dated as of January 20, 2009, by and among Ilan Bunimovitz, Game Link LLC and Private Media Group, Inc.

(9)10.8        Amended and Restated Employment Agreement dated as of October 8, 2009, by and among Ilan Bunimovitz, Game Link LLC and Private Media Group, Inc.

(6) 10.9        Employment Agreement dated as of October 29, 2009, by and among Eric Johnson, Entruphema Inc. and Private Media Group, Inc.

| ++10.10 | Amended and Restated1999 Employee Stock Option Plan |
| (7) 10.11 | 2009 Equity Incentive Plan |
| (2)14.1 | Code of Ethics |
| 21 | Subsidiaries. |
| 23.1 | Consent of BDO Auditores, S.L.. |
| 23.2 | Consent of Odenberg, Ullakko, Muranishi & Co. LLP |
| 31.1 | Certifications pursuant to Rule 13a-14 under the Securities Exchange Act of 1934. |
| 31.2 | Certifications pursuant to Rule 13a-14 under the Securities Exchange Act of 1934. |
| 32.1 | Certification of CEO and CFO Pursuant to 18 U.S.C. § 1350, as Adopted Pursuant to § 906 of the Sarbanes-Oxley Act of 2002. |

---

*Incorporated by reference from the registrant's Registration Statement on Form SB-2 (SEC File No. 333-62075).
**Incorporated by reference from the registrant's Registration Statement on Form S-1 (SEC File No. 333-69654).
 +Incorporated by reference from the registrant's Form 8-K dated January 14, 2003.
++Incorporated by reference from the registrant's Annual Report on Form 10-K for the year ended December 31, 2002.

(1)    Incorporated by reference from the registrant's Annual Report on Form 10-K for the year ended December 31, 2006.

(2)    Incorporated by reference from the registrant's Annual Report on Form 10-K for the year ended December 31, 2003.

(3)    Incorporated by reference from the registrant's Interim Report on Form 8-K filed with the SEC on March 6, 2009.

(4)    Incorporated by reference from the registrant's Current Report on Form 8-K filed with the SEC on January 23, 2009.  Schedules and exhibits to the Agreement have been omitted pursuant to Section 601(b)(2) of Regulation S-K.  Private agrees to furnish supplementally a copy of any omitted schedule or exhibit upon the request of the SEC.

(5)    Incorporated by reference from the registrant's Current Report on Form 8-K filed with the SEC on October 16,  2009.  Schedules and exhibits to the Agreement have been omitted pursuant to Section 601(b)(2) of Regulation S-K.  Private agrees to furnish supplementally a copy of any omitted schedule or exhibit upon the request of the SEC.

(6)    Incorporated by reference from the registrant's Current Report on Form 8-K filed with the SEC on December 23, 2009.

(7)    Incorporated by reference from the registrant's definitive Proxy Statement filed with the SEC on November 3, 2009.

(8)    Incorporated by reference from the registrant's Current Report on Form 8-K filed with the SEC on November 3, 2009.

(9)    Incorporated by reference from the registrant's Annual Report on Form 10-K for the year ended December 31, 2009.

**SIGNATURES**

In accordance with the requirements of Section 13 or 15(d) of the Exchange Act, the registrant has caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated:  June 2, 2011                     **PRIVATE MEDIA GROUP, INC.**


By: /s/ Berth Milton
    Berth Milton, Chief Executive
    Officer

In accordance with the requirements of the Exchange Act, the Report has been signed below by the following persons on behalf of the registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|------|-------|------|
| /s/ Berth Milton<br>Berth H. Milton | Chairman of the Board, Director, Chief Executive Officer | June 2, 2011 |
| _____<br>Ilan Bunimovitz | Director | June __, 2011 |
| /s/ Johan Gillborg<br>Johan Gillborg | Chief Financial Officer, Chief Accounting Officer | June 2, 2011 |
| /s/ Bo Rodebrant<br>Bo Rodebrant | Director | June 2, 2011 |
| /s/ Peter Dixinger<br>Peter Dixinger | Director | June 2, 2011 |
| /s/ Jan Jensen<br>Jan Jensen | Director | June 2, 2011 |
| _____<br>Eric Johnson | Director | June __, 2011 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

**To the Board of Directors and Shareholders of Private Media Group, Inc.**

1.  We have audited the accompanying consolidated balance sheets of Private Media Group, Inc. as of December 31, 2010 and 2009 and the related consolidated statements of income and comprehensive income, shareholders´ equity, and cash flows for each of the three years in the period ended December 31, 2010. In connection with our audits of the financial statements, we have also audited the schedule listed in the accompanying index. These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits. We did not audit the consolidated financial statements of ThinkForward, Inc., a wholly-owned subsidiary, which consolidated statements reflect at December 31, 2010 and 2009 total assets constituting U.S. $2,054,574 and U.S. $3,610,264, respectively, and total revenues of U.S. $12,264,439 and U.S. $14,295,293 for the years then ended. Those consolidated statements were audited by other auditor whose report has been furnished to us, and our opinion, insofar as it relates to amounts included for ThinkForward, Inc., is based solely on the report of the other auditor.

2.  We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements and schedule are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements and schedule, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

3.  In our opinion, based on our audits and the report of other auditors, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Private Media Group, Inc. at December 31, 2010 and 2009, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2010, in conformity with accounting principles generally accepted in the United States of America.

4.  The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has not yet reestablished profitable operations. The Company has suffered recurring losses from operations over the past years and has a working capital deficit. These factors raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

5.  Also, in our opinion, the financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

/s/ BDO Auditores, S.L.

**BDO AUDITORES, S.L.**

Barcelona, Spain
May 31, 2011

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors
ThinkForward, Inc.

We have audited the accompanying consolidated balance sheets of ThinkForward, Inc. (the "Company") as of December 31, 2010 and 2009 and the related consolidated statements of operations, changes in shareholder's deficit, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of ThinkForward, Inc. at December 31, 2010 and 2009 and the consolidated results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has suffered recurring operating losses in recent years and has not yet reestablished profitable operations. This raises substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Odenberg, Ullakko, Muranishi & Co. LLP
San Francisco, California
April 26, 2011

## PRIVATE MEDIA GROUP, INC.
## CONSOLIDATED BALANCE SHEETS

| | December 31, | | |
|---|---|---|---|
| | **2009** | **2010** | **2010** |
| | **EUR** | **EUR** | **USD** |
| | | **(in thousands)** | |
| **ASSETS** | | | |
| Cash and cash equivalents ............................................ | 613 | 370 | 493 |
| Trade accounts receivable – net (Note 4) ....................... | 5,382 | 4,199 | 5,598 |
| Inventories - net (Note 5) ............................................. | 2,439 | 1,790 | 2,387 |
| Deferred income tax asset (Note 12) ............................. | 4,478 | 5,014 | 6,685 |
| Prepaid expenses and other current assets ................... | 866 | 618 | 824 |
| TOTAL CURRENT ASSETS | 13,779 | 11,990 | 15,987 |
| | | | |
| Library of photographs and videos - net (Note 7) ....... | 11,635 | 8,345 | 11,126 |
| Property, plant and equipment - net (Note 6) .............. | 6,685 | 4,397 | 5,862 |
| Other intangible assets (Note 8) ................................. | 5,212 | 4,847 | 6,463 |
| Goodwill (Note 8) ....................................................... | 10,524 | 9,204 | 12,272 |
| Other assets .................................................................. | 675 | 500 | 667 |
| TOTAL ASSETS.............................................................. | 48,510 | 39,283 | 52,377 |
| | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| Short-term borrowings (Note 10) ................................. | 3,080 | 2,689 | 3,586 |
| Current portion of long-term borrowings (Note 10)......... | 222 | 402 | 536 |
| Accounts payable trade................................................... | 6,207 | 6,146 | 8,195 |
| Income taxes payable (Note 12) ..................................... | 1,089 | 1,059 | 1,412 |
| Deferred income taxes (Note 12) ................................... | 24 | 277 | 369 |
| Accrued other liabilities (Note 11) ................................ | 1,884 | 2,519 | 3,359 |
| TOTAL CURRENT LIABILITIES ................................... | 12,506 | 13,093 | 17,457 |
| | | | |
| Contingent consideration payable (Note 9) ................... | 4,703 | 514 | 685 |
| Long-term borrowings (Note 10) .................................. | 1,898 | 1,905 | 2,540 |
| Related party payable (Note 13)..................................... | 69 | 30 | 40 |
| TOTAL LIABILITIES ..................................................... | 19,176 | 15,542 | 20,722 |
| | | | |
| **SHAREHOLDERS' EQUITY (Note 15)** | | | |
| | | | |
| $4.00 Series A Convertible Preferred Stock 10,000,000 shares authorized, none issued and outstanding at December 31, 2009 and 2010, respectively ...................................... | - | - | - |
| Common Stock, $.001 par value, 100,000,000 shares authorized 20,704,934 and 20,815,824 issued and outstanding at December 31, 2009 and 2010, respectively............................ | 869 | 869 | 1,159 |
| Additional paid-in capital............................................. | 30,466 | 30,468 | 40,624 |
| Retained earnings ......................................................... | 1,564 | (2,771) | (3,695) |
| Accumulated other comprehensive income................................ | (3,565) | (4,824) | (6,432) |
| TOTAL SHAREHOLDERS' EQUITY ........................................ | 29,334 | 23,742 | 31,656 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY ..... | 48,510 | 39,283 | 52,378 |

See accompanying notes to consolidated financial statements

F - 1

## PRIVATE MEDIA GROUP, INC.
## CONSOLIDATED STATEMENTS OF INCOME
## AND COMPREHENSIVE INCOME

| | Years ended December 31, | | | |
|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2010** |
| | **EUR** | **EUR** | **EUR** | **USD** |
| | | **(in thousands)** | | |
| Net sales | 19,667 | 23,061 | 23,270 | 31,027 |
| Cost of sales | 13,505 | 16,864 | 16,849 | 22,465 |
| Gross profit | 6,161 | 6,197 | 6,422 | 8,562 |
| Selling, general and administrative expenses | 13,061 | 23,949 | 13,147 | 17,530 |
| Impairment of goodwill and other intangible assets | - | (884) | 1,562 | 2,083 |
| Benefit from change in fair value of contingent consideration | - | - | 4,189 | 5,586 |
| Operating income (loss) | (6,900) | (18,636) | (4,098) | (5,464) |
| Interest expense | 323 | 389 | 332 | 442 |
| Interest income | 257 | 234 | 3 | 5 |
| Income (loss) before income taxes | (6,965) | (18,790) | (4,427) | (5,902) |
| Income tax (benefit) | (1,777) | 1,720 | (92) | (122) |
| Net Income (loss) | (5,188) | (20,510) | (4,335) | (5,780) |
| | | | | |
| Other comprehensive income: | | | | |
| Foreign currency translation adjustments | (959) | 512 | (1,259) | (1,679) |
| Comprehensive income | (6,147) | (19,999) | (5,594) | (7,459) |
| | | | | |
| Net income (loss) per share: | | | | |
| Basic | (0.30) | (0.99) | (0.20) | (0.26) |
| Diluted | (0.30) | (0.99) | (0.20) | (0.26) |

See accompanying notes to consolidated financial statements

# PRIVATE MEDIA GROUP, INC.
## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

| | Common stock | | Additional paid-in capital | Retained earnings | Accumulated other comprehensive income | Total shareholders' equity |
|---|---|---|---|---|---|---|
| | Shares | Amounts | | | | |
| | | EUR | EUR | EUR | EUR | EUR |
| Balance at January 1, 2008 …………………… | 17,860,165 | 867 | 21,718 | 27,262 | (3,118) | 46,747 |
| Stock based compensation ………………………… | - | - | 9 | - | - | 9 |
| Translation adjustment ………………………… | - | - | - | - | (959) | (959) |
| Net loss …………………………………………… | - | - | - | (5,188) | - | (5,188) |
| Balance at December 31, 2008 …………………… | 17,860,165 | 867 | 21,727 | 22,074 | (4,077) | 40,610 |
| Shares issued in acquisition ……………… | 2,844,770 | 2 | 6,642 | - | - | 6,644 |
| Exchangeable shares issued in acquisition ……… | - | - | 2,095 | - | - | 2,095 |
| Stock based compensation ………………………… | - | - | 3 | - | - | 3 |
| Translation adjustment ………………………… | - | - | - | - | 512 | 512 |
| Net loss …………………………………………… | - | - | - | (20,150) | - | (20,150) |
| Balance at December 31, 2009 ………………… | 20,704,934 | 869 | 30,466 | 1,564 | (3,565) | 29,334 |
| Shares issued in reverse split ………………………… | 890 | - | - | - | - | - |
| Conversion of exchangeable shares ……………… | 110,000 | - | - | - | - | - |
| Stock based compensation ………………………… | - | - | 2 | - | - | 2 |
| Translation adjustment ………………………… | - | - | - | - | (1,259) | (1,259) |
| Net loss …………………………………………… | - | - | - | (4,335) | - | (4,335) |
| Balance at December 31, 2010 …………………… | 20,815,824 | 869 | 30,468 | (2,771) | (4,824) | 23,742 |

See accompanying notes to consolidated financial statements

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 70 of 105

| | **Years ended December 31,** | | | |
|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2010** |
| | **EUR** | **EUR** | **EUR** | **USD** |
| | | | **(in thousands)** | |
| **Cash flows from operating activities:** | | | | |
| Net income (loss) .................................. | (5,188) | (20,510) | (4,335) | (5,780) |
| **Adjustment to reconcile net income to net cash** | | | | |
| **flows provided by operating activities:** | | | | |
| Deferred income taxes..................................... | (1,856) | 1,710 | (283) | (377) |
| Depreciation .................................................. | 1,026 | 982 | 728 | 971 |
| Change in fair value of contingent consideration payable . | - | - | (4,189) | (5,586) |
| Stock based compensation ............................... | 9 | 3 | 2 | 3 |
| Bad debt provision ......................................... | 333 | 7,817 | 718 | 957 |
| Write-down of magazine inventory...................... | - | 806 | - | - |
| Investment write-off........................................ | - | 1,022 | - | - |
| Impairment of goodwill and other intangible assets ........ | 293 | 884 | 1,562 | 2,083 |
| Amortization of other intangible assets.............. | 124 | 124 | 124 | 165 |
| Amortization and impairment of web pages ...................... | - | 2,080 | 3,361 | 4,482 |
| Amortization of photographs and videos .......................... | 6,332 | 5,838 | 5,123 | 6,831 |
| **Changes in operating assets and liabilities,** | | | | |
| **net of acquisitions:** | | | | |
| Trade accounts receivable ................................... | 2,192 | 384 | 466 | 621 |
| Related party receivable .................................... | (298) | (198) | - | - |
| Inventories ..................................................... | 2,112 | 2,010 | 649 | 866 |
| Prepaid expenses and other current assets........................ | 1,285 | 573 | 248 | 331 |
| Accounts payable trade .................................... | (1,096) | 270 | (61) | (81) |
| Income taxes payable ...................................... | 97 | (172) | (30) | (40) |
| Accrued other liabilities .................................. | (149) | (312) | 636 | 848 |
| Net cash provided by operating activities ........................ | 5,216 | 3,310 | 4,719 | 6,292 |
| **Cash flows used in investing activities:** | | | | |
| Investment in library of photographs and videos .............. | (4,292) | (2,335) | (1,833) | (2,445) |
| Capital expenditures........................................ | (1,136) | (1,575) | (1,800) | (2,400) |
| Cash received in acquisitions ............................. | - | 333 | - | - |
| Investment in other assets ................................ | 36 | (288) | 175 | 233 |
| Net cash used in investing activities .................................. | (5,392) | (3,864) | (3,459) | (4,612) |
| **Cash flow provided by financing activities:** | | | | |
| Short-term borrowings - repayments ................... | (166) | (1,620) | (704) | (938) |
| Short-term borrowings - additions ..................... | 365 | 129 | 313 | 417 |
| Long-term borrowings - repayments................... | (111) | (143) | (306) | (408) |
| Long-term borrowings - additions...................... | - | 1,738 | 453 | 604 |
| Net cash (used in) provided by financing activities ........... | 88 | 104 | (244) | (326) |
| Foreign currency translation adjustment ........................ | (959) | 512 | (1,259) | (1,679) |
| **Net increase (decrease) in cash and cash equivalent .....** | (1,047) | 61 | (243) | (324) |
| **Cash and cash equivalents at beginning of the year .....** | 1,599 | 552 | 613 | 818 |
| **Cash and cash equivalents at end of the year ...............** | 552 | 613 | 370 | 493 |
| | | | | |
| Cash paid for interest........................................ | 162 | 220 | 254 | 339 |
| Cash paid for taxes ......................................... | - | - | 28 | 37 |
| Repurchase of common stock (non-cash transaction) ....... | - | - | - | - |

See accompanying notes to consolidated financial statements

F - 4

**1.      The company and basis of presentation**

Private Media Group, Inc. ("the Company") was originally incorporated on September 23, 1980 as Glacier Investment Company, Inc. under the laws of the State of Utah and, effective November 24, 1997, after a series of interim name changes, changed its name to Private Media Group Inc. Effective June 12, 1998 the Company acquired Cine Craft Limited ("Cine Craft"), a Gibraltar corporation and Milcap Media Limited ("Milcap"), a Republic of Cyprus corporation. Prior to the acquisitions the Company was a holding company with no operations. Milcap and its subsidiaries and Cine Craft operated under common control and were engaged in the acquisition, refinement and distribution of video and photo rights for adult feature magazines and movies (videocassettes and DVD's) through distributors and via the Internet. During the year ended December 31, 2000, the Company established two new wholly owned subsidiaries, one in Sweden (Peach Entertainment Distribution AB, "Peach") and one in the Republic of Cyprus (Fraserside Holdings Ltd., "Fraserside"). These subsidiaries were formed to carry on the business of Milcap Publishing Group AB (Sweden) and Milcap (Cyprus), respectively.

Solely for the convenience of the reader, the accompanying consolidated financial statements as of December 31, 2010 and for the twelve months then ended have been translated into United States dollars ("USD") at the rate of EUR 0.75 per USD 1.00 the Exchange Rate of the European Central Bank on December 31, 2010. The translations should not be construed as a representation that the amounts shown could have been, or could be, converted into US dollars at that or any other rate.

In each of the past three years we have experienced losses from operations.  At December 31, 2010, we had cash and cash equivalents of EUR 370,000 and a working capital deficit of EUR 1,102,000.  As a result, our independent registered public accounting firm has concluded that there is substantial doubt as to our ability to continue as a going concern, and has modified its report in the form of an explanatory paragraph describing the events that have given rise to this uncertainty.  Our ability to continue as a going concern is based on our ability to generate or obtain sufficient cash to meet our obligations on a timely basis and ultimately to attain profitable operations. We currently expect future growth, reduction in cost and expenses and to return to profitability provided we are successful with the following objectives:

- rolling out our Internet platforms, including: a) our newly built signature property and membership platform private.com, b) our cutting edge mobile platform for Smartphones and c) our multinational eCommerce VOD platform;
- the successful marketing of our affiliate programs for all our properties to compete aggressively for, and attract, affiliate traffic;
- continuing the rollout of our content on cable and IPTV video-on demand platforms;
- completing the integration of businesses acquired in 2009;
- consolidating and restructuring our operations into an efficient new media business;
- outsourcing of non-cost effective parts of our operations; and
- identifying and exploring new online business opportunities which are less dependent on content.

If we are not successful in implementing the above objectives, or if we otherwise do not successfully respond to changing conditions in the adult entertainment industry, we may continue to incur significant losses. There can be no assurance that we will be able to operate profitably in the future.

**2.      Summary of significant accounting policies**

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and all wholly owned subsidiaries. All significant intercompany transactions and balances have been eliminated in consolidation.

*Foreign Currency*

The financial statements of the Company's operations based outside of the euro area have been translated into euro. Management has determined that the functional currency for each of the Company's foreign operations is its applicable local currency. When translating functional currency financial statements into euro, year-end exchange rates are applied to the balance sheet accounts, while average annual rates are applied to income statement accounts. Translation gains and losses are recorded in other comprehensive income as a component of shareholders' equity.

Transactions involving foreign currencies are translated into euro or functional currencies using exchange rates in effect at the time of the transactions. Monetary assets and liabilities denominated in foreign currencies are translated at period end exchange rates and the resulting gain or loss is charged to income in the period.

For the years ended December 31, 2008, 2009 and 2010 the aggregate exchange gain included in determining net income amounted to EUR 222 thousand, EUR 95 thousand and EUR 912, respectively.

Should the Company choose to pay dividends, although the Company's current intention is to re-invest the un-remitted earnings of its foreign subsidiaries, dividends would be declared and paid in euro.

*Recognition of Revenue*

The Company's primary sources of revenue are the sale of content delivered via Internet, broadcasting, DVD & magazines and mobile phones.

Internet video on-demand offerings are sold directly via the Company's online retail websites and are paid for almost exclusively by credit card. The Company recognizes revenue from video-on-demand when the service is rendered and collectability is reasonably assured, specifically, when the customer's credit card is charged, which is, in most cases, simultaneous with delivery of the on-demand video. Credit card payments accelerate cash flow and reduce the Company's collection risk, subject to the merchant bank's right to hold back cash pending settlement of the transactions. The Company also offers a prepaid video-on-demand service in which a customer purchases a number of minutes of on-demand video at a set rate per minute based on the number of minutes purchased. The rate per minute decreases as the number of prepaid minutes increases. The Company records revenue from pre-pay customers as deferred revenue prior to commencement of services and recognizes revenue as the services are rendered. Prepaid minutes purchased under this program do not expire.

The Company also offers a customer loyalty program under which each member's purchase of video on-demand, DVDs, movie downloads, books, novelties or other items earns the member one point for each dollar spent. After accumulating 150 points, a customer may redeem the points for a $5 purchase. Points increase in value as they are accumulated and redeemed, with a maximum accumulation of 2,000 points, which may be redeemed for a $200 purchase. All of a customer's points expire after 180 days of no purchase activity. Because the value of the award points is not significant in relation to the value of the services or products purchased by the customer, the Company records a liability for the estimated cost of the discounted services or products to be provided in the future.

Revenues from the sale of subscriptions to the Company's Internet website are deferred and recognized ratably over the subscription period.

IPTV (Internet Protocol Television), satellite & cable broadcasting revenues are recognized upon delivery when the following conditions have been met (i) license period of the arrangement has begun and the customer can begin its exploitation, exhibition, or sale (ii) the arrangement fee is fixed or determinable and (iii) collection of the arrangement fee is reasonably assured. Such revenues may be generated by either a fixed license fee or as an agreed percentage of sales, based on sales reported each month by the Company's IPTV, cable and satellite affiliates. The affiliates do not report actual monthly sales for each of their systems to the Company until approximately 60 - 90 days after the month of service ends. This practice requires management to make monthly revenue estimates based on historical experience for each affiliated system. Revenue is subsequently adjusted to reflect the actual amount earned upon receipt. Adjustments made to adjust revenue from estimated to actual have historically been immaterial.

PRIVATE MEDIA GROUP, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

DVDs & Magazines (physical products) are sold both to wholesalers, on firm sale basis, and via national newsstand distributors, with the right to return. Our physical products are generally multi-lingual and the principal market is in Europe. Revenues from the sale of physical products where distributors are not granted rights-of-return are recognized upon transfer of title, which generally occurs upon delivery. Revenues from the sale of physical products under consignment agreements with distributors are recognized based upon reported sales by the Company's distributors. Revenues from the sale of physical products under agreements that grant distributors rights-of-return are recognized upon transfer of title, which generally occurs on delivery, net of an allowance for returned product. Distributors with the right to return are primarily national newsstand distributors. Most of our products are bi-monthly (six issues per year) and remain on sale at a newsstand for a period of two months. Normally, all unsolds are reported to us within a period of four to six months from delivery. There are normally two to four national newsstand distributors for all newspapers and periodicals operating in each country. A majority of our national newsstand distributors are members of Distripress, the international organization for publishers and distributors, and carry out the distribution of the largest national and international newspapers and periodicals, including: Financial Times, Herald Tribune, Time, Newsweek, Vogue, etc. The Company uses specific return percentages per title and distributor based on estimates and historical data. The percentages vary from 50-80%. Percentages are reviewed on an on-going basis. Magazines have an approximate retail price of EUR 11.50 (USD 15.95) per copy and are printed on glossy high-quality paper at a cost of EUR 1.25 (USD 1.75). They are often shrink-wrapped in order to comply with local regulation or guidance for the sale of adult publications. In view of the high retail price, the margin and the physical quality of the magazines and the fact that the content has a very long "shelf-life" since it is not particularly linked to time, trends, fashion or current events, the Company has always collected the returns from newsstands in order to make them available for sale again. The Company operates scheduled re-distribution of returned magazines, via national newsstand distributors, together with DVDs as Magazine/DVD packs as a way of increasing DVD distribution. Since the national newsstand distributors have the right to return, the DVD packs are returned and the magazines are broken out in order to be sold via an additional scheduled re-distribution. The retail price for products sold via re-distribution vary between EUR 14.95-19.95 (USD 20.75-27.70). Magazine returns not re-distributed as per above are sold on a firm sale basis to wholesalers as back numbers at a lower price than new issues. The Company has historically sold all returned copies at an average price higher than, or equal to, cost.

Revenues from mobile content (wireless) sales are recognized based on sales reported each month by mobile operators via aggregators. The aggregators do not report actual monthly sales for each of their operators to the Company until approximately 60 - 90 days after the month of service ends. This practice requires management to make monthly revenue estimates based on historical experience for each affiliated system. Revenue is subsequently adjusted to reflect the actual amount earned upon receipt. Adjustments made to adjust revenue from estimated to actual have historically been immaterial.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Inventories*

Inventories are valued at the lower of cost or market, with cost principally determined on an average basis. Inventories principally consist of DVD's and magazines held for sale or resale.

*Library of Photographs & Videos*

The items in the library comprise our content used for distribution on various formats. Currently these are principally DVD, IPTV, cable & satellite television and broadband (for films) and magazines and Internet broadband (for photos). All our content is sold or licensed repeatedly, unlike inventory items which are sold only once. Furthermore the content is not only sold on one particular release, or issue, but is also re-edited and included for sale on compilations such as "Best of.." titles and publications.

F - 7

The film library is sold or licensed on various formats such as DVD, television, and Internet, in different markets and territories. The current rate of technological advance means that we are continually finding new distribution platforms for our content. Recent examples of this would be IPTV and broadcasting via digital cable and satellite television with pay-per-view (PPV) and video-on-demand (VOD) abilities. The film library includes: a) films, which represent the content, i.e., the edited movie including soundtrack. b) translations, sound dubbing, & sub-titles, which are required to customize each movie in terms of language for all territories, and c) Digital Manipulation for DVD Masters, which is required to digitize the movie and create menus and language options in order to produce a master to be used to duplicate DVDs from.

The photo library comprises purchased photographic material used for print and internet publications. Our photographic material is used initially in one issue of our four principal magazine titles. However it will normally subsequently be used in later special editions. The print publications are typically printed once and thereafter they are sold over a period of several years, as discussed previously. Internet publications are sold via membership fees charged at the Company's websites. Photos are also licensed to other internet and print publishers.

The library of photographs and videos, including rights for photographs and videos as well as translation and dubbing of video material, is reflected at the lower of amortized cost or net realizable value. The cost is amortized on a straight-line basis over 3-5 years representing the estimated useful life of the asset, except for photos which are amortized on a sliding-scale basis over three years. Estimated future revenues are periodically reviewed and, revisions may be made to amortization rates or write-downs made to the asset's net realizable value as a result of significant changes in future revenue estimates. Net realizable value is the estimated selling price in the ordinary course of business, less estimated costs to complete and exploit in a manner consistent with realization of that income.

*Property, Plant and Equipment*

Property, plant and equipment are carried at cost and are generally depreciated using the straight-line method over the estimated useful lives of the assets. The useful lives range from 3-5 years. Website development costs involving the provision of additional functions or features to the website, including graphics and related software, are included in property, plant and equipment and are amortized on a straight-line basis over 3-5 years. In the years ended December 31, 2009 and 2010 the Company has capitalized EUR 1,276 thousand and EUR 1,917 thousand respectively of costs related to the development of its website including graphics and related software.

*Goodwill and Other Intangible Assets*

Goodwill represents the excess of the purchase price paid over the fair value of the net assets of businesses acquired.

Other Intangible Assets represents the value attributable to: a) Customer base, which was acquired from two of the Company's former distributors in the U.S. and in Canada in 2001 and 2003, respectively, (see Note 8). The amortization expense is calculated on a straight-line basis over 10 years for each acquisition, b) Broadcasting asset, which was acquired from International Film Production and Distribution Limited in 2003 (see Note 8). At the time of acquisition, the asset was deemed to have an indefinite life and is not subject to amortization, and c) Trade and Domain names, which were acquired from GameLink and Sureflix (see Note 8). At the time of acquisition, the assets were deemed to have an indefinite life and are not subject to amortization.

Goodwill and indefinite lived intangible assets are reviewed annually for impairment (or more frequently if indicators of impairment arise), see Note 8. Further separable intangible assets that are not deemed to have an indefinite life are amortized over their expected useful lives.

During 2008, 2009 and 2010, the Company had impairment charges of EUR 293 thousand, EUR 884 thousand and EUR 1,562 thousand, respectively, and going forward additional impairment charges may occur, see Note 8.

*Impairment of Long-Lived Assets*

The Company evaluates the carrying value of its long-lived assets when events or circumstances indicate the carrying value may not be recoverable through the estimated undiscounted cash flows from the use of the asset. An impairment loss is then measured as the amount by which the carrying value of the asset exceeds its estimated fair value. In 2010, the Company had an impairment charge of EUR 548 thousand relating developed website technology. Going forward additional impairment charges may occur, see Note 6.

*Advertising Costs*

Advertising costs are charged to income as incurred. The total advertising costs were EUR 1,120 thousand, EUR 858 thousand and EUR 615 thousand for the years ended December 31, 2008, 2009 and 2010, respectively.

*Shipping and Handling Costs*

Shipping and handling costs related to the Company's products are recognized in cost of sales.

*Income Taxes*

The Company accounts for certain income and expense items differently for financial reporting purposes than for tax purposes. Provision for deferred taxes are made in recognition of such temporary differences. The Company assesses the recoverability of deferred tax assets and records a valuation allowance when it believes it is not more likely than not that they will be recovered.

*Cash Equivalents*

All highly liquid investments purchased with an original maturity of three months or less at the time of acquisition are considered to be cash equivalents.

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash and cash equivalents and trade accounts receivable. The Company does not require collateral on these financial instruments.

Cash and cash equivalents are maintained principally with major financial institutions in Europe that have high credit standings and the Company's policy is to limit exposure to any one institution. Management attempts to limit credit risk on trade receivables mainly through establishment and monitoring of credit controls.

*Basic and Diluted Earnings Per Share*

Basic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of shares of common stock outstanding, including exchangeable shares issued on October 29, 2009, in the Sureflix acquisition, during the period. As of December 31, 2010, exchangeable shares equivalent to 1,190,000 shares of common stock was outstanding. Diluted earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of shares of common stock outstanding during the period increased to include the number of additional shares of common stock that would have been outstanding if the potentially dilutive securities had been issued. Potentially dilutive securities include outstanding stock options and unvested stock grants. The dilutive effect of potentially dilutive securities is reflected in diluted earnings per common share by application of the treasury stock method. Under the treasury stock method, an increase in the fair market value of the Company's common stock can result in a greater dilutive effect from potentially dilutive securities.

*Fair Value Measurements*

The Company applies fair value accounting for all financial assets and liabilities and non-financial assets and liabilities that are recognized or disclosed at fair value in the financial statements on a recurring basis. The Company defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly

transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities, which are required to be recorded at fair value, the Company considers the principal or most advantageous market in which the Company would transact and the market-based risk measurements or assumptions that market participants would use in pricing the asset or liability, such as inherent risk, transfer restrictions and credit risk, see Note 19.

*Stock-based compensation*

The Company accounts for stock-based payment transactions in which the Company receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. Stock-based compensation cost for stock awards is measured based on the closing fair market value of the Company's common stock on the date of grant. Stock-based compensation cost for stock options is estimated at the grant date based on each option's fair-value as calculated by the Black-Scholes option-pricing model. The Company recognizes stock-based compensation cost as expense ratably on a straight-line basis over the requisite service period.

*Recent Accounting Pronouncements*

In January 2010, FASB issued ASU No. 2010-06 – Improving Disclosures about Fair Value Measurements. This update provides amendments to Subtopic 820-10 that requires new disclosure as follows: 1) Transfers in and out of Levels 1 and 2. A reporting entity should disclose separately the amounts of significant transfers in and out of Level 1 and Level 2 fair value measurements and describe the reasons for the transfers. 2) Activity in Level 3 fair value measurements. In the reconciliation for fair value measurements using significant unobservable inputs (Level 3), a reporting entity should present separately information about purchases, sales, issuances, and settlements (that is, on a gross basis rather than as one net number). This update provides amendments to Subtopic 820-10 that clarify existing disclosures as follows: 1) Level of disaggregation. A reporting entity should provide fair value measurement disclosures for each class of assets and liabilities. A class is often a subset of assets or liabilities within a line item in the statement of financial position. A reporting entity needs to use judgment in determining the appropriate classes of assets and liabilities. 2) Disclosures about inputs and valuation techniques. A reporting entity should provide disclosures about the valuation techniques and inputs used to measure fair value for both recurring and nonrecurring fair value measurements. Those disclosures are required for fair value measurements that fall in either Level 2 or Level 3. The new disclosures and clarifications of existing disclosures are effective for interim and annual reporting periods beginning after December 15, 2009, except for the disclosures about purchases, sales, issuances, and settlements in the roll forward of activity in Level 3 fair value measurements. These disclosures are effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal years. The Company is currently evaluating the impact of this ASU, however, the Company does not expect the adoption of this ASU to have a material impact on its consolidated financial reporting.

In October 2009, the FASB issued ASU No 2009-13, Revenue Recognition—Multiple-Deliverable Revenue Arrangements (FASB ASC Topic 605), a consensus of the FASB Emerging Issues Task Force. This guidance modifies the fair value requirements of FASB ASC subtopic 605-25, Revenue Recognition-Multiple Element Arrangements, by allowing the use of the "best estimate of selling price" in addition to vendor specific objective evidence ("VSOE"), now referred to as third-party evidence ("TPE") for determining the selling price of a deliverable. A vendor is now required to use its best estimate of the selling price when VSOE or TPE of the selling price cannot be determined. In addition, the residual method of allocating arrangement consideration is no longer permitted. This update requires expanded qualitative and quantitative disclosures and is effective for fiscal years beginning on or after June 15, 2010. The Company is currently evaluating the impact of this ASU, however, the Company does not expect the adoption of this ASU to have a material impact on its consolidated financial reporting.

*Reclassifications and Immaterial Error*

Certain reclassifications of prior year balances have been made in the accompanying consolidated financial statements to conform to the 2010 presentation.

In connection with the preparation of the Company's 2010 annual financial statements, management of the Company determined that a portion of the compensation to the CEO in 2006 and 2007, EUR 265 thousand and EUR 88 thousand, respectively, had been inadvertently recorded as an increase in related party receivable from Slingsby Enterprises Limited, an affiliate of the CEO, resulting in the understatement of selling, general and administrative expenses and the overstatement of related party receivable in both 2006 and 2007. As a result, at the beginning and end of 2008 retained earnings and the note receivable were overstated by EUR 353. At December 31, 2009, the Company recorded a provision against the full value of the related party receivable, accordingly, the overstatement of this balance in 2006, 2007 and 2008 had no impact on related party receivable and retained earnings as of December 31, 2009 and 2010.

As the amounts involved are not material to the Company's financial statements, management has determined that the previously issued 2006, 2007, 2008, and 2009 financial statements do not require restatement.

3.      **Acquisitions**

*GameLink Acqusition*

On January 20, 2009, Private Media Group, Inc. ("Private") completed the acquisition of 100% of the business of Game Link LLC and its affiliate, eLine, LLC collectively ("GameLink"). The GameLink companies are engaged in the business of digital distribution of adult content over the Internet and online eCommerce development.

The amounts of GameLink's revenue and earnings included in Private's consolidated income statement for the twelve months ended December 31, 2009, and the pro forma revenue and earnings of the combined entity had the acquisition date been January 1, 2008, are:

| | Revenue | Earnings |
|---|---|---|
| | EUR | EUR |
| | (in thousands) | |
| Actual from January 20, 2009 – December 31, 2009 . . . . . . . . . . . . . . . . . . | 9,468 | (176) |
| Supplemental pro forma from January 1, 2009 – December 31, 2009 . . . . | 23,627 | (20,574) |
| Supplemental pro forma from January 1, 2008 – December 31, 2008 . . . . . | 30,795 | (5,619) |

*Sureflix Acquisition*

On October 29, 2009, Private Media Group, Inc. ("Private") completed the acquisition of 100% of the business of Entruphema Inc. and Sureflix Digital Distribution Inc.,("Sureflix"). The Sureflix companies are engaged in the business of digital distribution of premium gay adult content over the Internet and online eCommerce development.

The amounts of Sureflix's revenue and earnings included in Private's consolidated income statement for the twelve months ended December 31, 2009, and the pro forma revenue and earnings of the combined entity had the acquisition date been January 1, 2008, are:

| | Revenue | Earnings |
|---|---|---|
| | EUR | EUR |
| | (in thousands) | |
| Actual from October 29, 2009 – December 31, 2009 . . . . . . . . . . . . . . . . . . | 729 | 3 |
| Supplemental pro forma from January 1, 2009 – December 31, 2009 . . . . | 26,904 | (20,477) |
| Supplemental pro forma from January 1, 2008 – December 31, 2008 . . . . . | 25,454 | (5,453) |

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 78 of 105

**4.      Trade accounts receivable**

Trade accounts receivable consist of the following:

|  | December 31, | |
|---|---|---|
|  | **2009** | **2010** |
|  | **EUR** | **EUR** |
|  | **(in thousands)** | |
| Trade accounts receivable........................................ | 7,169 | 6,640 |
| Allowance for doubtful accounts............................. | (1,787) | (2,442) |
| Total trade accounts receivable, net......................... | 5,382 | 4,199 |

Management reviews the allowance for doubtful accounts on at least a quarterly basis and adjusts the balance based on their estimate of the collectability of specific accounts as well as a reserve for a portion of other accounts which have been outstanding for more than 180 days. This estimate is based on historical losses and information about specific customers. After collection attempts have failed, the Company writes off the specific account.

**5.      Inventories**

Inventories consist of the following:

|  | December 31, | |
|---|---|---|
|  | **2009** | **2010** |
|  | **EUR** | **EUR** |
|  | **(in thousands)** | |
| Magazines for sale and resale ..................................................... | 805 | 564 |
| DVDs ........................................................................................... | 1,417 | 1,152 |
| Other ........................................................................................... | 217 | 73 |
|  | 2,439 | 1,790 |

**6.      Property, plant and equipment**

Property, plant and equipment consist of the following:

|  | December 31, | |
|---|---|---|
|  | **2009** | **2010** |
|  | **EUR** | **EUR** |
|  | **(in thousands)** | |
| Equipment & Furniture............................................................. | 10,463 | 9,847 |
| Website Development............................................................... | 8,832 | 11,247 |
| Production Database................................................................. | 1,229 | 1,229 |
| Accumulated impairment, amortization and depreciation......................... | (13,838) | (17,380) |
| Total Property, Plant and Equipment, net................................. | 6,685 | 4,944 |

For the year ended December 31, 2010, accumulated impairment, amortization and depreciation includes EUR 548 thousand of impairment charge to developed website technology related to our eCommerce business in USA.

**7.      Library of photographs & videos**

Library of photographs & videos consist of the following:

|  | December 31, | |
|---|---|---|
|  | **2009** | **2010** |
|  | **EUR** | **EUR** |
|  | **(in thousands)** | |
| **Gross:** | | |
| Photographs …………………………… | 7,796 | 7,739 |
| Videos …………………………………… | 51,071 | 52,232 |
| Translations, Sound Dubbing, & Sub-Titles ….. | 13,623 | 14,109 |
| Digital Manipulation for DVD Masters ……….. | 9,992 | 10,235 |
| Digital Manipulation for Broadband Masters …. | 584 | 584 |
|  | 83,067 | 84,900 |
| **Less accumulated depreciation:** | | |
| Photographs …………………………… | 7,586 | 7,706 |
| Videos …………………………………… | 43,291 | 46,806 |
| Translations, Sound Dubbing, & Sub-Titles ….. | 10,558 | 11,654 |
| Digital Manipulation for DVD Masters ……….. | 9,417 | 9,805 |
| Digital Manipulation for Broadband Masters …. | 581 | 584 |
|  | 71,432 | 76,555 |
| **Net:** | | |
| Photographs …………………………… | 211 | 33 |
| Videos …………………………………… | 7,780 | 5,426 |
| Translations, Sound Dubbing, & Sub-Titles ….. | 3,066 | 2,456 |
| Digital Manipulation for DVD Masters ……….. | 575 | 430 |
| Digital Manipulation for Broadband Masters …. | 3 | - |
|  | 11,635 | 8,345 |

**8.      Goodwill and Other Intangible Assets**

Other intangible assets consist of the following:

|  | Years ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | **2009** | **2010** | **2009** | **2010** | **2009** | **2010** | **2009** | **2010** |
|  | **Broadcasting asset** | | **Trade/Domain Names** | | **Customer Base** | | **Total** | |
|  | **EUR** | **EUR** | **EUR** | **EUR** | **EUR** | **EUR** | **EUR** | **EUR** |
|  |  |  |  |  | **(in thousands)** | | | |
| Beginning of year ............................ | 2,525 | 2,525 | - | 2,366 | 1,240 | 1,240 | 3,765 | 6,131 |
| Acquisition value (cost) ................... | - | - | 2,366 | - | - | - | 2,366 | - |
| End of year ........................................ | 2,525 | 2,525 | 2,366 | 2,366 | 1,240 | 1,240 | 6,131 | 6,131 |
| Beginning of year ............................ | - | - | - | - | (794) | (918) | (794) | (918) |
| Amortization and impairment .......... | - | - | - | (242) | (124) | (124) | (124) | (366) |
| End of year ........................................ | - | - | - | (242) | (918) | (1,042) | (918) | (1,284) |
| Net book value ................................. | 2,525 | 2,525 | 2,366 | 2,124 | 322 | 198 | 5,213 | 4,847 |

Broadcasting asset and trade/domain names are deemed to have an indefinite life and are not subject to amortization, however, management regularly performs impairment tests on these assets and, as a result of reviews

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 80 of 105

performed in 2010, trade and domain name assets related to our eCommerce business in USA were reduced by EUR 242 thousand. The estimated amortization expense for customer base for the two years ended December 31, 2011 and 2012 is EUR 124 thousand and EUR 74 thousand, respectively.

Goodwill consist of the following:

| | Years ended December 31, | |
|---|---|---|
| | 2009 | 2010 |
| | EUR | EUR |
| | (in thousands) | |
| Beginning of year (cost) | 2,900 | 12,176 |
| Acquisition value (cost) (a) | 9,276 | - |
| End of year | 12,176 | 12,176 |
| Beginning of year | (768) | (1,652) |
| Amortization and impairment (b) (c) | (884) | (1,320) |
| End of year | (1,652) | (2,972) |
| Net book value | 10,524 | 9,204 |

(a) During 2009, the Company acquired the two eCommerce businesses in USA and Canada, and the related goodwill was EUR 7,974 thousand and EUR 1,302 thousand, respectively.

(b) As a result of impairment reviews performed in 2009 and 2010, the goodwill related to our video distribution company in the Benelux countries was reduced by EUR 884 thousand and 62 thousand, respectively. As of December 31, 2010 the remaining goodwill amounted to EUR 396 thousand.

(c) As a result of impairment reviews performed in 2010, the goodwill related to our eCommerce business in USA was reduced by EUR 1,258 thousand. As of December 31, 2010 the remaining goodwill amounted to EUR 6,716 thousand.

**9. Contingent consideration payable**

In connection with the acquisitions of GameLink and Sureflix in 2009, it was agreed that part of the consideration for each acquisition would be in the form of contingent consideration. The terms for the contingent consideration are as follows:

*GameLink*

The former GameLink shareholders are entitled to receive up to an additional 1,531,799 shares of Private Common Stock if the combined EBITDA of the online digital media operations of Private and GameLink meet specified targets in 2009, 2010 and 2011. Using an exchange rate of EUR 0.75 per 1.00 USD, the combined EBITDA targets of the online digital media operations of Private and GameLink which the contingent consideration arrangement stipulates for each of the years below are:

| | USD |
|---|---|
| | (in thousands) |
| Twelve-months ending Dec. 31, 2009 | 5,210 |
| Twelve-months ending Dec. 31, 2010 | 8,013 |
| Twelve-months ending Dec. 31, 2011 | 9,329 |
| | 22,552 |

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 81 of 105

The manner in which the contingent consideration is earned in relation to the combined EBITDA targets is as follows:

For each of the years ended December 31, 2009, 2010 and 2011 in which the actual EBITDA of the online digital media operations equals or exceeds the target EBITDA, the former owners are entitled to receive 510,600 shares of Private Common Stock. If there is a shortfall in the actual EBITDA compared to the target EBITDA in any year, instead of receiving 510,600 target shares for that year, the former owners are entitled to receive a pro rata portion of the target shares for that year, based upon the ratio between the actual EBITDA and the target EBITDA for that year. In such event, if the actual EBITDA required in the following year(s) exceeds the target EBITDA, in addition to the 510,600 target shares earned for the following year(s), the former owners are entitled to recover all or a portion of unearned target shares from the prior year(s) based upon the amount by which actual EBITDA exceeds the target EBITDA in the subsequent year.

At the acquisition date, the contingent consideration was valued at a fair value of EUR 3,575 thousand using the lattice model. In 2009 and 2010 the EBITDA targets were not reached and as a result of re-measurement, using the lattice model, the current fair value has been adjusted to EUR 308 thousand. As per Company determination, the number of shares of common stock earned 2009 and 2010, is 132,318 and 106,833, respectively. The contingent consideration is classified as a liability and will be re-measured at its current fair value each reporting period until the contingency is resolved.

*Sureflix*

The former Sureflix shareholders are entitled to receive up to an additional 2,100,000 Class A Preference Shares of a newly formed Private subsidiary, which shares are exchangeable for 700,000 shares of Private Common Stock, if the combined EBITDA of the digital media operations of Private and the acquired companies meet specified targets in the three months ending December 31, 2009, the two 12-month periods ending December 31, 2010 and 2011, and the nine month period ending September 30, 2012. Using an exchange rate of EUR 0.75 per 1.00 USD, the combined EBITDA targets of the online digital media operations of Private and Sureflix, which the contingent consideration arrangement stipulates for each of the periods, are:

|  | USD |
| --- | --- |
|  | (in thousands) |
| Three-months ending Dec. 31, 2009 | 1,503 |
| Twelve-months ending Dec. 31, 2010 | 9,012 |
| Twelve-months ending Dec. 31, 2011 | 10,373 |
| Nine-months ending Sep. 30, 2012 | 7,898 |
|  | 28,785 |

The manner in which the contingent consideration is earned in relation to the combined EBITDA targets is as follows:

For each of the three month period ending December 31, 2009, the two 12-month periods ending December 31, 2010 and 2011, and the nine month period ending September 30, 2012, in which the actual EBITDA of the online digital media operations equals or exceeds the target EBITDA, the former owners of Sureflix (the "Former Owners") are entitled to receive a quantity of Class A Preference Shares of the newly formed Private subsidiary, which shares are exchangeable for 58,333, 233,333, 233,333 and 175,000 shares of Private Common Stock, respectively. If there is a shortfall in the actual EBITDA compared to the target EBITDA in any period the Former Owners are entitled to receive a pro rata portion of the target shares for that year, based upon the ratio between the actual EBITDA and the target EBITDA for that year. In such event, if the actual EBITDA required in the following period(s) exceeds the target EBITDA, in addition to the target shares earned for the following period(s), the Former Owners are entitled to recover all or a portion of unearned target shares from the prior period(s) based upon the

amount by which actual EBITDA exceeds the target EBITDA in the subsequent year.

At the acquisition date, the contingent consideration was valued at a fair value of EUR 1,128 thousand using the lattice model. In 2009 and 2010 the EBITDA targets were not reached and as a result of re-measurement, using the lattice model, the current fair value has been adjusted to EUR 206 thousand. The equivalent number of shares of common stock earned 2009 and 2010, as per Company determination, is 20,560 and 44,133, respectively. The contingent consideration is classified as a liability and will be re-measured at its current fair value each reporting period until the contingency is resolved.

**10. Borrowings**

Short- and long-term borrowings are comprised of the following:

|  | December 31, | |
|---|---|---|
|  | 2009 | 2010 |
|  | EUR | EUR |
|  | (in thousands) | |
| *Short-term borrowings:* | | |
| Banks | 1,090 | 450 |
| Other debt | 1,990 | 2,239 |
|  | 3,080 | 2,689 |
| *Current portion of long-term borrowings:* | | |
| Banks | 109 | 323 |
| Other debt | 113 | 79 |
|  | 222 | 402 |
| *Long-term borrowings:* | | |
| Banks | 1,600 | 1,654 |
| Other debt | 298 | 251 |
|  | 1,898 | 1,905 |

*Banks*

The Company's European subsidiaries have existing bank line of credit agreements under which these subsidiaries may borrow up to EUR 450 thousand. Borrowings under the lines of credit during 2010 were charged at variable interest rates of EURIBOR+2.0%-3.5% and a fixed interest rate of 6.75%. As of December 31, 2010, the credit lines were fully utilized. During 2009 and 2010 credit lines were partially re-financed and converted into loans by institutional lenders. These loans are: a) a three year loan of EUR 450 thousand at an interest rate of 4.4%, repayable in equal monthly installments over a two year period starting October, 2010, b) a three year loan of EUR 150 thousand at an interest rate of 4.4%, repayable in semiannual installments over a two year period starting October, 2010, c) a three year loan of EUR 200 thousand at an interest rate of 5.5%, repayable in monthly installments over a two year period starting June, 2011, d) a 14 month loan of EUR 90 thousand at an interest rate of 8.3%, repayable in monthly installments starting October, 2010, and d) a three year loan of EUR 150 thousand at an interest rate of 9.0%, repayable in monthly installments starting November, 2010. As of December 31, 2010, the remaining amount outstanding under the loans was EUR 977 thousand.

On December 11, 2009 a credit line of EUR 1.0 million was re-financed by an institutional lender at an interest rate of EURIBOR + 1.2%. Interest is payable annually starting December 11, 2010. The loan is repayable in equal annual installments over a five year period starting December 11, 2011. The loan is guaranteed by an affiliate of the Private's Chairman and principal shareholder and the guaranty is secured by 666,667 shares of Private Media Group, Inc. Common Stock.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 83 of 105

*Other debt*

In December 2001 the group's holding company, Private Media Group, Inc., borrowed $ 4.0 million from Commerzbank AG pursuant to a Note originally due on December 20, 2002. The Note bore interest at an annual rate of 7%, payable quarterly, with the entire principal amount and accrued interest originally due on December 20, 2002. The Note was guaranteed by Slingsby Enterprises Limited, an affiliate of Berth Milton, Private's Chairman, President and principal shareholder, and the guaranty was secured by 1,650,000 shares of Private Media Group, Inc. common stock. In December 2002 Commerzbank AG agreed to extend the maturity date of the Note to March 20, 2003. In April 2003 the Note was acquired by Consipio Holding b.v. from Commerzbank AG, and Consipio and Private reached an agreement-in-principle with Consipio to extend the maturity of the Note until April 2008. However, Consipio and Private were unable to reach final agreement on other terms and conditions relating to the restructured Note. Accordingly, in December 2003 Consipio notified Private and Slingsby Enterprises that Private was in default under the Note, and demanded $3.4 million as payment in full of all outstanding principal and interest under the Note. The Company continued to make regular payments on the Note, including principal and accrued interest, through February 2008. In April 2008 Consipio requested Private to pay the remaining balance of the Note, without indicating the amount due. Private in turn requested that Consipio provide a statement of the amount due and the basis for its calculation. In response, Consipio demanded payment of $3,194,000 as settlement in full of the Note, to be received by May 9, 2008. This calculation was made using an interest rate of 9.9%, as opposed to the 7% rate provided under the original terms of the Note. Consipio also advised that if payment was not received on such date it would institute litigation, in which event Consipio would claim that the amount due under the Note should be denominated in Euro, rather than U.S. dollars. In August 2008 Consipio notified Private that the Note was in default and that it intended to exercise its rights under the Note and the pledge of shares by Slingsby of Private common stock. Private believes that the amount due under the Note at May 9, 2008, including accrued interest, was no more than $2.4 million, utilizing an interest rate of 7%. As of December 31, 2010, EUR 2.2 million ($2.9 million), including accrued interest, was outstanding.

An adverse outcome in this dispute would likely have a material impact upon our liquidity if we are unable to obtain additional debt or equity financing to satisfy any resulting liability. In addition, this lender has recently filed an application with the New York court seeking an order attaching assets of the Company as security for the promissory note, which if granted may make it more difficult to obtain bank financing. For additional information regarding this litigation, see Item 3 – "Legal Proceedings".

The Company has various lease purchase arrangements and leases meeting certain criteria are treated as financing leases and, accordingly, assets acquired under such leases are capitalized and a corresponding liability representing the present value of the future lease payments is recorded. Leases primarily include all of the Company's computers and website hosting equipment, which generally have terms of 3-5 years. The leases are collateralized by the underlying equipment. At December 31, 2010, the net book value of assets subject to capital leases was EUR 193 thousand. In addition, the Company has several other credit arrangements which as of as of December 31, 2010 amounted to EUR 220 thousand. These credit arrangements range from short-term to three years at interest rates of 7%-13.25%.

**11.    Accrued other liabilities**

Accrued other liabilities are comprised of the following:

|  | December 31, | |
|---|---|---|
|  | 2009 | 2010 |
|  | EUR | EUR |
|  | (in thousands) | |
| Accrued expenses | 549 | 717 |
| Deferred income | 1,052 | 1,171 |
| Taxes and social security | 283 | 631 |
|  | 1,884 | 2,519 |

**12.     Income taxes**

Following is a summary of income before income taxes of U.S. and international operations:

|  | Years ended December 31, | | |
|---|---|---|---|
|  | **2008** | **2009** | **2010** |
|  | **EUR** | **EUR** | **EUR** |
|  |  | **(in thousands)** |  |
| USA ................................................... | (1,762) | (4,875) | (86) |
| International ...................................... | (5,204) | (13,915) | (4,341) |
|  | (6,966) | (18,790) | (4,427) |

The provision for income taxes consisted of the following in the years ended December 31, 2008, 2009, and 2010:

|  | Years ended December 31, | | |
|---|---|---|---|
|  | **2008** | **2009** | **2010** |
|  | **EUR** | **EUR** | **EUR** |
|  |  | **(in thousands)** |  |
| *Current* |  |  |  |
| State ........................................................ | 1 | 3 | 3 |
| Foreign .................................................... | 78 | 7 | 188 |
| Current tax expense | 79 | 10 | 191 |
|  |  |  |  |
| *Deferred* |  |  |  |
| Federal .................................................... | (684) | 258 | (249) |
| State ........................................................ | (112) | 42 | (41) |
| Foreign .................................................... | (1,060) | 1,410 | 7 |
| Deferred tax expense/(benefit) | (1,856) | 1,710 | (283) |
| Income tax expense/(benefit) | (1,777) | 1,720 | (92) |

A reconciliation of income taxes determined using the United States corporate statutory rate of 35% to actual income taxes provided is as follows:

|  | Years ended December 31, | | |
|---|---|---|---|
|  | **2008** | **2009** | **2010** |
| US federal statutory income tax rate ................................. | 35.00% | 35.00% | 35.00% |
| Aggregate effect of foreign tax rates ................................. | (8.43%) | (15.62%) | (26.30%) |
| Permanent differences |  |  |  |
| Items not deductible for tax purposes .......................... | 0.00% | (0.09%) | (0.37%) |
| Prior period adjustments ............................................. | (1.80%) | (10.75%) | (5.76%) |
| Other ........................................................................... | 3.59% | 1.80% | 2.75% |
| Movement in valuation allowances ................................... | (2.87%) | (19.47%) | (3.21%) |
| Total tax provision......................................................... | 25.48% | (9.13%) | 2.11% |

Deferred tax assets and liabilities reflect the future tax consequences of events that have already been recognized in the consolidated financial statements or income tax returns. At December 31, deferred tax assets and liabilities consisted of the following:

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 85 of 105

|  | December 31, | |
|---|---|---|
|  | **2009** | **2010** |
|  | **EUR** | **EUR** |
|  | **(in thousands)** | |
| *Deferred Tax Assets:* | | |
| Provisions for sales returns ............................................. | (1) | 14 |
| Provision for bad debts ................................................... | 26 | 104 |
| Differences in fixed assets ............................................. | 39 | (316) |
| Deferred expenses/revenues .......................................... | (53) | - |
| NOL carryforwards ......................................................... | 9,487 | 9,630 |
| Investment in subsidiaries ............................................. | 996 | 1,374 |
| Tax credits....................................................................... | 240 | 283 |
| Other ............................................................................... | 113 | 436 |
|  | 10,847 | 11,525 |
| Less: Valuation allowance ............................................. | (6,369) | (6,511) |
|  | 4,478 | |
| *Deferred Tax Liabilities:* | | |
| Spanish leasing benefits ................................................ | (14) | - |
| Investment Incentives ................................................... | (10) | (9) |
| Deferred expenses/revenues .......................................... | - | (268) |
| Net deferred tax asset/(liability) .......................................... | 4,454 | 4,737 |

The Company's deferred tax assets, net of valuation allowances, are primarily located in the United States and Cyprus, which is where the Company expects to record most of its future earnings.

**Net Operating Loss Carryforward**

The company's operating loss carry-forwards are described in the table below:

|  | Year ended December 31 |
|---|---|
|  | **2010** |
|  | **EUR** |
|  | **(in thousands)** |
| United States ……………………………………………… | 11,201 |
| Sweden …………………………………………………… | 4,912 |
| Cyprus …………………………………………………… | 15,956 |
| Spain ……………………………………………………… | 5,801 |
| Holland …………………………………………………… | 660 |
| France …………………………………………………… | 463 |
| Canada …………………………………………………… | 736 |
|  | 39,729 |

Cyprus, the United States and Spain are the jurisdictions in which nearly all of the NOLs have been generated. NOLs in Cyprus post-2000 may be carried forward indefinitely. The NOLs in the United States may be carried back 2 years and carried forward for 20 years, while the NOLs in Spain may only be carried forward for 15 years.

No provision has been made for United States federal and state taxes or foreign taxes that may result from future remittances of undistributed earnings of the Company's foreign subsidiaries because it is expected that all such earnings will be permanently reinvested in these foreign operations.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 86 of 105

The Company's subsidiaries file income tax returns in numerous tax jurisdictions, including the United States, several U.S. states and several non-U.S. jurisdictions, primarily in Europe. The statute of limitations varies by the various jurisdictions in which we operate. Because of the number of jurisdictions in which we file tax returns, in any given year the statute of limitations in certain jurisdictions may lapse without examination within the 12-month period from the balance sheet date. Other than the recurring effect of changes in unrecognized tax benefits due to the lapse of the statute of limitations, none of which are expected to be individually significant, management believe there are no other reasonably possible changes that will significantly impact the amount of tax benefits recognized in the Company's financial statements within the 12-month period from the balance sheet date. The Company has substantially concluded all US Federal and State income tax matters for years up to and including 2005 and 2003 respectively, and all foreign income tax matters for years up to 2004.

The Company's practice is to recognize interest and penalties related to income tax matters in interest and other expenses respectively. Interest and penalties amounting to EUR 515 thousand were accrued as of December 31, 2010, of which EUR 43 thousand was recognized as interest expense during the year then ended.

In December 1999 the Company received final notification from the Swedish Tax Authority assessing its subsidiary in Cyprus for the tax years 1995-1998 for a total amount of SEK 42,000,000 (approx. EUR 4.5 million) plus fines amounting to SEK 16,800,000 (approx. EUR 1.8 million) plus interest. The Swedish Tax Authority has taken the position that the subsidiary carried on business in Sweden from a permanent establishment during the period in question and should therefore be taxed on the income attributable to the permanent establishment. The Company is of the view that no permanent establishment is at hand in Sweden. However, the Administrative Court of Appeal has finally decided that a permanent establishment is at hand. In February 2009, the County Administrative Court reduced the assessment for the tax years 1995-1998 to a total amount of SEK 12,600,000 (approx. EUR 1.1 million) plus fines amounting to SEK 5,040,000 (approx. EUR 0.5 million) plus interest. In November 2010, the Administrative Court of Appeal decided that the County Administrative Court's decision should prevail. However, as a matter of fact, the tax claim on the Company has been extinguished according to Administrative Law. Due to the fact there is no longer any claim at stake, no amounts have been provided in the Company's financial statements for this dispute.

**13.     Related party transactions**

*Guaranty of Commerzbank Note by Affiliate of Berth Milton*

In December 2001 the group's holding company, Private Media Group, Inc., borrowed $ 4.0 million from Commerzbank AG pursuant to a Note originally due on December 20, 2002. The Note bore interest at an annual rate of 7%, payable quarterly, with the entire principal amount and accrued interest originally due on December 20, 2002. The Note was guaranteed by Slingsby Enterprises Limited, an affiliate of Berth Milton, Private's Chairman, President and principal shareholder, and the guaranty was secured by 1,650,000 shares of Private Media Group, Inc. common stock. In December 2002 Commerzbank AG agreed to extend the maturity date of the Note to March 20, 2003. In April 2003 the Note was acquired by Consipio Holding b.v. from Commerzbank AG, and Consipio and Private reached an agreement-in-principle with Consipio to extend the maturity of the Note until April 2008. However, Consipio and Private were unable to reach final agreement on other terms and conditions relating to the restructured Note. Accordingly, in December 2003 Consipio notified Private and Slingsby Enterprises that Private was in default under the Note, and demanded $3.4 million as payment in full of all outstanding principal and interest under the Note. The Company continued to make regular payments on the Note, including principal and accrued interest, through February 2008. In April 2008 Consipio requested Private to pay the remaining balance of the Note, without indicating the amount due. Private in turn requested that Consipio provide a statement of the amount due and the basis for its calculation. In response, Consipio demanded payment of $3,194,000 as settlement in full of the Note, to be received by May 9, 2008. This calculation was made using an interest rate of 9.9%, as opposed to the 7% rate provided under the original terms of the Note. Consipio also advised that if payment was not received on such date it would institute litigation, in which event Consipio would claim that the amount due under the Note should be denominated in Euro, rather than U.S. dollars. In August 2008 Consipio notified Private that the Note was in default and that it intended to exercise its rights under the Note and the pledge of shares by Slingsby of Private common stock. Private believes that

the amount due under the Note at May 9, 2008, including accrued interest, was no more than $2.4 million ($2.9 million at December 31, 2010), utilizing an interest rate of 7%.

For additional information regarding this litigation, see Item 3 – "Legal Proceedings," and Item12 - "Security Ownership of Certain Beneficial Owners and Management – Changes in Control" elsewhere in this Report.

*Guaranty of EUR One Million Loan by Affiliate of Berth Milton*

In December 2007 an affiliate of Mr. Milton agreed to guarantee a bank line of credit agreement of Euro 1.0 million entered into by one of the Company's European subsidiaries, which was originally due on December 31, 2008, and was subsequently extended until it expired in December 31, 2009. On December 11, 2009, the credit line of Euro 1.0 million was refinanced with a six year term loan by an institutional lender at an interest rate of EURIBOR + 1.2%. Interest is payable annually starting December 11, 2010 and the loan is repayable in equal annual installments over a five year period starting December 11, 2011 (the "December 2009 Refinancing"). The December 2009 Refinancing was arranged and guaranteed by an affiliate of Berth Milton and the guaranty is secured by 666,667 shares of Private common stock beneficially owned by Mr. Milton.

*Unsecured Loans to Slingsby Enterprises Limited*

We have unsecured loans to Slingsby Enterprises Limited ("Slingsby"), an entity controlled by Mr. Milton (the "Slingsby Loans"). The Slingsby Loans bear interest at the rate of EURIBOR+1% per annum and have no maturity date. During 2010 the highest amount outstanding was EUR 7.1 million. As of December 31, 2010, and March 31, 2011, EUR 7.1 million and EUR 7.1 million, respectively, remained outstanding on these loans, including interest. No payments of principal or interest have been made in respect of the Slingsby Loans. As of December 31, 2010, there are no amounts recorded in the Company's financial statements with respect to the loans, see below for further information.

In connection with the acquisition of Game Link LLC by the Company on January 20, 2009, in order to induce the sellers to consummate the acquisition, Slingsby Enterprises Limited entered into an agreement (the "GameLink Letter Agreement") with the Company and the sellers with regard to the partial repayment of the Slingsby Loans. Under the GameLink Letter Agreement, in each of the fiscal years ended December 31, 2009, 2010, and 2011, Slingsby is required to repay not less than EUR one million, either in cash or in Private common stock valued at its fair market value as determined by the disinterested directors of Private, to be applied first to accrued interest and then to principal of the loan. At December 31, 2010, Slingsby had not made the EUR one million payments due on December 31, 2009 and December 31, 2010.

In January 2010 Mr. Milton advised the Company's Board of Directors that Slingsby did not make the EUR one million payment due under the GameLink Letter Agreement on December 31, 2009, as he had arranged for the EUR one million December 2009 Refinancing on terms favorable to the Company and arranged for the pledge of 666,667 shares of common stock beneficially owned by Mr. Milton to secure the December 2009 Refinancing. In February 2010 the Company's independent directors determined that it was not in the best interest of the Company to enforce the December 31, 2009 EUR one million payment obligation under the GameLink Letter Agreement, in view of its determination that the arrangement by Mr. Milton of December 2009 Refinancing was done in good faith and was in the best interests of the Company and that Mr. Milton's involvement in the refinancing was an important factor in completing this financing, but that the payments due in 2010 and 2011 would remain in place.

The independent directors further determined in April 2010 that the terms of the Slingsby Loan should be renegotiated with Mr. Milton to reflect reasonable market terms in view of a number of factors, including the size of the loan, the failure of Slingsby Enterprises Limited to make the scheduled payment due on December 31, 2009, the absence of any security for the loan and the absence of a fixed maturity date or agreed payment schedule sufficient to repay the full amount of the Slingsby Loan. In April 2010 Mr. Milton proposed to restructure the payment terms of the Slingsby Loan to provide for a personal guaranty of the Slingsby Loan by Mr. Milton, a fixed maturity date of five years, and payments of EUR 1 million, in cash or Private common stock, in 2011 and 2012. However, the Company

and Mr. Milton were unable to reach agreement on the material terms of the restructuring of the Slingsby Loan. Based upon the payment history of the loan and the absence of any security for the Slingsby Loan, in May 2010 the Company determined to fully provide against the Loan in its financial statements until such time as the terms of the Slingsby Loan are modified to provide adequate assurances of the collectability of the Slingsby Loan. As of the date of this Report no agreement has been reached regarding the restructuring of the Slingsby Loan.

The terms of the GameLink Letter Agreement provide that it may not be amended without the consent of the GameLink sellers, which includes Ilan Bunimovitz. These terms require payments of the Slingsby Loan of EUR1 million, in cash or Private common stock, on or before December 31, 2009, 2010 and 2011. Therefore, any restructuring of the Slingsby Loan which requires a modification of the payment terms in the GameLink Letter Agreement will be subject to obtaining the consent of the GameLink sellers. As of the date of this report the GameLink sellers have not agreed to waive or defer any required payments, including the payment required to be made by Slingsby to Private on December 31, 2009, and December 31, 2010.

For additional information regarding the Slingsby Loans, see Item 3 – "Legal Proceedings – Nevada State Court Action,"

*Game Link Agreements*

In January 2009 the Company completed the acquisition of Game Link LLC and eLine LLC, companies engaged in the business of digital distribution of adult content over the Internet and online eCommerce development. Mr. Bunimovitz was the founder and chief operating officer of Game Link LLC and an indirect co-owner of Game Link LLC and eLine, LLC. In consideration of the acquisition of Ilan Bunimovitz's interests in Game Link LLC and eLine LLC, he received 2,066,725 shares of the Company's common stock and he is entitled to receive up to an additional 1,112,852 shares of common stock if the combined EBITDA of the digital media operations of the Company and Game Link meet specified targets in 2009, 2010 and 2011. The total value of the shares received and to be received by Mr. Bunimovitz in connection with the acquisition, assuming the EBITDA targets are met in 2009, 2010 and 2011, is EUR 7,418,271 (USD 9,634,118), based on the closing price of the Company's common stock on January 20, 2009. The Company and the sellers have not yet reached agreement as to what extent the EBITDA target has been met for 2009 or 2010.

In connection with the acquisition by the Company of Game Link LLC and its affiliate, Game Link LLC entered into a lease agreement with 537 Stevenson Street L.L.C., a limited liability company which is 50% owned by Mr. Bunimovitz, providing for the lease by Game Link LLC of the land and building used by Game Link in San Francisco, California. The lease extends through December 31, 2011, has a base rent of $13,620 per month, and provides for Game Link to be responsible for property taxes and maintenance expenses during the term of the lease.

*Sureflix Transactions*

Effective December 17, 2009, the Company appointed Eric Johnson as a director pursuant to his Employment Agreement with the Company and Entruphema Inc., a subsidiary of the Company ("Entruphema"), entered into on October 29, 2009. The Employment Agreement was entered into in connection with the acquisition of Entruphema and its affiliate, Sureflix Digital Distribution Inc. on October 29, 2009, companies engaged in the business of digital distribution of premium gay adult content. Mr. Johnson was the chief executive officer and a minority owner of Entruphema prior to its acquisition by Private on October 29, 2009.

The Employment Agreement provides for Mr. Johnson to serve as Chief Executive Officer of Entruphema for a period of three years, subject to earlier termination by either party under specified circumstances. Under the terms of the Employment Agreement the Company agreed to appoint Mr. Johnson to its Board by December 31, 2009, and to nominate him to continue to serve as a director in 2010 and 2011 until such time as he ceases to be employed by Entruphema. The Employment Agreement provides for Mr. Johnson to receive an annual base salary of CAD 235,000 during each year of the three year employment term. If Entruphema terminates Mr. Johnson's employment during the

term of the Employment Agreement other than for "cause," or if Mr. Johnson terminates his employment with the Entruphema for "good reason," then Mr. Johnson is entitled to continue to receive his monthly base salary for the remaining period of the three year term.

In consideration of the acquisition of Mr. Johnson's interest in Entruphema, he received non-voting Class A Preference Shares of Entruphema convertible into 130,000 shares of the Company's common stock, and he is entitled to receive additional Class A Preference Shares convertible into up to 70,000 shares of the Company's common stock if the combined EBITDA of the digital media operations of the Company and Entruphema meet specified targets in the three months ended December 31, 2009, the two 12-month periods ending December 31, 2010 and 2011, and the nine month period ending September 30, 2012. The Company and the sellers have not yet reached agreement as to what extent the EBITDA target has been met for the three months ended December 31, 2009, and the 12 months ended December 31, 2010.

The total value of the shares received and to be received by Mr. Johnson in connection with the acquisition, assuming the EBITDA targets are met, is $474,000, based on the closing price of the Company's common stock on October 29, 2009. The total value of the acquisition of Entruphema by the Company, based upon shares received and to be received by all of the sellers of Entruphema common stock in the transaction, including Mr. Johnson, assuming the EBITDA targets are met, is $4,740,000, based on the closing price of the Company's common stock on October 29, 2009.

**14.     Shareholders' equity**

*Reverse stock split*

The Company implemented a 1:3 reverse stock split on March 11, 2010, whereby each holder of Common Stock received one share of Common Stock for each three shares owned on the record date. Corresponding adjustments have been made to options outstanding and any shares issuable to reflect the reverse stock split. Accordingly, all share and per share values have been adjusted to give effect to the reverse stock split.

*Retained Earnings*

The Company is a holding company with no significant operations of its own. Accordingly, the retained earnings of the Company represent the accumulated earnings of its foreign subsidiaries, principally Cine Craft Ltd, and Milcap Media Ltd. The ability of the Company to pay dividends is dependent on the transfer of accumulated earnings from these subsidiaries. The Company's current intention is to re-invest the unremitted earnings of its foreign subsidiaries. In addition the Company is restricted from payment of dividends under the terms of its Note agreement (see Note 10).

*Common Stock*

The Company is authorized to issue 100,000,000 shares of common stock. Holders of common stock are entitled to one vote per share. The common stock is not redeemable and has no conversion or pre-emptive rights.

During 2000 the Company's Board of Directors authorized the repurchase of up to 10% of the Company's outstanding common shares. Such purchases may be made from time to time in the open market for an indefinite period of time. As of December 31, 2009 no shares had been repurchased.

*Preferred Stock*

The Company is authorized to issue 10,000,000 shares of preferred stock with relative rights, preferences and limitations determined at the time of issuance.

**15.  Earnings (loss) per share**

The following table sets forth the computation of basic and diluted earnings (loss) per share:

| | Years ended December 31, | | |
| | 2008 | 2009 | 2010 |
|---|---|---|---|
| **Numerator: (EUR in thousands)** | | | |
| Net income (loss) …………………………………… | (5,188) | (20,510) | (4,335) |
| | | | |
| **Denominator:** | | | |
| Denominator for basic earnings per share – | | | |
| weighted average shares outstanding ………………………… | 17,860,165 | 20,773,440 | 22,005,569 |
| | | | |
| Effect of dilutive securities: | | | |
| Common stock warrants, convertible notes, | | | |
| options and other dilutive securities ………………………… | n/a | n/a | n/a |
| | | | |
| Denominator for diluted earnings per share – | | | |
| weighted average shares and assumed conversions ………… | n/a | n/a | n/a |
| | | | |
| **Earnings (loss) per share (in EUR)** | | | |
| Basic ……………………………………………………… | (0.29) | (0.99) | (0.20) |
| Diluted …………………………………………………… | (0.29) | (0.99) | (0.20) |

For 2008 diluted impact of potentially dilutive securities is anti-dilutive therefore diluted and basic loss per share is EUR 0.29. The equivalent of 2,011 common shares derived from dilutive securities such as options, warrants and convertible notes is excluded from the diluted earnings per share for 2008 as they are anti-dilutive. For 2009 and 2010, basic earnings per share include exchangeable shares equivalent to the weighted average number of 224,384 and 1,248,466 shares of common stock outstanding in the period, respectively.

**16.  Commitments and contingent liabilities**

The Company leases certain property and equipment under non-cancelable operating leases. Certain of these leases contain renewal options. Rental payments under these leases are charged to operations on a straight-line basis with any differential recognized as deferred rent in the balance sheet. The rental payments under these leases are charged to operations as incurred. Rental expense for the years ended December 31, 2008, 2009 and 2010 amounted to EUR 879 thousand, EUR 1,293 thousand and EUR 1,110 thousand, respectively.

Future minimum payments under non-cancelable leases as of December 31, 2010 are as follows:

| Year | EUR (in thousands) |
|---|---|
| 2011 | 870 |
| 2012 | 541 |
| 2013 | 73 |
| 2014 | 3 |
| 2015 | - |
| | 1,487 |

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 91 of 105

**17.      Operations by geographical area**

The Company operates in one business segment, which is the acquisition, refinement and distribution of video and photo rights for adult feature magazines, movies and the Internet.

Information concerning net sales originating from the Company's different geographic locations is summarized as follows:

|  | Years ended December 31, | | |
|---|---|---|---|
|  | **2008** | **2009** | **2010** |
|  | **EUR** | **EUR** | **EUR** |
| *Net Sales* | | **(in thousands)** | |
| USA | 550 | 10,435 | 10,266 |
| Canada | 316 | 889 | 3,751 |
| Cyprus | 8,860 | 7,940 | 5,155 |
| Sweden | 6,441 | 9,014 | 6,030 |
| Spain | 14,670 | 11,464 | 9,305 |
| Gibraltar | 525 | 581 | 337 |
| France | 325 | - | - |
| Benelux | 755 | - | - |
| Eliminations | (12,775) | (17,894) | (11,574) |
| Total | 19,667 | 23,061 | 23,270 |

Eliminations principally relates to inter-group revenue arising from trademark, license and distribution agreements between the Company's subsidiaries in the USA and Europe.

Information on the Company's long-lived assets held in different geographic locations is summarized as follows:

|  | December 31, | |
|---|---|---|
|  | **2009** | **2010** |
|  | **EUR** | **EUR** |
|  | **(in thousands)** | |
| *Long-lived assets* | | |
| USA | 12,549 | 9,697 |
| Canada | 3,784 | 3,290 |
| Cyprus | 13,734 | 10,695 |
| Sweden | 3,874 | 3,130 |
| Spain | 772 | 480 |
| Other European countries | 19 | - |
| Total | 34,731 | 27,292 |

For the years ended 2008, 2009 and 2010, no customer accounted for more than 10% of consolidated revenues.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 92 of 105

The following table illustrates our net sales by product group for the periods indicated.

|  | Years ended December 31, | | |
| --- | --- | --- | --- |
|  | **2008** | **2009** | **2010** |
|  | **EUR** | **EUR** | **EUR** |
| *Net sales by product group* | | (in thousands) | |
| Internet .............................................................. | 4,218 | 13,129 | 14,766 |
| Broadcasting...................................................... | 5,805 | 4,491 | 3,859 |
| DVDs & Magazines ........................................... | 7,687 | 3,843 | 3,151 |
| Wireless ............................................................. | 1,957 | 1,597 | 1,494 |
| Total .................................................................. | 19,667 | 23,061 | 23,270 |

**18.      Stock-based compensation**

The Company has an expired Employee Stock Option Plan ("the 1999 Plan") and a new Equity Incentive Plan (the "2009 EIP") available as described below. The compensation cost charged against income for the twelve-month periods ended December 31, 2009 and 2010 was EUR 3 thousand and EUR 2 thousand, respectively, which is included in selling, general and administrative expense. The charge of compensation cost had no impact on tax since none of the option beneficiaries are taxable in the U.S. and tax rules are different in the beneficiaries' respective tax jurisdictions.

*The 1999 Plan*

The 1999 Plan, which was in effect until its expiration on March 1, 2009, allowed the Company to grant options to purchase common stock to designated employees, executive officers, directors, consultants, advisors and other corporate and divisional officers of Private Media Group. The 1999 Plan authorized the Company to grant stock options exercisable for up to an aggregate of 2,400,000 shares of common stock. No stock options may be granted under the 1999 Plan, following its expiration, on March 1, 2009.

Under the expired plan, the purchase price (exercise price) of option shares had to be at least equal to the fair market value of such shares on the date the stock option was granted. The stock option was exercisable for a period of ten years from the date of grant or such shorter period as was determined by the Company. Each stock option under the plan provided that it was exercisable in full or in cumulative or non-cumulative installments, and each stock option was exercisable from the date of grant or any later date specified in the option. Unless otherwise provided by the Company, an optionee could not exercise a stock option unless from the date of grant to the date of exercise the optionee remained continuously in the Company's employ. At December 31, 2010, options for 8,668 shares were still outstanding under the 1999 Plan.

*The 2009 EIP*

The 2009 EIP is shareholder approved and came into effect on December 16, 2009. It allows the Company to grant incentive stock options, non-statutory stock options, restricted stock, unrestricted stock and other equity-based awards, such as stock appreciation rights, phantom stock awards, and restricted stock units, which we refer to collectively as Awards. The Company may issue up to 2,066,667 shares of its common stock pursuant to Awards granted. Shares pursuant to Awards that have expired or are forfeited will be returned to the 2009 EIP.

The Company may grant Awards under the 2009 EIP to employees, directors and consultants of Private Media Group. No Awards may be granted after the 2009 EIP expires on December 15, 2019. The purchase price (exercise price) of option shares must be at least equal to the fair market value of such shares on the date the stock option is granted or such later date the Company may specify. Each Award may provide that it is exercisable in full or in cumulative or non-cumulative installments, and each Award is exercisable from the date of grant or any later date specified in the Award. Awards must expire within a period of ten years from the date of grant or such shorter period

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 93 of 105

as is determined by the Company. Unless otherwise provided by the Company, an Award holder may not exercise an Award unless from the date of grant to the date of exercise the holder remains continuously in the Company's employ.

At December 31, 2010, Awards for 2,065,667 shares were available for future grant under the 2009 EIP. Awards become exercisable on their respective vesting dates with vesting terms determined by management and approved by the Company's compensation committee.

A summary of stock option activity for the year ended December 31, 2010 is a follows:

| | Number of Shares | Weighted-Average Exercise Price in USD | Weighted-Average Remaining Life in Years | Aggregate Intrinsic Value[10] in Thousands of USD |
|---|---|---|---|---|
| Outstanding January 1, 2010 ............... | 17,336 | 6.77 | | |
| Granted ................................................ | - | - | | |
| Exercised............................................... | - | - | | |
| Expired or forfeited ............................ | 7,668 | 7.21 | | |
| Outstanding December 31, 2010 ......... | 9,668 | 6.42 | 1.5 | - |
| Exercisable December 31, 2010 .......... | 9,668 | 6.42 | 1.5 | - |

Stock-based compensation cost for stock awards is measured based on the closing fair market value of the Company's common stock on the date of grant.

Stock-based compensation cost for option awards is measured on the date of grant using the Black-Scholes option pricing model. The following general assumptions are used: a) expected volatility is based on historical volatility of our stock, b) expected life is determined based on historical experience of similar awards, giving consideration to the contractual terms of the stock-based awards, vesting schedules and expectations of future employee behavior, c) risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant and d) dividend yield is zero based on the Company's current dividend policy.

During the twelve-month periods ended December 31, 2008 and 2009 grants for 7,000 and 4,334 shares for each year, respectively, were made. During the twelve-month periods ended December 31, 2010, no grants for shares were made. The following assumptions were used in calculating the fair value:

| | 2008 | 2009 |
|---|---|---|
| Expected volatility ……………………… | 50% | 70% |
| Expected dividend yield ………………… | - | - |
| Expected term (in years) ……………… | 2.5 | 2.36 |
| Risk-free interest rate ……………………… | 2.96% | 3.49% |
| Weighted average fair value ……………… | $1.20 | $0.82 |

As of December 31, 2010, there was no unrecognized compensation cost related to nonvested option granted under the Plan. The total fair value of all options vested and outstanding at December 31, 2009 and 2010, was USD 42 thousand and USD 22 thousand, respectively.

---

[10] The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying awards and the quoted price of our common stock for the options that were in-the-money at December 31, 2010.

**19.     Fair value measurements**

The Company accounts for certain assets and liabilities at fair value. The hierarchy below lists the three levels of fair value based on the extent to which inputs used in measuring fair value are observable in the market. The Company categorizes each of its fair value measurements in one of these three levels based on the lowest level input that is significant to the fair value measurement in its entirety. These levels are:

- Level 1—inputs are based upon unadjusted quoted prices for identical instruments traded in active markets.
- Level 2—inputs are based upon quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active, and model-based valuation techniques (such as a Black-Scholes or Lattice model) for which all significant inputs are observable in the market or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3—inputs are generally unobservable and typically reflect management's estimates of assumptions that market participants would use in pricing the asset or liability. The fair values are therefore determined using model-based techniques, including option pricing models and discounted cash flow models.

*Assets and Liabilities Measured at Fair Value on a Nonrecurring Basis*

The Company measures certain assets, such as goodwill, other intangible assets and developed website technology, at fair value on a nonrecurring basis when they are deemed to be impaired. The fair values determined were based on valuation techniques using the best information available and primarily included market comparables, relief from royalty method and discounted cash flow projections. An impairment charge is recorded when the cost of the asset exceeds its fair value.

The following tables presents the Company's assets and liabilities measured at fair value on a nonrecurring basis:

| | Level 1 | Level 2 | Level 3 | Fair Value | Gains (Losses) |
|---|---|---|---|---|---|
| | EUR | EUR | EUR | EUR | EUR |
| | | | (in thousands) | | |
| Goodwill (a) ............................................... | - | - | 7,112 | 7,112 | (1,320) |
| Other intangible assets (b) ......................... | - | - | 1,613 | 1,613 | (242) |
| Property, plant and equipment (c) ............................ | - | - | 1,050 | 1,050 | (548) |
| **Total** | **-** | **-** | **9,775** | **9,775** | **(2,110)** |

For the year ended December 31, 2010

(a) Measurement relates to impairment reviews performed with respect to our eCommerce business in USA and our video distribution company in the Benelux countries. See Note 8 Goodwill and Other Intangible Assets for additional discussion.

(b) Measurement relates to impairment reviews performed with respect to our eCommerce business in USA. See Note 8 Goodwill and Other Intangible Assets for additional discussion.

(c) Measurement relates to impairment reviews performed with respect to our eCommerce business in USA. See Note 6 Property, plant and equipment for additional discussion.

|  | For the year ended December 31, 2009 | | | | |
|---|---|---|---|---|---|
|  | Level 1 | Level 2 | Level 3 | Fair Value | Gains (Losses) |
|  | EUR | EUR | EUR | EUR | EUR |
|  |  |  | (in thousands) | | |
| Goodwill (a) ................................................... | - | - | 458 | 458 | (884) |
| **Total** | - | - | **458** | **458** | **(884)** |

(a) Measurement relates to impairment reviews performed with respect to our video distribution company in the Benelux countries. See Note 8 Goodwill and Other Intangible Assets for additional discussion.

*Assets and Liabilities Measured at Fair Value on a Recurring Basis*

As of December 31, 2010, the Company held certain liabilities that are required to be measured at fair value on a recurring basis. The fair value hierarchy requires the use of observable market data when available. In instances in which the inputs used to measure fair value fall into different levels of the fair value hierarchy, the fair value measurement classification below has been determined based on the lowest level input that is significant to the fair value measurement in its entirety. Management's assessment of the significance of a particular item to the fair value measurement in its entirety requires judgment, including the consideration of inputs specific to the asset or liability.

The fair values of liabilities measured on a recurring basis were determined using the following inputs:

|  | For the year ended December 31, 2010 | | | | |
|---|---|---|---|---|---|
|  | Level 1 | Level 2 | Level 3 | Net Fair Value | Total Gains (Losses) |
|  | EUR | EUR | EUR | EUR | EUR |
|  |  |  | (in thousands) | | |
| Contingent consideration payable (a) ..................... | - | - | 514 | 514 | 4,189 |
| **Total** | - | - | **514** | **514** | **4,189** |

|  | For the year ended December 31, 2009 | | | | |
|---|---|---|---|---|---|
|  | Level 1 | Level 2 | Level 3 | Net Fair Value | Total Gains (Losses) |
|  | EUR | EUR | EUR | EUR | EUR |
|  |  |  | (in thousands) | | |
| Contingent consideration payable (a) ..................... | - | - | 4,703 | 4,703 | - |
| **Total** | - | - | **4,703** | **4,703** | - |

(a) Under certain acquisition agreements, the Company has agreed to pay the sellers earnouts based on the performance of the businesses acquired. These earnout payments will be made in common stock of the Company. Contingent consideration payable is measured at its acquisition date fair value. Contingent consideration payable in the tables above represents the estimated fair value of additional future earn-outs payable for such acquisitions and is based on management's estimates and entity-specific assumptions, which are Level 3 inputs. See Note 9. Contingent consideration payable for additional discussion.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 96 of 105

The following table provides a reconciliation between the beginning and ending balances of items measured at fair value on a recurring basis that used significant unobservable inputs (Level 3).

|  | Contingent Consideration Payable |
|---|---|
|  | EUR |
|  | (in thousands) |
| Balance at January 1, 2009 .................................................. | - |
| Acquisitions (Note 9) .......................................................... | 4,703 |
| Balance at December 31, 2009 .............................................. | 4,703 |
| Change in fair value recorded in earnings ...................... | (4,189) |
| Balance at December 31, 2010 .............................................. | 514 |

## 20. Selected quarterly financial data (unaudited)

Selected quarterly financial data for the years ended December 31, 2010 and 2009 is summarized as follows:

|  | For the year 2010 | | | | |
|---|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Total |
|  | EUR | EUR | EUR | EUR | EUR |
|  | (in thousands, except per share data) | | | | |
| Net sales ................................................... | 6,363 | 6,037 | 5,878 | 4,993 | 23,270 |
| Gross profit ............................................... | 2,039 | 2,047 | 2,066 | 269 | 6,422 |
| Net income (loss) ...................................... | (1,198) | 931 | (2,598) | (1,470) | (4,335) |
| Net income (loss) per share: |  |  |  |  |  |
| Basic ...................................................... | (0.05) | 0.04 | (0.12) | (0.07) | (0.20) |
| Diluted ................................................... | (0.05) | 0.04 | (0.12) | (0.07) | (0.20) |
| Weighted average shares outstanding: |  |  |  |  |  |
| Basic ...................................................... | 22,005,032 | 22,005,816 | 22,005,824 | 22,115,824 | 22,005,569 |
| Diluted ................................................... | n/a | n/a | n/a | n/a | n/a |

|  | For the year 2009 | | | | |
|---|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Total |
|  | EUR | EUR | EUR | EUR | EUR |
|  | (in thousands, except per share data) | | | | |
| Net sales ................................................... | 5,804 | 6,175 | 5,757 | 5,325 | 23,061 |
| Gross profit ............................................... | 2,239 | 2,145 | 2,163 | (349) | 6,197 |
| Net income (loss) ...................................... | (835) | (1,553) | (1,205) | (16,917) | (20,510) |
| Net income (loss) per share: |  |  |  |  |  |
| Basic ...................................................... | (0.04) | (0.08) | (0.06) | (0.78) | (0.99) |
| Diluted ................................................... | (0.04) | (0.08) | (0.06) | (0.78) | (0.99) |
| Weighted average shares outstanding: |  |  |  |  |  |
| Basic ...................................................... | 20,042,454 | 20,704,934 | 20,704,934 | 21,614,934 | 20,773,440 |
| Diluted ................................................... | n/a | n/a | n/a | n/a | n/a |

a. In the three month period ending December 31, 2010 the Company recorded impairment charges of EUR 2,048 thousand related to our newly acquired eCommerce business in USA. The impairment affected goodwill, other intangible assets and developed website technology by EUR 1,258 thousand, EUR 242 thousand and EUR 548 thousand, respectively. The relevant charges were recorded in impairment of goodwill and other intangible assets, except for developed website technology which was recorded in cost of sales.

b.  In the three month periods ending June 30 and December 31, 2010, the Company recorded EUR 2,352 thousand and EUR 1,837 thousand benefit from change in fair value of contingent consideration payable as a result of the performance of GameLink and Sureflix. In 2009 and 2010 the EBITDA earnout targets were not reached and as a result of re-measurement, using the lattice model, the current fair value was adjusted.

c.  As a result of impairment reviews performed in 2009 and 2010, goodwill related to the Company's video distribution company in the Benelux countries was reduced by EUR 884 thousand and 62 thousand, respectively. The relevant charges were recorded in impairment of goodwill and other intangible assets in the three month periods ending December 31, 2009 and 2010.

d.  In the three month period ending December 31, 2009 the Company recorded a write-down of magazine inventory of EUR 806 thousand in cost of sales.

e.  In the three month period ending December 31, 2009 the Company recorded selling, general and administrative expenses of a non-recurring nature totaling EUR 8,657 thousand. The non-recurring expenses were made up of: provision against related party receivable of EUR 7,250 thousand, investment write-off of EUR 1,022 thousand and acquisition related expenses of EUR 385 thousand.

Case 3:11-cv-03005-MWB-LTS   Document 29-3   Filed 08/02/11   Page 98 of 105

## PRIVATE MEDIA GROUP, INC.
## VALUATION AND QUALIFYING ACCOUNTS
### (in thousands)

| | Opening balance EUR | Additions charged to | | Deductions (b) EUR | Ending balance EUR |
|---|---|---|---|---|---|
| | | Costs and expenses EUR | Revenue (a) EUR | | |
| **Description** | | | | | |
| Allowance deducted in the balance sheet from the asset to which it applies: | | | | | |
| | | | | | |
| Year ended December 31, 2010: | | | | | |
| Allowance for magazine returns ......... | 104 | | 275 | (292) | 87 |
| Allowance for doubtful accounts ........ | 1,788 | 718 | | (64) | 2,442 |
| | | | | | |
| Year ended December 31, 2009: | | | | | |
| Allowance for magazine returns ......... | 207 | - | 407 | (510) | 104 |
| Allowance for doubtful accounts ........ | 1,389 | 567 | | (168) | 1,788 |
| | | | | | |
| Year ended December 31, 2008: | | | | | |
| Allowance for magazine returns ......... | 308 | - | 843 | (945) | 207 |
| Allowance for doubtful accounts ........ | 1,269 | 333 | | (214) | 1,389 |

Notes:

(a) Represents provisions for expected returns of magazines from national distribution networks which are charged to net revenues.

(b) Represents settlements on returns provisions previously recorded, and write-offs less recoveries on doubtful accounts.

**EXHIBIT 21**

**Private Media Group, Inc. Subsidiaries**

| Name of Subsidiary | Place of Incorporation |
| --- | --- |
| Cine Craft, Ltd. | GIBRALTAR |
| Coldfair Holdings Limited | CYPRUS |
| Fraserside Holdings Ltd. | CYPRUS |
| Peach Entertainment Distribution AB | SWEDEN |
| Milcap Media Group S.L.U. | SPAIN |
| Private Media Group Services S.L. | SPAIN |
| Private Benelux B.V. | THE NETHERLANDS |
| Private France SAS | FRANCE |
| Private North America, Ltd. | U.S. (California) |
| Barbuda B.V. | THE NETHERLANDS |
| Ceresland S.L. | SPAIN |
| Private Media Group Canada, Inc. | CANADA |
| Fraserside IP LLC | U.S. (Iowa) |
| ThinkForward, Inc. | U.S. (California) |
| GreenCine, Inc. | U.S. (Delaware) |
| Mama's LLC | U.S. (Delaware) |
| GameLink LLC | U.S. (Delaware) |
| eLine LLC | U.S. (Delaware) |
| Sureflix Digital Distribution, Inc. | U.S. (Delaware) |
| Entruphema, Inc. | CANADA |

**EXHIBIT 23.1**

## CONSENT OF BDO AUDITORES, S.L.

We consent to the incorporation by reference in the Registration Statements on Form S-8 (File No. 333-31076), Form S-8 (File No. 333-122329), Form S-3 (File No. 333-109607), Form S-3 (File No. 333-40936) and Form S-3 (File No. 333-147964) of Private Media Group, Inc. of our reports dated May 31, 2011, relating to the consolidated financial statements and financial statement schedule II of Private Media Group, Inc. which appear in this Form 10-K. Our report contains an explanatory paragraph regarding the Company's ability to continue as a going concern.

/s/ BDO Auditores, S.L.

**BDO Auditores, S.L.**

Barcelona, Spain
June 2, 2011

EXHIBIT 23.2

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in the Registration Statements on Form S-8 (File No. 333-31076), Form S-8 (File No. 333-122329), Form S-3 (File No. 333-109607), Form S-3 (File No. 333-40936) and Form S-3 (File No. 333-147964) of Private Media Group, Inc. of our report dated April 26, 2011, relating to the consolidated financial statements of ThinkForward, Inc. as of and for the year ended December 31, 2010. Our report contains an explanatory paragraph regarding the Company's ability to continue as a going concern.

/s/ Odenberg, Ullakko, Muranishi & Co. LLP

San Francisco, California
June 2, 2011

**EXHIBIT 31.1**

**CERTIFICATIONS**

I, Berth Milton, certify that:

1.   I have reviewed this annual report on Form 10-K of Private Media Group, Inc.;

2.   Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

    a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over reporting.

Date: June 3, 2011

/s/ Berth Milton
Berth Milton, Principal Executive Officer

**EXHIBIT 31.2**

**CERTIFICATIONS**

I, Johan Gillborg, certify that:

1.      I have reviewed this annual report on Form 10-K of Private Media Group, Inc.;
2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:
   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):
   a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over reporting.

Date: June 3, 2011


/s/ Johan Gillborg_____
Johan Gillborg, Principal Financial Officer

EXHIBIT 32.1

**CERTIFICATION OF CEO AND CFO PURSUANT TO**
**18 U.S.C. § 1350,**
**AS ADOPTED PURSUANT TO**
**§ 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Private Media Group, Inc. (the "Company") for the annual period ending December 31, 2010 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Berth Milton, Chief Executive Officer of the Company, and Johan Gillborg, Vice President, Chief Financial Officer and Chief Accounting Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


/s/ Berth Milton
Berth Milton
Chief Executive Officer

June 3, 2011

/s/ Johan Gillborg
Johan Gillborg
Chief Financial Officer

June 3, 2011

This certification accompanies this Report pursuant to § 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by the Sarbanes-Oxley Act of 2002, be deemed filed by the Company for purposes of § 18 of the Securities Exchange Act of 1934, as amended.