# UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF IOWA

### CENTRAL DIVISION

| | |
|---|---|
| FRASERSIDE IP LLC, | |
| An Iowa Limited Liability Company | |
| Plaintiff, | No.  3:11-cv-03005-MWB |
| vs. | **BRIEF IN SUPPORT OF RESISTANCE TO MOTION TO DISMISS** |
| Youngtek Solutions Limited, dba | |
| EmpFlix, dba empflix.com, dba , | |
| TnaFlix, dba tnaflix.com, and John Does 1 - 100 and | |
| John Doe Companies 1 - 100 | |
| Defendant(s). | |

COMES NOW, Plaintiff Fraserside IP LLC, by and through its counsel, Chad Belville, and RESISTS Defendant's Motion to Dismiss in its entirety. In support of it Resistance to Motion, Plaintiff provides the following Brief and Attachments.

Table of Contents

FACTS ……………………………………………………………………………3

LAW AND ARGUMENT …………………………………………………………4

I.      Plaintiff Resists Defendant's Motion to Dismiss for Lack of Personal Jurisdiction ..4

        A.      The Standard for Granting a Motion to Dismiss for Lack of Personal

                Jurisdiction  …………………………………………………………5

        B.      The Standard for Finding Personal Jurisdiction Over a Defendant …………5

        C.      Defendant's Internet Activities Establish Specific Personal Jurisdiction …..6

        D.      The Court May Exercise General Personal Jurisdiction Over Defendant….17

        E.      The Court Should Alternatively Permit Jurisdictional Discovery by Plaintiff ..21

II.     Plaintiff is the Proper Assignee and Successor in Interest of all Rights in and to the

        Copyrighted and Trademarked Products and the Right to Sue for Accrued Infringement,

        And thus has Standing to Sue …………………………………………………..23

III.    Defendant is not Entitled to Protection Under the Digital Millennium Copyright Act ..25

CONCLUSION …………………………………………………………………33

**Facts**

Plaintiff Fraserside IP LLC is the rightful owner of copyrights and trademarks in high quality brand driven adult motion picture films. Plaintiff, as successor in interest to sister and parent organizations,  is engaged in the business of producing, distributing, and/or licensing to others the rights to copy, distribute, transmit and exhibit those copyrighted films and/or other audio visual works. Plaintiff and/or its parent and sister companies expend significant amounts of time, money and other resources to produce high quality products, develop supply chains and distribution systems, and build premium brand recognition of their products. Complaint, ¶ 5, p. 5. Plaintiff is also the rightful holder of the certain Trademarks described in the Complaint that have been actively promoted and marketed throughout the world. As a result, the purchasing public has come to know, rely upon and recognize these marks as an international brand of high quality entertainment. Complaint, ¶ 6-17.

Plaintiff, either directly or through affiliates or licensees, distributes its copyrighted works in various forms, without limitation, over the Internet, pay-per-view, video on demand, DVD's, and other formats, by selling them directly or indirectly to the home viewing market or licensing others to do so and through Internet streaming and download services. Complaint, ¶ 5, p. 5.

Defendant is the owner and operator of two websites, Tnaflix.com and Empflix.com. Defendant's websites offer adult entertainment to users all over the world.  By Defendant's own admissions, some 17 to 21 percent of their business comes from United States residents. Users don't just view adult videos on the sites; users may upload their own videos, watch videos uploaded by others, download videos and stream videos into their homes. Complaint,

Attachment 4.  The websites also offer a premium membership whereby users can get additional benefits, including the ability to download videos and watch them in higher resolution, known as HD, for a monthly fee. Complaint, ¶ 36.

Defendant's websites are offering, displaying and distributing Plaintiff's films to Internet Users worldwide.  Defendant knows, or has reason to know, that there is no proper license or authority to display and distribute Plaintiff's films on Defendant's websites and no proper license or authority to obtain commercial financial gain from such display and distribution. Complaint, ¶ 33.  Nevertheless, even after being served, Defendant continues distributing, showing and receiving Plaintiff's films without proper license, and infringing on Plaintiff's copyright.

Defendant attempts to bring in information that is outside of the Complaint or the exceptions in its Motion.  Although Defendant cites case law pertaining to the extent outside materials may be cited in a Motion to Dismiss (Footnote 1, Page 1, Def. Mot. To Dismiss), Defendant chooses to attach or reference materials outside of the exceptions.  Plaintiff respectfully requests that the Court disregard the extraordinarily voluminous and excludable attachments to Defendant's Motion.  In Defendant's Motion to Set Aside Default it relied on discredited newspaper articles for its "facts" and in this Motion continues to push beyond acceptable boundaries.  Plaintiff argues that the extraordinarily voluminous attachments provided in its Motion to Dismiss be disregarded by the Court and Defendant's Motion DENIED.  In addition, Plaintiff provides the following arguments for its Resistance to Defendant's Motion to Dismiss.

## Law and Argument

**I.    Plaintiff Resists Defendant's Motion to Dismiss for Lack of Personal Jurisdiction**

### A.  The Standard for Granting a Motion to Dismiss for Lack of Personal Jurisdiction

Although Plaintiff bears the ultimate burden of proof on the issue of personal jurisdiction over the Defendant, "jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991). To defeat a motion to dismiss for lack of personal jurisdiction, Plaintiff here need only make a prima facie showing of jurisdiction. *Id.* "If the district court does not hold a hearing and instead relies on pleadings and affidavits, as it did here, the court must look at the facts in the light most favorable to the nonmoving party,… and resolve all factual conflicts in favor of that party." *Id.*; *See also,  Pangaea, Inc. v. Flying Burrito LLC*, --- F.3d ----, 2011 WL 3241859, (8th Cir. 2011).  Plaintiff makes that prima facie showing.

### B.  The Standard for Finding Personal Jurisdiction Over a Defendant

As Defendant admits, Iowa's long-arm statute extends personal jurisdiction over nonresidents to the fullest extent permissible under the Due Process Clause. See Iowa R. Civ. P. 1.306. *Hicklin Eng'g, Inc. v. Aidco, Inc.*, 959 F.2d 738, 739 (8th Cir.1992) (per curiam). Therefore, this Court only needs to examine whether the exercise of personal jurisdiction over Defendant comports with due process. *Hicklin*, 959 F.2d at 739.

"The Supreme Court has recognized two theories for evaluating personal jurisdiction: general and specific jurisdiction." *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir.2008) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984)). General jurisdiction arises when a defendant has carried on in the forum state a continuous and

systematic, even if limited, part of its general business, and if so, the injury sued upon need not have any connection with the forum state." *Steinbuch*, 518 F.3d at 586.

"Specific jurisdiction on the other hand is appropriate only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities." *Id.*; *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985).

Defendant Youngtek in its Motion to Dismiss fails to distinguish between these different forms of jurisdiction and the different standards and proof required for each. Defendant also fails to perceive the difference between "foreign" and "alien", mis-applying precedent involving foreign defendants that clearly does not apply to jurisdiction over an alien defendant. Plaintiff sets forth the requirements for the finding of jurisdiction and asks that this Court exercise jurisdiction over Defendant.

### C.  Defendant's Internet Activities Establish Specific Personal Jurisdiction

"The continuous and illimitable presence of the internet has required fashioning special rules for applying the traditional due process test." *Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 504 (S.D. Iowa 2007). The "traditional territorial notions of personal jurisdiction, …have required re–examination in recent years in light of technological advances and the increasing globalization of the economy. Commercial uses of the Internet, in particular, have tested the limits of a territorial–based concept of jurisdiction." Richard E. Kaye, J.D., Annotation, *Internet Web site activities of nonresident person or corporation as conferring personal jurisdiction under long–arm statutes and due process clause*, 81 A.L.R. 5th 41 (2000).

The Eighth Circuit Court of Appeals addressed the issue of whether a website may provide sufficient contacts to invoke jurisdiction in *Lakin v. Prudential Sec., Inc.*, 348 F.3d 704 (8th Cir.2003). As the court noted there, a prima facie case of specific jurisdiction is established by showing that the Defendant has purposely directed its activities at Iowa residents, and that the claims in the suit either arise out of or relate to the defendant's activities. *Lakin*, 348 F.3d at 707.

Discussing the unique aspects of basing jurisdiction on Internet activities, the court turned, as many other courts have, to *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997). Taking its cue from *Zippo*, the Eighth Circuit noted that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of the commercial activity that an entity conducts over the Internet." *Lakin,* at 701, quoting *Zippo*. The *Zippo* court devised a "sliding scale" approach to determine the nature and quality of the Internet activity, stating:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet [website] which is accessible to users in foreign jurisdictions. A passive [website] that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive [websites] where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the [website].

*Zippo*, 952 F.Supp. at 1124.

In *Lakin,* the Eighth Circuit analyzed the sliding scale method outlined in Zippo and concluded that it was proper for use in cases where specific personal jurisdiction was alleged.[1] *See Lakin*, 348 F.3d at 711. Because the fact situation in *Lakin* concerned only general

---

[1] Defendant ignores this holding of *Lakin*.

7

jurisdiction, the Eighth Circuit provided no further guidance for the application of the *Zippo* sliding scale. However, as *Zippo* taught, at the top of the scale is the situation where "the defendant enters into contracts with residents of a foreign jurisdiction that involve knowing and repeated transmission of computer files over the Internet," in which case, personal jurisdiction is proper. *Zippo*, 952 F.Supp. at 1124. Under this analysis, the operation of an Internet website can constitute the purposeful availment of the privilege of acting in a forum state "if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir.2002).

The Sixth Circuit Court of Appeals provided an example of what type of website had the interactivity necessary for the exercise of specific jurisdiction. *Neogen Corp. v. Neo Gen Screening, Inc.*, *supra.* As in this case, *Neogen* involved trademark infringement. The defendant company provided blood testing for newborns. The defendant accepted blood for testing and accepted payment from residents in Michigan. It packaged the results of the tests and made the results available over the Internet, providing passwords to Michigan residents. The court found that establishment of a paid area accessible only to members is characteristic of a website with a high degree of interactivity. *See Neogen*, 282 F.3d at 890-91. Here, the Defendant's websites also have a paid membership area like the defendants in *Neogen*.  The Court held that Neogen had presented a prima facie case that NGS transacted business in Michigan by showing the interactive nature of the website. "When Michigan residents purchase NGS's services, for example, NGS provides them with passwords to access their test results on the website from Michigan. The granting of passwords to Michigan residents as part of a contract for NGS's services is an interactive usage showing that NGS has intentionally reached out to Michigan

customers and enabled them to use NGS's services from Michigan." Thus, the court found it appropriate to exercise specific jurisdiction over the defendant, NGS.

Likewise, in *Bird v. Parsons*, 289 F.3d 865, 874-875 (6th Cir. 2002), the Sixth Circuit court held that the defendants, by maintaining a website on which Ohio residents could register domain names and by allegedly accepting the business of Ohio residents, satisfied the purposeful-availment requirement and were subject to specific jurisdiction. There, the fact that the defendant regularly chose to do business with Ohio residents was sufficient. *Id*.

Here, Defendant's websites are not mere passive websites such as those at the bottom of the *Zippo* sliding scale. These websites do much "more than make information available to those who are interested in it." *Zippo Mfg.*, 952 F.Supp. at 1124. These websites fall on that end of the spectrum "where a defendant clearly does business over the Internet" by "enter[ing] into contracts with residents of a foreign jurisdiction that involve knowing and repeated transmission of computer files over the Internet," and thus, specific personal jurisdiction is proper.

On Defendant's websites, users are encouraged not just to view the videos on the websites and to upload their own videos, but also to "watch videos that other users have posted, meet other like-minded individuals and discuss what's great (or what you'd love to change)" about adult entertainment. Complaint, Attachment 4 and also attached to this Brief as #4.  The websites go even further, offering a membership option at $29.95 per month billed to the user's credit card, where "members receive the full spectrum of features that are available to the community. Upload videos, rate videos, upload a [sic] avatar and message other users, fully participate in the EMPflix experience! You can even store your favorite videos on your very own member's page, browse other member's profiles, send them messages and see what other

members are watching and talking about!" As in *Neogen* this interactive usage shows intentional reaching out to Iowa residents by Defendant.

As Plaintiff's complaint alleges, and Defendant admits in its Motion to Dismiss (Note 8, Page 11, Defendant's Motion to Dismiss), the EmpFlix.com TnaFlix.com websites are visited by over 1,500,000 and 3,000,000 internet surfers respectively each day. Complaint, ¶ 23. About 21% of all visitors to Tnaflix.com come from the US, where it is ranked #529. EMPflix draws 17 % of its visitors from the U.S. Complaint, Attachments 2 and 3, Alexa.com rankings. Further, Plaintiff has alleged that discovery will show numerous Iowans are customers of Defendant's sites. Complaint, ¶ 23.

The U.S. District Court for the Central District of California recently decided a case very similar to this one using tests for specific jurisdiction developed by the Ninth Circuit Court of Appeals. In *CYBERsitter, LLC v. People's Republic of China,* 2011 WL 3322552 (C.D. Cal. 2011), Plaintiff was the developer of Internet parental control software. It alleged that Chinese companies had targeted Plaintiff by obtaining its code for the software and using it to develop their own software programs, and/or reproducing, adapting, and/or distributing Plaintiff's copyrighted work without authorization. As to jurisdiction, Plaintiff alleged that the companies knew that Plaintiff was a U.S. company and that the defendants' acts would cause injury in the U.S. and in Plaintiff's home state. Plaintiff also claimed that the defendants made the infringing software program available for download to individuals in the United States and had made Plaintiff's code for the software publicly available on its servers. The Plaintiff also alleged that a third defendant, who engaged in other activity in California, distributed computers with Plaintiff's software code in China.

The California court used the Ninth Circuit's three-part test to determine whether a district court can exercise specific personal jurisdiction over a nonresident defendant. First, the defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum. Second, the claim must be one which arises out of or relates to the defendant's forum-related activities. Third, the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable. *CYBERsitter*, 2011 WL 3322552, 6.

The first test, whether there has been purposeful availment of the privilege of doing business in the forum, is the threshold test. The Ninth Circuit evaluates this issue using a form of the "Calder-effects" test, taken from the Supreme Court's decision in *Calder v. Jon*es, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).  The test requires that defendant allegedly must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id*.

The California district court found that the intentional act requirement was easily met as to all defendants. "Courts construe 'intent' in the context of the 'intentional act' test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act."  *CYBERsitter*, at 6. Any one of the alleged acts of theft, misappropriation, and subsequent distribution of Plaintiff's code were all actual, physical acts, even if done by computer.

Here, too, Plaintiff's allegations show that Defendant has knowingly allowed its users to upload Plaintiff's videos to Defendant's websites, store them on the host computer and make

them available for download throughout the United States.  As Defendant reviews each video

uploaded (Complaint, Attachment 4, Empflix.com Frequently Asked Questions (FAQ)  page),[2]

Defendant is aware that the videos it is offering are Plaintiff's videos, and that the distribution to

its users infringes on Plaintiff's copyrights and trademarks. As a result, these actions were done

knowingly, and in the actual, physical world.

Next, the *CYBERsitter* court looked at whether the activities of the defendants were

expressly aimed at the forum state. The requirement of express aiming requires more than

"'untargeted negligence' that merely happens to cause Plaintiff harm." *CYBERsitter* at 8. The

court cited the Ninth Circuit's previous decision in *Columbia Pictures Television v. Krypton*

*Broad. of Birmingham, Inc.*, 106 F.3d 284 (9th Cir.1997), *rev'd on other grounds*, 523 U.S. 340,

118 S.Ct. 1279, 140 L.Ed.2d 438 (1998), and noted that "an allegation of a defendant's willful

copyright infringement against a plaintiff with knowledge of plaintiff's principal place of

business satisfies the Calder effects test." *Id*. citing *Columbia Pictures* at 289.

In *CYBERsitter*, the defendants argued that no express aiming occurred because, even if

Plaintiff's allegations were true, the defendants did nothing above and beyond willfully

infringing Plaintiff's copyright with the knowledge that Plaintiff resided in California, and never

distributed or marketed the allegedly infringing products in California. The court disagreed,

pointing to the Ninth Circuit's decision in *Columbia Pictures* that an allegation of willful

copyright infringement knowingly directed at a forum resident "alone" is sufficient to satisfy

purposeful availment. *Id* at 10, citing *Columbia Pictures*, 106 F.3d at 289. Thus, "[t]aking

Plaintiff's allegations as true" the Court found that Plaintiff had stated a prima facie case showing

---

[2] As discussed more thoroughly, infra, the Defendant's own FAQ page indicates that "submitted videos must be approved before they will appear" on the website, and states that "approving and declining videos is a manual process."

12

that the defendants expressly aimed their conduct at Plaintiff. "Here, a software developer alleges that foreign software developers and computer manufacturers intentionally stole its copyrighted software—the very basis of its business—and conspired to distribute it to Chinese-speaking customers throughout China and the United States." This constituted intentional express aiming under the Calder test. *Id*. at 9. "When Defendants commit intentional copyright infringement with knowledge of plaintiff's residency, … they 'should reasonably anticipate being haled into court' in the forum in which Plaintiff resides, as the brunt of the injury takes place there." *Id*.

Here, too, the infringement of Plaintiff's videos was expressly aimed at harming Plaintiff in its business. Defendant permitted the uploading of Plaintiff's videos to its website with the intent that they would be distributed to and viewed and downloaded by Defendant's paying users. The Defendant's website managers screened the videos, so Defendant knew they were Plaintiff's videos, and knew that Defendant had no license or authority to distribute the videos. Defendant then conspired to and did distribute and make the videos available to residents in the United States and Iowa. Defendant sells intellectual property, stolen from Plaintiff, to Plaintiff's potential customers. This is the very definition of express aiming.

The last element in the Ninth Circuit's purposeful availment test is the harm likely to be suffered in the forum state. To satisfy this element, "the 'brunt' of the harm need not be suffered in the forum state," but only "a jurisdictionally sufficient amount of harm." *CYBERsitter,* at 10. Further, Plaintiff satisfies this element if it alleges that defendant's intentional act has 'foreseeable effects' in the forum. *Id*. The *CYBERsitter* court quoted *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010): "In this case, it was foreseeable that [plaintiff] would be harmed by infringement of its copyright, including harm to its business

13

reputation and goodwill, and decreased business and profits. It was also foreseeable that some of this harm would occur in the Forum, where [plaintiff] was known to reside." *Id*. The court held that plaintiff had met the third and last prong of the test, as it alleged that the misappropriation of Plaintiff's copyrighted material would cause harm to Plaintiff in California, and that all of the defendants knew Plaintiff was an American company and that their actions would cause injury to Plaintiff in California. The court thus denied the Motion to Dismiss.

This Court should do the same. It was imminently foreseeable to Defendant that Plaintiff would be injured by the unrecompensed offering of Plaintiff's videos on Defendant's website. Defendant knew that Plaintiff would lose profits by its acts, that Plaintiff was an American business and that it was located in Iowa. Thus, this Court should also find that Plaintiff has made a prima facie case showing that it has specific personal jurisdiction over the Defendant.

The cases that Defendant cites to support its motion are radically different factually, and thus don't apply here. In *AmerUs Group Co. v. Ameris Bancorp*, 2006 WL 1452808 (S.D. Iowa 2006), the defendant was a Georgia corporation with no business contacts in Iowa. Although it had a website, only persons already customers and who paid a monthly fee could use the Internet interactive services, and only persons who visited one of its local banks in Georgia, Florida, or Alabama could be a customer.  Defendant Ameris was not open for business to residents of Iowa. Here, Defendant is open to doing business with any and all residents of Iowa who have a credit card and Internet connection. Discovery will show that Defendant does indeed have customers in Iowa.

The other case Defendant cites, *Dryspace, Inc. v. Crawlspace Concepts, L.L.C.,* 2011 WL 1113585 (N.D. Iowa 2011) is likewise distinguishable since the defendant there never did any business with a resident of Iowa and its website was not of the interactive type found in this case.

Notably, Defendant fails to cite the Eighth Circuit Court of Appeals' decision in *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991). The case, though not involving Internet activity, demonstrates that the Eighth Circuit would likely follow the reasoning in *CYBERsitter* and find specific personal jurisdiction in this case. Like the California court, the Eighth Circuit there applied the *Calder* "effects" test, and adopted it as an additional test for specific jurisdiction. *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390-1391 (8th Cir. 1991).

In *Dakota Industries, Inc. v. Dakota Sportswear, Inc.,* the Plaintiff, Dakota Industries, claimed trademark infringement by Dakota Sportswear. Sportswear had no offices, outlets, agents or employees in the forum state (South Dakota), and had never marketed or advertised in South Dakota, and never directly or indirectly shipped products into South Dakota. The evidence showed, however, that the end purchasers of Sportswear's clothing were located throughout the entire United States. Further, major chains carried Sportswear clothing, and thus, if the chains to which Sportswear sold had outlets in the forum state (South Dakota), Sportswear's clothes could be shipped there.

The Court cited *Calder* for the proposition that the defendant's lack of control over distribution of the product in the forum state would not bar jurisdiction when the plaintiff has alleged an intentional tort. *Id.*, citing *Calder* at 789-90, 104 S.Ct. at 1487. The evidence showed that there was some "passing off" (where the deceived customer buys the defendant's product

believing it is the plaintiff's) of Sportswear's infringing clothing in South Dakota. This fact, along with the fact that Industries' principal place of business was in South Dakota, demonstrated that "Sportswear's actions were uniquely aimed at the forum state and that the 'brunt' of the injury would be felt there, as required by Calder. Under these circumstances, Sportswear 'must reasonably anticipate being haled into court' in South Dakota." *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*,  946 F.2d at 1391. The Court therefore held that Plaintiff had made a prima facie showing of personal jurisdiction, reversed the dismissal and remanded for further proceedings.

In *Dakota*, the Eighth Circuit also made special note of two Ninth Circuit Court of Appeals cases that held that <u>jurisdiction may be proper when defendant's only contact with the forum state is the "purposeful direction" of a foreign act having effect in that state</u>: *Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir.1989); *Haisten v. Grass Valley Medical Reimbursement*, 784 F.2d 1392, 1397 (9th Cir.1986). It is safe to presume that the court would have followed the analysis in *CYBERsitter* and came to the same conclusion: that exercising personal jurisdiction is proper.

The facts of this case are comparable to those in *Dakota*, *CYBERsitter*, *Neogen* and *Bird v. Parsons*, where the courts found specific personal jurisdiction could be exercised over the defendants. Here, as in the Internet cases, Defendant maintains interactive websites where Defendant distributes Plaintiff's videos, causing injury to Plaintiff, an Iowa company. Further, Defendant is accepting the business of Iowa residents, offering Iowa residents the opportunity to become paying members with membership benefits including the ability to view higher resolution videos, download videos to their computers in Iowa, and participate in video exchanges and other interactions, many involving the pirated videos copyrighted and owned by

Plaintiff. By these activities, Defendant has purposefully directed its activities at Iowa residents and purposefully availed itself of the privilege of doing business in Iowa as required for specific jurisdiction.

For the court to exercise specific jurisdiction, it must also find that the plaintiff's action arises out of or relates to the defendant's forum-related activities. *Lakin, supra*. Here, the activities of defendant – allowing Iowa residents to view the Plaintiff's pirated videos – is exactly what Plaintiff sues for in this action. Consequently, the elements of specific personal jurisdiction are met in this case, and the Court may exercise jurisdiction over Defendant. The court should therefore deny the Motion to Dismiss.

### D.  The Court May Exercise General Personal Jurisdiction Over Defendant

Even if the Court finds no specific personal jurisdiction over Defendant exists, the facts also support a finding of general jurisdiction.

In *Lakin v. Prudential Sec., Inc.*, 348 F.3d 704 (8th Cir.2003), the court held the Zippo test insufficient by itself to determine the propriety of exercising general jurisdiction. *Id*. at 711-12. Although the court found that the *Zippo* test was the starting point for determining if a website created general jurisdiction for a defendant, the court directed that after looking at the nature and quality of a website (that is, applying the Zippo test), courts must then weigh the quantity of the defendant's contacts via its website. *Lakin*, 348 F.3d at 712. Thus, under *Lakin*, a defendant with a website that is interactive in nature, and with a quantity of contacts with the forum, will be subject to the exercise of general jurisdiction in the forum.

Addressing the issue of general jurisdiction, the Defendant compares the case before this court to *Lindgren v. GDT, LLC*, 312 F.Supp.2d 1125 (S.D. Iowa 2004). There the Iowa plaintiff

sued a California company for trademark infringement. The defendant maintained a website and sold some of its infringing products to Iowa residents. The court found that Iowa did not have jurisdiction. The case does not apply here, however, because the court based its decision on factors not present in this case.  It should also be noted that the Court concluded the United States District Court in the Central District of California would have proper jurisdiction over such a case involving a U.S. trademark, not a Court in Cyprus.  *Id* at 1134.  The Lindgren Court may have concluded the Iowa Court did not have jurisdiction, but it also concluded a different United States District Court would have jurisdiction, unlike what the Defendant desires, which is for the Plaintiff to have no recourse AT ALL in the United States for its claims based upon US copyrights and trademarks.

In *Lindgren*, the court first noted that defendant GDT's website consisted primarily of single point-of-sale transactions rather than continuous, long-term contracts. Visitors to the site, even purchasers, could establish an online account, but it entailed no continuing obligations. The Lindgren court contrasted this fact with the facts in *Lakin*, where the defendant maintained a sophisticated, interactive twenty-four hour Web site which allowed users to exchange information with the host computer, and establish accounts and apply online for loans. *Id.* at 1130.

The situation here is like that in *Lakin*, not *Lingren*. Here, Defendant's websites allow users to establish membership which does entail an ongoing commitment to a monthly fee. It also entitles the purchaser to ongoing communication with Defendant's host computer for the purposes of downloading and viewing videos, uploading videos and interacting with other members on a twenty-four hour basis. This is the type of systematic, continuous relationship found in *Lakin*, not the occasional sales found in *Lindgren*.

18

Further, the *Lindgren* court also found it significant that the sales were goods under the Uniform Commercial Code.  Under the U.C.C., the sales to Iowa residents were not made to Iowa.  Instead, they were "F.O.B. seller," so that the title passed to the Iowa buyer in California when defendant delivered the items to FedEx for shipment. Here, the user is streaming videos to his home computer in Iowa, and there is no "F.O.B." term in the contract, as no physical product is shipped.  Defendant delivers digital content over the Internet to Iowa users' homes.  Thus, this element for denying jurisdiction does not exist here.

The facts in the Eighth Circuit's decision in *Lakin* provide a much closer comparison for the analysis of Defendant's contacts.  The defendant in *Lakin,* Prudential Savings, was located in Georgia. The Plaintiff sued in Missouri. The court found that although Prudential had no offices in Missouri, it did have a website and did have loans with Missouri residents. The court found that the website was sophisticated, provided interaction such that the user could exchange information with the host computer, allowed consumers to establish and access secure online accounts, calculate home mortgage rates and complete online applications for home equity loans and lines of credit. Thus, "[t]hrough its Web site Prudential Savings could have continuous, significant contacts with Missouri residents. In fact, because its site is available twenty-four hours a day, it is possible for Prudential Securities 'to have contacts with the [State of Missouri] that are 'continuous and systematic' to a degree that traditional foreign corporations can never even approach.'" *Lakin* 348 F.3d at 712. The court also found it notable that the financial interactions with users were not single point of sale transactions, but involved loans measured over years, meaning that the defendant created continuous long-term contacts with its users. *Id*. at 708.

19

Here, Defendant's websites are highly interactive. They are sophisticated websites that provide interaction such that the user can exchange videos, uploading their own, downloading others, interacting with fellow users. Iowa users exchange information with the Defendant's host computers just as in *Lakin*. Further, with the premium membership, users don't have one single point of sale transaction. Instead, they have ongoing and continuous obligations to defendant. Like the defendant in *Lakin*, Defendant here has the quality and nature of contacts to subject it to general jurisdiction.

In addition, the relationship here between Defendant's websites and their users is akin to a more traditional, and thus more familiar, contract – the magazine seller and its subscribers. Like the magazine subscriber, users receive the content right in their own state and in their own home. The magazine seller sends it by mail, the website owner transmits it at the user's behest over the Internet. The Supreme Court has found the magazine subscription contract to be the basis for jurisdiction in a state where a corporation continuously had customers in the forum's market, and has held that under the circumstances, the defendant "must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." *See e.g.*, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780-781, 104 S.Ct. 1473, 1481-1482 (1984). Likewise here, Defendant's continuous exploitation of the Iowa market would certainly make it reasonable to anticipate being haled into court here regarding the infringement of Plaintiff's copyrights and trademarks.

The next step in determining general jurisdiction is whether the defendant has the quantity of contacts necessary to allow the court to exercise general jurisdiction over defendant. *Lakin*, 348 F.3d at 712. The relevant inquiry regarding quantity of contacts is not whether the

percentage of a company's contacts is substantial for that company; rather, the inquiry focuses on whether the company's contacts are substantial for the forum. *Lakin*, 348 F.3d at 709.

Here, as in *Lakin*, the quantity of contacts in Iowa – how many users, how many web visits, how many premium members and other information, is as yet unknown. This is not publicly available information. Thus, as in *Lakin*, (unless the court finds specific jurisdiction exists over Defendant) the Court must permit Plaintiff to undertake jurisdictional discovery, as noted in the Complaint at Page 9, ¶ 23.

### E.  The Court Should Alternatively Permit Jurisdictional Discovery by Plaintiff

The Court in *Lakin* also established when a Plaintiff should alternatively be permitted jurisdictional discovery if there is not sufficient evidence to determine the extent and nature of the Defendant's contacts with the forum state without it. *Lakin,* 348 F.3d at 712-713. If the record does show that asserting jurisdiction would be reasonable and would not offend notions of fair play and substantial justice (that is, it would comport with due process), then Plaintiff should be permitted discovery on such things as the number of times Iowa residents have accessed the websites, the number of residents that have signed on for premium services, and any other data showing interaction between Defendant's websites and Iowa residents. *Lakin*, 348 F.3d at 712-714.

Here, it would comport with due process to exercise jurisdiction over Defendants. The attachments to the Complaint and to Defendant's Motion to Dismiss show that U.S. customers make up a full one-fifth or 17-21% of the customer base of Defendant's world-wide market.

Since the U.S. population is only 4.5% of the world population,[3] this means that the "company's contacts are substantial" for the U.S. forum. At this time, there is no public evidence of the extent of Defendant's contacts specifically with Iowa, however, given the numbers admitted by Defendant there would be thousands of views in Iowa every month.

In *Lakin*, the court found that the interest of the state in providing a forum was an element of finding due process. 348 F.3d at 713. Here, Plaintiff is an Iowa company whose trademarks are being infringed by Defendant. Thus, Iowa has a significant interest in providing a forum for redress of Plaintiff's rights. Further, Defendant has provided not a clue as to where in the United States it might be fair to sue it. Instead, it asserts that Plaintiff should sue it in Cyprus for infringements of US trademarks and US copyrights, even though a full 20% of Defendant's business comes from United States residents, the foundation for the complaint is based upon US copyright and trademark registrations, and Defendant even claims a defense under the United States law in the Digital Millennium Copyright Act.  There are certain to be residents in Iowa who do business with Defendant's websites, and because Plaintiff, the company suffering the injury because of Defendant's websites, is legitimately located in Iowa, exercising personal jurisdiction in the United States District Court for the Northern District of Iowa does comport with due process.

The *Lakin* court also considered the burden on the defendant to travel here. *Lakin,* 348 F.3d at 713. Defendant, by its own admissions, has substantial business in the United States. For it to contend that even though a fifth of its websites' business is from the U.S., it may not be sued here does not demonstrate "fair play and substantial justice." As the Defendant has contacts with

---

[3] The world population is approx. 6.96 billion and the population of the USA is approx. 311 million. http://www.census.gov/main/www/popclock.html

Iowa, the burden is not overly heavy on Defendant and due process permits it to be called to

defend the claims here. Further, Defendant has recently been haled into a United States District

Court in the Southern District of California and appears to have resolved that case.  Clearly,

defendant knows what it is doing inside a United States Federal Courthouse.

The evidence on the record shows it would be reasonable and not offend notions of fair

play and substantial justice to find jurisdiction over the Defendant.  In the alternative, if the

Court determines that the current record does not establish personal jurisdiction over Defendant,

the Court must then allow jurisdictional discovery to permit Plaintiff to discover information

regarding Defendant's contacts with Iowa residents

## II.   Plaintiff is the Proper Assignee of all Rights in and to the Copyrighted and Trademarked Products and The Right to Sue for Accrued Infringement, and Thus Has Standing to Sue

Plaintiff alleged in its Complaint the ownership of the copyrights and trademarks at issue

here. Complaint, ¶ 27.  Defendant claims that because a transfer is not showing in the public

records that the Plaintiff has no standing.  Plaintiff re-asserts that it is the rightful owner of all

copyrights and trademarks claimed, and Plaintiff has witnesses and documentation to prove it.

Plaintiff's ownership rights are not bare assignments of the right to sue but all rights and

ownership of the copyrights and trademarks and all transfers have been or will be delivered to

the respective copyright and trademark offices.  Plaintiff acquired its full rights through the

Assignment of Copyright and Common Law Copyright Rights attached hereto as Exhibit 1.

The Assignment "sells, assigns, transfers and conveys to [Plaintiff] all of [the] right, title

and interest to the Copyrights, together with the goodwill of the business associated with the

23

Copyrights." In addition, the Assignor assigned to Plaintiff "the right to sue for and receive all damages accruing from past infringements of the Copyrights herein assigned."   There are no limitations or reservation of rights by the Assignor.

The generally accepted law is that an owner of an exclusive right in the copyrights is entitled to sue for an infringement of that right which was committed prior to the assignment of the copyright, provided that the document granting the copyright includes the causes of action with respect to that right, accrued prior to the grant. *See Abkco Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir.1991) ("Thus, a copyright owner can assign its copyright but, if the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them."); *Two Pepper Music v. Rhino Records, Inc.*, 173 F.3d 846 (2d Cir. 1999)("Where the assignment of an exclusive right under a copyright expressly includes the right to prosecute accrued claims for infringement, that right passes to the assignee."); *Getty Images (US) Inc. v. Advernet, Inc.*, --- F.Supp.2d ----, 2011 WL 2732202 (S.D.N.Y. 2011); see also Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03.

The cases cited by Defendant agree. For instance, the Ninth Circuit in *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881 (9th Cir. 2005) acknowledged and agreed with the holding in *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, *supra*. Thus, the law provides that because Plaintiff has both the current ownership of the copyrights and the right to sue for past infringement, it has standing in this case. The court should thus deny the Motion to Dismiss.

The same is true with respect to Plaintiff's trademark infringement claims. Plaintiff is the assignee and rightful owner of ALL the rights to the trademarks, and to the business associated with it, as cases cited by Defendant require. See *International Society for Krishna Consciousness*

*of Western Penn., Inc. v. Stadium Authority of the City of Pittsburgh*, 479 F. Supp. 792 , 797

(W.D. Pa. 1979), cited by Defendant at p. 15; See also, *Specht v. Google, Inc.,* 660 F.Supp.2d

858 (N.D. Ill. 2009). Plaintiff attaches the assignment as Exhibit 2.  Thus Plaintiff has standing

to assert the trademark infringement claims.

### III.      Defendant is not Entitled to the Protection of the Digital Millennium Copyright Act

Youngtek also cites the provisions of the Digital Millennium Copyright Act as grounds

for dismissal. Youngtek argues that under the "safe harbor" protections of 17 U.S.C. § 512(c),

Plaintiff's failure to allege that it issued a takedown notice as provided by the statute requires the

Court to dismiss the Complaint.

Youngtek has missed a very important step in the process of obtaining dismissal under

the safe harbor provisions of Section 512(c): proof that it is entitled to the safe harbor

protections.  Defendant cannot simply claim safe harbor protections; a defendant must prove it

qualifies for safe harbor protections.  If a defendant was not entitled to the safe harbor protection

of the statute, then Plaintiff had no obligation to send a takedown notice.

"Liability protection under the DMCA is an affirmative defense and, as such, Defendants

bear the burden of establishing its applicability." *In re Aimster Copyright Litigation*, 252

F.Supp.2d 634, 657 (N.D. Ill. 2002); See also *Hendrickson v. Amazon.Com, Inc.*, 298 F.Supp.2d

914 (C.D. Cal. 2003). This Court has also acknowledged that the DMCA "safe harbor" provision

is an affirmative defense. *Fraserside IP L.L.C. v. Youngtek Solutions Ltd.*, __ F. Supp. 2d ___,

2011 WL 2689058, 8 (N.D. Iowa 2011).

As a general rule, the possible existence of an affirmative defense is not ordinarily a

ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense. *Jessie v.*

*Potter*, 516 F.3d 709, 713 n. 2 (8th Cir.2008) *Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364 (8th Cir. 2011)(statute of limitations); *Noble Systems Corp. v. Alorica Central, LLC*, 543 F.3d 978 (8th Cir. 2008)(privilege).

Here, Defendant has made no effort to point out what in the Complaint shows that they come within the safe harbor of Section 512(c). As a result, it has not met its burden of proof, and the Court should deny the motion to dismiss.

Even if Defendant had tried to prove that it falls within the statute, it would fail. Motions to dismiss are sparingly granted and in passing on such a motion the court accepts well pleaded allegations of fact as true, in a light most favorable to the plaintiff. *Lundell v. Massey-Ferguson Services N. V.*, 277 F.Supp. 940 (D.C. Iowa 1967). The Court is "bound to accept as true, for purposes of [a Rule 12(b)(6) ] motion, the facts alleged by the plaintiff." *Stephens v. Associated Dry Goods Corp.*, 805 F.2d 812, 814 (8th Cir.1986).

The starting place for looking at whether Youngtek should be granted dismissal is the statute.  17 U.S.C. § 512(c) provides:

(1) In general.--A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright <u>by reason of the storage at the direction of a user of material that resides on a system</u> or network controlled or operated by or for the service provider, if the service provider--

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

The Court must review the Complaint for allegations that might admit that Youngtek may take advantage of this safe harbor exception to liability. However, the opposite is true. The Complaint instead shows that Youngtek does not fall within its provisions.

The Complaint alleges that Defendant does business as EmpFlix.com and TNAFlix.com and operates the websites www.empflix.com and www.tnaflix.com. Complaint, ¶ 19. The websites provide adult-oriented audio-visual content to the general public without request for age-verification. Complaint, ¶ 22.

Under the statute, the first element of proof is that the Defendant is a service provider. Defendant must first prove this. Next, Defendant must prove that the allegedly copyright infringing material resides on the Defendant's system "by reason of the storage at the direction of a user of material," rather than at Defendant's instance. Material that resides on the system or

network operated by Defendant through its own acts or decisions are excluded from DCMA safe

harbor protections. *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132 (N.D. Cal. 2008).

Plaintiff's Complaint alleges that Defendant is doing more than just allowing storage of

Plaintiff's videos on its websites at the instance of a user of the material. These allegations raise

an inference that Defendants are posting material and disseminating material on their own:

Complaint, ¶ 32: Defendant is truly a subscription membership web site hiding behind the veneer

of a simple user-generated content exchange site.

Complaint, ¶ 33: Defendant uses these sites to display and distribute Plaintiff's films, among

others, to Internet Users…. The fundamental purpose of the website is to capitalize on the illegal

dissemination and contribute to the illegal dissemination of infringing works.

Complaint, ¶ 35: As opposed to legitimate user generated content exchange sites, Defendant's

websites induce the Internet user to pay subscription fees.

Complaint, ¶ 36: Upon information and belief, EmpFlix.com allows users to view the full length

of Plaintiff's films or download Plaintiff's film to the user's computer [See Attachment 4,

EMPFlix FAQ's]. If the Internet user wishes to view the film in High Definition, or download in

HQ MP or IPod format, the user is presented the option by becoming a member of the respective

website.

Complaint, ¶ 40: Upon information and belief, Plaintiff's copyrighted works have been and

continued to be infringed by Defendant and the Doe Defendants through the reproduction,

distribution, and public display of Plaintiff's films by and through the Internet Web sites

28

EmpFlix.com and TnaFlix.com for which Defendant Youngtek Solutions Ltd. owns the domain registrations.

All of these allegations show Defendant taking an active role in the reproduction, distribution and display of the infringed material. These allegations show that Defendant does <u>not</u> fit within the statute's requirements to garner its protections. On this ground alone, the Court should deny the Motion to Dismiss.

However, even if Defendant showed that the materials were only put on its websites at the instance of users, this does not end the discussion. Defendant must next show that it lacked actual knowledge of the infringing material or was not aware of facts or circumstances from which infringing activity was apparent on its system or network and/or acted expeditiously to remove or disable access to the material upon obtaining such knowledge or awareness. 17 U.S.C. § 512(c)(1)(A)(i)-(iii); *Tur v. YouTube, Inc.*, 2007 WL 1893635 (C.D. Cal. 2007).

The immunity of the DMCA "is not presumptive, but granted only to 'innocent' service providers who can show that they do not have a defined level of knowledge regarding the infringement on their system. The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, i.e. at the moment it becomes aware that a third party is using its system to infringe." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001).

It is clear from the Complaint that Defendant does have the right and ability to control the activity and directly benefits financially from the infringement of Plaintiff's copyrights. Attached to Plaintiff's Complaint as Attachment 4 is the EMPFlix.com FAQ's page. On it, a question is shown concerning why a video uploaded cannot be found. EMPflix answers, "In order to prevent

unacceptable content from appearing on the site, most submitted <u>videos must be approved before</u> <u>they will appear on EMPflix</u>. While we do try to approve your videos as quickly as possible, there can sometimes be a short delay before your video appears online." Further down, the page lists reasons a video might get rejected. Then it states, "Ultimately, <u>approving and declining</u> <u>videos is a manual process</u> and one that leaves room for interpretation, but as long as you stay within the guidelines, you should be ok."

According to its own documentation,  Defendant reviews each video.  Therefore, Defendant must know that it is approving and posting and distributing Plaintiff's videos. The Complaint states that "Plaintiffs have taken industry standard steps to identify their products, including placing recorded warnings at the beginning and end of video productions and embedding "watermarks" in their videos that appear whenever those videos are played." Complaint, ¶ 5, p. 5. When Defendant reviews each video to decline or approve, according to its own documentation, defendant must see the logos, titles, and/or watermarks present on Plaintiff's copyrighted and trademarked intellectual property.  Here again it becomes clear that Defendant had "actual knowledge of the infringing material" or was "aware of facts or circumstances from which infringing activity was apparent on its system or network." 17 U.S.C. § 512(c)(1)(A)(i)-(ii). As a result, Defendant is not entitled to take advantage of the safe harbor intended for innocent service providers. Defendant is not one of the innocent.[4]

Defendant must also show that it did "not receive a financial benefit directly attributable to the infringing activity," if it had "the right and ability to control such activity." 17 U.S.C. §

---

[4] If a Defendant does have actual or apparent knowledge, it must show that it acted "expeditiously to remove, or disable access to, the [infringing] material" or lose the safe harbor protection. 17 U.S.C. § 512(c)(1)(A)(iii). Here, Defendant has known of this for years and failed to do anything about it. The videos continue to be posted. Complaint, ¶ 24.

512(c)(1)(B). The 'right and ability to control' infringing activity, as the concept is used in the DMCA, has been held to mean "something more" than just the ability of a service provider to remove or block access to materials posted on its website or stored in its system." *Hendrickson v. Ebay, Inc.*, 165 F.Supp.2d 1082, 1093 (C.D. Cal. 2001); *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090 (W.D. Wash. 2004). This requirement has been held to presuppose some antecedent ability to limit or filter copyrighted material. *Tur v. YouTube, Inc.*, 2007 WL 1893635 (C.D. Cal. 2007), citing *MGM, Inc. v. Grockster*, 545 U.S. 913, 926, 125 S.Ct. 2764 (2005).

Further, the term "direct financial benefit" had been interpreted consistently with the similar common law standard for vicarious copyright liability. Thus, the relevant inquiry is "whether the infringing activity constitutes a draw for subscribers, not just an added benefit." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117-1118 (9th 2007) ("CCBill").

Defendant's websites' review of each video shows the right and ability to control the material posted as well as ACTUAL control of the material posted.  Defendant, to stay within the law and avoid serious criminal charges, must assure that no child pornography is posted. See Complaint, Attachment 4, EMPflix.com FAQ's, stating videos appearing to depict underage persons will be rejected. Given this, Defendant must view every video at least to determine its apparent legality. Clearly then, the Complaint indicates directly and also creates an inference that Defendant does and always has exercised the ability to limit and filter the content. This is just the sort of control contemplated under 17 U.S.C. § 512(c)(1)(B) and the sort of control that disqualifies the Defendant from safe harbor protection.

Plaintiff's Complaint further alleges that Defendant receives financial benefit directly from this infringing activity. The Complaint alleges in paragraph 33 that Defendant uses its

websites to display and distribute Plaintiff's films without license or authority. In addition,

Plaintiff alleges that "[i]f the Internet user wishes to view the film in High Definition, or

download in HQ MP or IPod format, the user must become a member of the respective website.

Membership is available for $1 trial period or $29.95 monthly, which renews automatically until

cancelled. [See Attachments 5 and 6 EMPFlix and TNAFlix Join Pages]. Both websites have

identical Join Pages, and both inform the prospective member that "Charges will appear on your

card as 'www.CGBILLING.com'" Complaint, ¶ 36. The Complaint states that users on

Defendant's websites must commit to subscription services to view an entire Plaintiff film in

high-definition. Complaint, ¶ 38. Thus, the infringement directly and financially benefits

Defendant.

Likewise, the Complaint alleges that the "purchasing public has come to know, rely upon

and recognize the marks of Plaintiff" as assuring that the video will be high quality

entertainment. ¶¶ 7-16. In other words, the public knows and looks for the material for which

Plaintiff owns the copyright. Thus, per the Ninth Circuit's decision in *CCBill*, the infringing

activity, posting and distributing Plaintiff's videos, "constitutes a draw for subscribers, not just

an added benefit." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d at 1117-1118.

Finally, Youngtek does not qualify for the DMCA's safe harbor provisions because it

failed to designate an agent to receive notifications of copyright infringements as required by 17

U.S.C. § 512(c)(2) at the times relevant to the infringements.  Section 512(c)(2) provides:

The limitations on liability established in this subsection apply to a service provider *only if the*

*service provider has designated an agent to receive notifications* of claimed infringement

described in paragraph (3), by making available through its service, including on its website in a

location accessible to the public, and by providing to the Copyright Office, substantially the following information:

(A) the name, address, phone number, and electronic mail address of the agent.

(B) other contact information which the Register of Copyrights may deem appropriate. (emphasis added).

Youngtek claims that it has "at all relevant times, maintained a DMCA agent for service of takedown notices and responded expeditiously to all properly submitted takedown notices. (Def. Supporting Brief in Motion to Dismiss, Pg. 18)  However, Youngtek did *not* have a registered agent to receive takedown notices as of the time of the documented infringement (See Exhibit 3) and only adopted an agent after the infringing activity occurred.  Further, even if Defendant did have a registered agent, it did not comply with the rest of the statute and still fails to qualify for safe harbor protection.

The foregoing shows that Defendant is not entitled to the safe harbor protection as it asserts. The knowledge, control and financial gain from the infringement of Plaintiff's copyrights takes Defendant out of the safe harbor of the DMCA. For that reason, the Court must deny Defendant's motion to dismiss.

## CONCLUSION

Defendant's claims that Plaintiff has created an Iowa company and opened an Iowa office for the purpose of forum shopping in Iowa are silly and baseless.  Plaintiff is a duly registered Iowa Limited Liability Company with a real office in Northwood, Iowa and entitled to bring its claims in this Court.  Plaintiff has made claims for infringement of its rightfully owned United

States Copyrights and Trademarks and therefore has standing to bring this action. Defendant clearly does not understand the concept of "successor in interest" nor does it understand that what was true in 2005 has changed since then, rendering its arguments based upon changed circumstances invalid. Defendant is properly and fairly under the jurisdiction of this Court, having met the due process requirements to be haled into this court. Defendant's assertions that US trademarks and copyrights, rightfully owned by an Iowa company, should somehow be litigated in an alien court in Cyprus, where Defendant would argue a defense under the U.S. DMCA, simply because a LLC member is a Cyprus entity are astounding, and Defendant fails to cite how the status of a company's owners will remove jurisdiction from an Iowa company to an alien court. Defendant is not qualified for safe harbor protection under the DMCA and thus its final argument also fails as well.

Defendant has not met its burden and the Motion to Dismiss should be DENIED.

Date: August 12, 2011                    Respectfully submitted,


                                  By:      /s/ Chad L. Belville

                                  Chad Belville, Attorney at Law

                                  Iowa Bar # 015731

                                  304 East Beth Drive

                                  Phoenix, AZ 85042


                                  P.O. Box 17879

                                  Phoenix, AZ 85011

                                  Telephone:  602-904-5485

                                  FAX:  602-297-6953

                                  E-mail cbelville@azbar.org


                        ATTORNEY FOR PLAINTIFF



                        Certificate of Service


I, Chad Belville, Attorney for Plaintiff, hereby certify that on August 12, 2011 a copy of this
Brief in Support of Resistance to Defendants' Motion to Dismiss was served upon the Attorneys
for Defendants, listed as Connie M. Alt, Jennifer Rinden, Valentin Gurvits, and Evan Fray-
Witzer, through the Courts Electronic Case Filing System.


                        /s/ Chad L. Belville


                                  35